UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP FOR PRESIDENT, INC.,

          Plaintiff,

    v.

WP COMPANY LLC, d/b/a THE WASHINGTON POST,

          Defendant.

No. 1:20-cv-00626-KBJ

### DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

      WP Company LLC, doing business as The Washington Post, by and through its undersigned counsel, moves the Court for an order dismissing the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Arguments in support of the motion are set forth in the attached Memorandum of Points and Authorities.

      Pursuant to Local Rule 7(f), the Post requests oral argument on the motion to dismiss.

Date: July 20, 2020

Respectfully submitted,

/s/ Kevin T. Baine

Kevin T. Baine (D.C. No. 128600)
Thomas G. Hentoff (D.C. No. 438394)
Nicholas G. Gamse (D.C. No. 1018297)
Anna Johns Hrom* (D.D.C. No. D00558)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
kbaine@wc.com

*Counsel for The Washington Post*

\* Admitted only in North Carolina (N.C. Bar No. 50280).  Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP FOR PRESIDENT,
INC.,

        Plaintiff,

   v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST,

        Defendant.

No. 1:20-cv-00626-KBJ

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Kevin T. Baine
Thomas G. Hentoff
Nicholas G. Gamse
Anna Johns Hrom*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
kbaine@wc.com

*Counsel for The Washington Post*

* Admitted only in North Carolina.  Practice
supervised by D.C. Bar members pursuant to D.C.
Court of Appeals Rule 49(c)(8).

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    The Mueller Report Reveals the Trump Campaign's Extensive Contacts and Links with the Russian Government. ...................................................4

    B.    In an ABC News Interview, President Trump States that He Would "Listen" to a Foreign Nation's Offer of Information about a Political Opponent. ...........................................................................................9

    C.    Post Columnists Sargent and Waldman Criticize the President. ...........................10

        1.    The Sargent Column. ..................................................................10

        2.    The Waldman Column. ................................................................11

    D.    Plaintiff Files a Series of Lawsuits Against the Press, Including the Post. ...........11

LEGAL STANDARD ...........................................................................................................12

    A.    The Rule 12(b)(6) Standard. ...................................................................12

    B.    New York Law Applies to Issues As to Which State Law Governs. ...................13

ARGUMENT ...................................................................................................................14

I.    THE CHALLENGED STATEMENTS ARE CONSTITUTIONALLY PROTECTED STATEMENTS OF OPINION. ................................................................15

    A.    Both Columns Are Clearly Labeled "Opinion." ...................................................17

    B.    The Sargent Column Is Protected Opinion. ...................................................19

    C.    The Waldman Column Is Protected Opinion. ...................................................21

II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT THE POST PUBLISHED THE CHALLENGED STATEMENTS WITH ACTUAL MALICE. ........24

    A.    The Complaint Does Not Plausibly Allege that the Sargent Column Was Published with Actual Malice. ...................................................27

    B.    The Complaint Does Not Plausibly Allege that the Waldman Column Was Published with Actual Malice. ...................................................29

III.    THE FAIR REPORT PRIVILEGE SHIELDS THE ANALYSIS OF THE MUELLER REPORT IN THE SARGENT COLUMN. ...................................................30

IV.    THE WALDMAN COLUMN NEITHER CONCERNS NOR DEFAMES PLAINTIFF. ...................................................................................................34

CONCLUSION ...................................................................................................................37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbas v. Foreign Policy Grp.*, 783 F.3d 1328 (D.C. Cir. 2015)................................................... 22

*Abbas v. Foreign Policy Grp.*, 975 F. Supp. 2d 1 (D.D.C. 2013)............................. 17, 18, 19, 20

*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ........................................ 17, 21, 23, 32

*Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000) .................................................. 17

*Arpaio v. Cottle*, 404 F. Supp. 3d 80 (D.D.C. 2019) ...................................................... 24, 26, 29

*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019)................................................ 24, 25, 26, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 12

*Biro v. Condé Nast*, 2014 WL 4851901 (S.D.N.Y. Sept. 30, 2014) ................................. 17, 18, 30

*Bose Corp. v. Consumers Union,* 466 U.S. 485 (1984) ................................................................ 27

*BuzzFeed, Inc. v. DOJ*, 318 F. Supp. 3d 347 (D.D.C. 2018) ........................................................ 31

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)................................................... 24

*Church of Scientology v. Time Warner*, 806 F. Supp. 1157 (S.D.N.Y. 1992)........................ 34, 35

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) ........................................................................ 24

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) ..................................... 25, 35

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)......................... 3, 4

*Edwards v. Schwartz*, 378 F. Supp. 3d 468 (W.D. Va. 2019) ..................................................... 17

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)................................................. 12, 24, 25

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ....................................................... *passim*

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ...................................................................... 24, 28, 29

*Gilman v. Spitzer*, 902 F. Supp. 2d 389 (S.D.N.Y. 2012)............................................................ 34

*Glantz v. Cook United, Inc.*, 499 F. Supp. 710 (E.D.N.Y. 1979) ................................................ 33

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6 (1970)............................................. 22

*Authorities upon which counsel chiefly rely are marked with asterisks.*

*Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161 (E.D.N.Y. 2018) ............................. 14

*Groop Internet Platform Inc. v. Psychotherapy Action Network*, 2020 WL 353861
    (D.D.C. Jan. 21, 2020) ....................................................................................................... 14

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ...................................................................... 2

*Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304 (S.D. Fla. 2018) .......................................... 32

*Hayashi v. Ozawa*, 2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) ............................................ 21

*Hourani v. PsyberSolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016) ................................ 13, 25

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ................................................ 24, 25

*Kinsey v. N.Y. Times Co.*, 2020 WL 1435141 (S.D.N.Y. Mar. 23, 2020) .................................. 31

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955
    (2d Cir. 1988) .................................................................................................................... 32

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) .......................................................... 26, 28

*Long v. Sears Roebuck & Co.*, 877 F. Supp. 8 (D.D.C. 1995) .................................................... 13

*Luhn v. Scott*, 2019 WL 5810309 (D.D.C. Nov. 7, 2019) ......................................................... 34

*Makaeff v. Trump Univ., LLC*, 26 F. Supp. 3d 1002 (S.D. Cal. 2014) .......................................... 1

*Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 (D.D.C. 2011) ................................... 14

*Marsh v. Hollander*, 339 F. Supp. 2d 1 (D.D.C. 2004) .............................................................. 34

*McFarlane v. Esquire Mag.*, 74 F.3d 1296 (D.C. Cir. 1996) ..................................................... 24

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) .................................................... 25

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ............................................................. 15, 23

*Mills v. Alabama,* 384 U.S. 214 (1966) ..................................................................................... 2

*Moldea v. N.Y. Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994) ............................................. 15, 16, 21

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ......................................................... 15

*Montgomery v. Risen*, 197 F. Supp. 3d 219 (D.D.C. 2016) ....................................................... 15

*\*N. Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ....................................................... 2, 24, 30

*Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999) ...................................................... 17

*Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45 (D.D.C. 1997)............................ 30

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264 (1974).......................................................................................... 22

*\*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc) ................................................ *passim*

*Parisi v. Sinclair*, 774 F. Supp. 2d 310 (D.D.C. 2011)......................................................... 25, 30

*Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012) ................................................. 25, 26, 30

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995) .................................................................. 16

*Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490 (D.D.C. 1987) ...................................... 13, 14

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) .......................... 16, 22

*Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495 (3d Cir. 1978)........................................ 30

*Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 10 (D.D.C. 1985)................................................................................ 36

*Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990) ................................................................. 26

*Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128 (D.D.C. 2009) .................................................. 25

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290 (S.D.N.Y. 2017)...................................................................................................... 23

*St. Amant v. Thompson,* 390 U.S. 727 (1968) ............................................................................... 24

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc) ...................................... 25, 28, 34

*Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584 (S.D.N.Y. 2009)................................................................................................ 31, 32

*Time, Inc. v. Pape*, 401 U.S. 279 (1971)...................................................................................... 27

*Trump v. Chi. Tribune Co.*, 616 F. Supp. 1434 (S.D.N.Y. 1985) ............................................. 1, 23

*Trump v. O'Brien*, 422 N.J. Super. 540 (App. Div. 2011).............................................................. 1

*Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 10 (D.C. Cir. 2017). ............................. 12, 27

*Wash. Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) ........................................................... 12

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ............................................................ 3, 4

*Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019)................. 21, 23

## STATE CASES

*Alf v. Buffalo News, Inc.*, 100 A.D.3d 1487 (N.Y. App. Div. 2012) ...................................... 34, 35

*Arts4All, Ltd. v. Hancock*, 5 A.D.3d 106 (N.Y. App. Div. 2004) ................................................ 36

*Barimany v. Urban Pace LLC*, 73 A.3d 964 (D.C. 2013) ........................................................... 13

*Brian v. Richardson*, 660 N.E.2d 1126 (N.Y. 1995) ................................................................... 18

*Cohn v. Nat'l Broad. Co.*, 67 A.D.2d 140 (N.Y. App. Div. 1979) ............................................... 36

*First Manhattan Co. v. Sive*, 2020 WL 70398 (N.Y. Sup. Ct. Jan. 07, 2020) ............................. 35

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   399 N.E.2d 1185 (N.Y. 1979) ................................................................................ 31, 33

*Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991) ........................................ 13, 15

*Jacobus v. Trump*, 51 N.Y.S.3d 330 (N.Y. Sup. Ct.) .................................................................. 16

*Mann v. Abel*, 885 N.E.2d 884 (N.Y. 2008) ................................................................. 15, 16, 19

*Parks v. Steinbrenner*, 131 A.D.2d 60 (N.Y. App. Div. 1987) ............................................ 16, 21

*Sandals Resorts Int'l Ltd. v. Google Inc.*, 925 N.Y.S.2d 407 (N.Y. App. Div. 2011) ................. 17

*Steinhilber v. Alphonse*, 68 N.Y.2d 283 (1986) ........................................................................ 16

*Sweeny v. Ottaway Newspapers, Inc.*, 84 A.D.2d 899 (N.Y. App. Div. 1980) ........................... 32

*West v. Thomson Newspapers*, 872 P.2d 999 (Utah 1994) .......................................................... 18

## STATUTES AND RULES

*N.Y. Civ. Rights Law § 74 ...................................................................................................... 30

Fed. R. Civ. P. 8 ....................................................................................................................... 12

*Fed. R. Civ. P. 12(b)(6) .................................................................................................. 3, 12, 24

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws § 150 (Am. Law Inst. 1971) ............................... 13, 14

Restatement (Second) of Torts § 566 (Am. Law Inst. 1971) ....................................................... 16

1 Robert D. Sack, Sack on Defamation § 7:3.5[B] (5th ed. 2017 & Supp. 2020) ....................... 32

## INDEX OF EXHIBITS

**Exhibit A**    Greg Sargent, *Trump just invited another Russian attack.  Mitch McConnell is making one more likely.*, The Plum Line, Wash. Post (Mar. 12, 2020), https://www.washingtonpost.com/opinions/2019/06/13/trump-just-invited-another-russian-attack-mitch-mcconnell-is-making-one-more-likely/.

**Exhibit B**    Paul Waldman, *Trump: I can win reelection with just my base*, The Plum Line, Wash. Post (June 20, 2019), https://www.washingtonpost.com/opinions/2019/06/20/trump-i-can-win-reelection-with-just-my-base/.

**Exhibit C**    Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (2019), vols. I & II, available in text-searchable format at https://www.nytimes.com/interactive/2019/04/18/us/politics/mueller-report-document.html.

**Exhibit D**    Benjamin Wittes, *Five Things I Learned From the Mueller Report*, The Atlantic (Apr. 29, 2019), https://www.theatlantic.com/ideas/archive/2019/04/ben-wittes-five-conclusions-mueller-report/588259/.

**Exhibit E**    *ABC News' Oval Office interview with President Trump*, ABC News (June 13, 2019), https://abcnews.go.com/Politics/abc-news-oval-office-interview-president-donald-trump/story?id=63688943.

## <u>INTRODUCTION</u>

As a private citizen, Donald Trump famously brought and lost multiple libel suits, including one complaining that his biographer had understated his net worth, and another challenging an architecture column that criticized his plan to build "the tallest building in the world."[1]  Now, as President, he has loosed his campaign organization to bring a libel suit complaining of two Washington Post columns that discussed Russian assistance to his presidential campaign—a subject that has been the focus of an independent counsel's investigation, massive news coverage, and endless public debate.  And this suit is just one of three such suits that the Trump campaign organization has brought against major news outlets in recent months.[2]  To our knowledge, these cases mark the first time that anyone has brought a civil libel suit for damages on behalf of a sitting President.

While unprecedented, these suits are no surprise, for President Trump has loudly championed the expansion of libel laws and castigated the press as the "enemy of the people."[3]  Those positions, like this lawsuit, betray a fundamental misunderstanding of the First Amendment and the role of the press in a democracy.  The First Amendment protects our "profound national commitment to the principle that debate on public issues should be

---

[1] *See Trump v. O'Brien*, 422 N.J. Super. 540, 543 (App. Div. 2011) (affirming dismissal); *Trump v. Chi. Tribune Co.*, 616 F. Supp. 1434, 1438 (S.D.N.Y. 1985) (granting motion to dismiss); *see also Makaeff v. Trump Univ., LLC*, 26 F. Supp. 3d 1002, 1014 (S.D. Cal. 2014) (granting special motion to dismiss Trump University's defamation counterclaim).

[2] *See Donald J. Trump for President, Inc. v. N.Y. Times Co.*, Case No. 152099/2020 (N.Y. Sup. Ct. filed Feb. 26, 2020); *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, No. 1:20-cv-01045-MLB (N.D. Ga. filed Mar. 6, 2020).

[3] John Wagner, *Trump renews attacks on media as 'the true Enemy of the People'*, Wash. Post (Oct. 29, 2018), https://www.washingtonpost.com/politics/trump-renews-attacks-on-media-as-the-true-enemy-of-the-people/2018/10/29/9ebc62ee-db60-11e8-85df-7a6b4d25cfbb_story.html (quoting https://twitter.com/realDonaldTrump/status/1056879122348195841).

uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N. Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  And the explicit guarantee of freedom of the press reflects the critical role that the press plays in informing the citizenry about matters that affect their well-being.  *See, e.g., Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (purpose of free press guarantee was "to preserve an untrammeled press as a vital source of public information"); *Mills v. Alabama,* 384 U.S. 214, 218-219 (1966) ("[T]he press serves . . . as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.").

This lawsuit is an affront to these principles.  Donald J. Trump for President, Inc. ("Trump for President") complains of two brief passages in the two online Post columns.  One column, which linked to the Mueller Report, noted that although Special Counsel Robert S. Mueller III "did not find sufficient evidence of a criminal conspiracy," he "also concluded that Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of" Russian interference in the 2016 election.  *See* Compl. ¶¶ 13–16.  The other column, which linked to Trump's public statement in an ABC News interview that he would "listen" to opposition research from Russia, China or another foreign nation, posed a rhetorical question: "who knows what sort of aid Russia and North Korea will give to the Trump campaign [in 2020], now that he has invited them to offer their assistance?"  Compl. ¶¶ 2, 4.  Neither of those statements can support a libel claim.

• Each was a statement of constitutionally protected opinion, based on disclosed facts, on a subject of national importance.

- The Complaint fails to allege, and cannot allege, facts that plausibly support the claim that the Post published the columns with actual malice, as required by the First Amendment.

- One column is protected by the fair report privilege.

- The other column does not contain an actionable statement that is "of and concerning" Trump for President, the sole Plaintiff here.

For these reasons, the Complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); because its deficiencies are incurable, it should be dismissed with prejudice.

## BACKGROUND

Plaintiff asserts a defamation claim based on opinion columns published in the Washington Post's online "Opinion" section by two columnists, Greg Sargent and Paul Waldman. Exs. A, B.[4] Each of the columns expressed the author's opinion about Russian interference in American elections and the President's public position with respect to that interference. Both columns included numerous hyperlinks to underlying articles and reports that were the subject of their commentary. Of particular significance here, and as described in greater detail below, the statement at issue in the Sargent column linked to both the Mueller Report and a column about that Report from *The Atlantic*, while the statement at issue in the Waldman column linked to the transcript of an ABC News interview with President Trump.[5]

---

[4] Although the Complaint did not link to or physically attach the Waldman and Sargent columns, the Court may consider them because they are directly at issue and incorporated by reference in the Complaint. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997); *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

[5] The Court may consider these underlying materials, including the Mueller Report, the *Atlantic* article, and the interview transcript, in its determination of this motion, because they are part of the columns that are the subject of the Complaint and are therefore incorporated by reference in

**A.** **The Mueller Report Reveals the Trump Campaign's Extensive Contacts and Links with the Russian Government.**

After a nearly two-year investigation, the two-volume Mueller Report was released to the public in April 2019.  Ex. C.  The Report revealed in extraordinary detail how "the Russian government interfered in the 2016 presidential election in sweeping and systematic fashion."  *Id.* vol. I at 1.  Contrary to the characterizations in Plaintiff's Complaint, the Report did not exculpate the President or his campaign.  In fact, "the Special Counsel's investigation established that the Russian government perceived it would benefit from a Trump presidency and worked to secure that outcome, and that the Campaign expected it would benefit electorally from information stolen and released through Russian efforts."  *Id.* vol. I at 5.  And the Mueller Report devoted more than one hundred pages to accounts of the extensive contacts and links between the Russian government and the Trump campaign relating to Russian election interference.  *Id.* vol. I, pt. IV.  These interactions included the following:

• A Trump Campaign foreign policy advisor had repeated contacts with individuals affiliated with the Russian government, worked to arrange a meeting between Trump and Putin, and "suggested to a representative of a foreign government that the Trump Campaign had received indications from the Russian government that it could assist the Campaign through the anonymous release of information that would be damaging to Hillary Clinton."  *Id.* vol. I at 81-89.  More specifically, the Trump Campaign advisor learned in late April 2016 through his Russian contacts that the Russian government had "dirt on candidate Hillary Clinton" in the form of "thousands of emails."  *Id.* vol. I at 89 (quotation marks omitted).

---

the Complaint, and are independently appropriate subjects for judicial notice.  *See E.E.O.C.*, 117 F.3d at 625; *Robinson*, 935 F.2d at 291.

- Donald Trump Jr. received an email informing him that the "'[c]rown prosecutor of Russia had . . . offered to provide the Trump Campaign with some official documents and information that would incriminate Hillary [Clinton] and her dealings with Russia' as 'part of Russia and its government's support for Mr. Trump.'" *Id.* vol. I at 110. "Trump Jr. immediately responded that 'if it's what you say I love it,' and arranged the meeting through a series of emails and telephone calls." *Id.* The meeting took place at Trump Tower on June 9, 2016, and included Trump Jr., campaign chairman Paul Manafort, senior advisor Jared Kushner, and a Russian attorney, Natalia Veselnitskaya. *Id.* She "claimed that funds derived from illegal activities in Russia were provided to Hillary Clinton and other Democrats." *Id.* "Trump Jr. requested evidence to support those claims, but Veselnitskaya did not provide such information." *Id.*

- On July 22, 2016, "WikiLeaks posted thousands of hacked [Democratic National Committee] documents." *Id.* vol. II at 17; *see also id.* vol. I at 36 (explaining that the emails were stolen by a Russian military cyber unit). "Within the Trump Campaign, aides reacted with enthusiasm to reports of the hacks." *Id.* vol. II at 17. Shortly after the release of these documents, then-candidate Trump told deputy campaign manager Rick Gates "that more releases of damaging information would be coming," and the Campaign planned "a communications strategy based on the possible release of Clinton emails by WikiLeaks." *Id.* vol. II at 18.

- On July 27, 2016, then-candidate Trump publicly said "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing," which was "apparently a reference to emails described in media accounts as having been stored on a personal server that Clinton had used while serving as Secretary of State." *Id.* vol. I at 49. "Within approximately five hours of Trump's statement, [Russian intelligence] officers targeted for the first time Clinton's

personal office" by, among other things, "creat[ing] and sen[ding] malicious links targeting 15
email accounts . . . which were not public."  *Id.*

- On October 7, 2016, WikiLeaks released the first set of emails "stolen by a
Russian intelligence agency from Clinton Campaign chairman John Podesta."  *Id.* vol. II at 20.
WikiLeaks appeared to time the release to occur less than an hour after the release of "an *Access
Hollywood* video that captured comments by candidate Trump some years earlier and that was
expected to adversely affect the Campaign."  *Id.* vol. I at 58.  "The same day," the U.S.
government released a "statement directly link[ing] Russian hacking to the releases on
WikiLeaks, with the goal of interfering with the presidential election."  *Id.* vol. II at 20.  Yet,
even after this revelation, Donald Trump Jr. "had direct electronic communications with
WikiLeaks during the campaign period" and complied with WikiLeaks' request that he
disseminate a link to "help Trump in 'digging through' leaked emails." *Id.* vol. I at 59-60.

- "On multiple occasions, members and surrogates of the Trump Campaign
promoted—typically by linking, retweeting, or similar methods of reposting—pro-Trump or anti-
Clinton content published by the [Russian Internet Research Agency] through IRA-controlled
social media accounts."  *Id.* vol. I at 33.  While "the investigation did not identify evidence that
any U.S. persons knowingly or intentionally coordinated with the IRA's interference operation,"
"[p]osts from the IRA-controlled Twitter account @TEN_GOP were cited or retweeted by
multiple Trump Campaign officials and surrogates, including Donald J. Trump Jr., Eric Trump,
Kellyanne Conway, Brad Parscale, and Michael T. Flynn." *Id.* vol. I at 14, 33-34.

- In addition, "[t]he investigation established that several individuals affiliated with
the Trump Campaign lied to the [Special Counsel's] Office, and to Congress, about their
interactions with Russian-affiliated individuals and related matters.  Those lies materially

impaired the investigation of Russian election interference." *Id.* vol. I at 9-10.  Several of these individuals were ultimately charged with criminal conduct related to the investigation, including former National Security Advisor Michael Flynn, campaign foreign policy advisor George Papadopoulos, Trump Organization attorney Michael Cohen, and campaign chairman Paul Manafort.  *Id.*

Finally, while the Complaint alleges that the Mueller Report "concluded there was *no conspiracy* between the Campaign and the Russian government," Compl. ¶ 3 (emphasis original), in fact, the Mueller Report carefully warned against such a misinterpretation.  The Report specifically clarified that a "statement that the investigation did not establish particular facts does not mean there was no evidence of those facts."  Ex. C vol. I at 2; *see also id.* vol. II at 2 (noting that the Report "does not exonerate" the President and that the Special Counsel was "unable to reach [the] judgment" that "the President clearly did not commit obstruction of justice").

The Mueller Report and its revelations about Russia's election interference and connections to the Trump campaign spurred widespread political commentary and debate from voices across the political spectrum.  Of particular relevance here, approximately two weeks after the Report became public, *The Atlantic* published an online opinion column by Benjamin Wittes, entitled "Five Things I Learned from the Mueller Report."  *See* Ex. D.  The statement at issue from the Sargent column specifically cited and hyperlinked to Wittes' piece and the Mueller Report itself.  *See* Ex. A.[6]

---

[6] The Sargent column included hyperlinks to (1) *Read the Mueller Report: Searchable Document Index*, N.Y. Times, Apr. 18, 2019, https://www.nytimes.com/interactive/2019/04/18/us/politics/mueller-report-document.html, and (2) Benjamin Wittes, *Five Things I Learned from the Mueller Report*, Atlantic Monthly, Apr. 29, 2019, https://www.theatlantic.com/ideas/archive/2019/04/ben-wittes-five-conclusions-mueller-

The Wittes piece analyzed the Mueller Report's findings in depth and explained Wittes' conclusion from analyzing the Report that, among other things, "Trump's complicity in the Russian hacking operation and his campaign's contacts with the Russians present a . . . complicated picture." Ex. D. Wittes stated that while "the investigation did not find a criminal conspiracy in the veritable blizzard of contacts between Trumpworld and the Russians," "[i]f there wasn't collusion on the hacking, it sure wasn't for lack of trying." *Id.* He detailed numerous contacts and attempted contacts between the campaign and the Russian government:

> Indeed, the Mueller report makes clear that Trump personally ordered an attempt to obtain Hillary Clinton's emails; and people associated with the campaign pursued this believing they were dealing with Russian hackers. Trump also personally engaged in discussions about coordinating public-relations strategy around WikiLeaks releases of hacked emails. At least one person associated with the campaign was in touch directly with the Guccifer 2.0 persona—which is to say with Russian military intelligence. And Donald Trump Jr. was directly in touch with WikiLeaks—from whom he obtained a password to a hacked database.

*Id.* Wittes also highlighted the infamous Trump Tower meeting where Trump Jr. and "[t]he campaign's senior staff took a meeting with Russian representatives who promised disparaging information on Clinton" as "one of the most damning single episodes discussed" in the Report. *Id.* (emphasizing that "the campaign showed eagerness to benefit from Russian activity"). Finally, Wittes concluded that "in Clinton, Democrats, and liberals, the Trump campaign saw a sufficiently irreconcilable enemy that it looked at Vladimir Putin and saw a partner. That may not be a crime, but it is a very deep betrayal." *Id.*

---

report/588259/. Wittes is identified in the byline as a contributing writer at *The Atlantic* and the editor in chief of *Lawfare*. *Id.*

**B.      In an ABC News Interview, President Trump States that He Would "Listen" to a Foreign Nation's Offer of Information about a Political Opponent.**

In June 2019, ABC News Chief Anchor George Stephanopoulos conducted a videotaped interview with President Trump in which he inquired into the President's views on the subject of foreign interference.  As the following excerpt of the transcript of that interview shows, President Trump indicated that he would "listen" to damaging information about a political opponent from a foreign state like Russia or China:

> *Stephanopoulos*: Your campaign this time around, if foreigners, if Russia, if China, if someone else offers you information on opponents, should they accept it or should they call the FBI?
>
> *President Trump*: I think maybe you do both.  I think you might want to listen, *there's nothing wrong with listening*.  If somebody called from a country, Norway, "we have information on your opponent."  Oh, I think I'd want to hear it.
>
> *Stephanopoulos*: You want that kind of interference in our elections?
>
> *President Trump*: It's not an interference, they have information.  *I think I'd take it.*  If I thought there was something wrong, I'd go maybe to the FBI.  If I thought there was something wrong.  But when somebody comes up with oppo research, right, they come up with oppo research.  Oh, let's call the FBI.  The FBI doesn't have enough agents to take care of it, but you go and talk honestly to congressmen, they all do it, they always have.  And that's the way it is.  It's called oppo research.

Ex. E (emphasis added).  ABC News published a video and transcript of the interview on June 13, 2019.  *See id.*  ABC News' introduction to the transcript noted that "President Trump opined on the Russia investigation, telling Stephanopoulos he would consider accepting damaging information about his political rivals from foreign nations."  *Id.*  Both Sargent and Waldman

commented on President Trump's statements in their columns, and the statement at issue in

Waldman's column explicitly referred and linked to the ABC News interview.  Exs. A, B.[7]

### C.    Post Columnists Sargent and Waldman Criticize the President.

In the week after the President's ABC News interview, Post columnists Sargent and

Waldman each published an opinion column in the Post's online "Opinion" section, "The Plum

Line," analyzing the President's attitude towards foreign interference in campaigns and the

possible impact of this attitude on the 2020 campaign.  *Id.*

### 1.    The Sargent Column.

Sargent's June 13, 2019 column, titled "Trump just invited another Russian attack. Mitch

McConnell is making one more likely," articulated two primary concerns: (1) that through the

ABC News interview, Trump had effectively invited another attempt by foreign powers to

influence the 2020 elections, and (2) that Senate Majority Leader Mitch McConnell's refusal to

allow election-reform bills to reach the Senate floor was thwarting attempts to combat such

interference.  Ex. A.

In the context of his first point, Sargent stated the following, which is the passage at issue

in the Complaint:

> Special counsel Robert S. Mueller III's investigation concluded
> that Russia's 'sweeping and systematic' attack involved massive
> cybertheft aimed at one major U.S. political party and
> disinformation warfare designed to divide the country along racial
> and social lines.  Mueller also concluded that Trump and/or his
> campaign eagerly encouraged, tried to conspire with, and happily
> profited off of those efforts.  Yet Mueller did not find sufficient
> evidence of a criminal conspiracy.

---

[7] *See* Paul Waldman, *Trump: I can win reelection with just my base*, Wash. Post, June 20, 2019,
https://www.washingtonpost.com/opinions/2019/06/20/trump-i-can-win-reelection-with-just-my-
base/ (linking to *ABC News' Oval Office Interview with President Trump*, June 13, 2019,
https://abcnews.go.com/Politics/abc-news-oval-office-interview-president-donald-
trump/story?id=63688943).

*Id.* (quoting Ex. C).  The word "concluded" in the first sentence linked to a searchable, full-text version of the Report hosted on the *New York Times*' website.  The word "concluded" in the second sentence linked to the Wittes piece on *The Atlantic*'s website.

### 2.    The Waldman Column.

Waldman's June 20, 2019 column, "Trump: I can win reelection with just my base," also looked ahead to the 2020 election.  He began the column by commenting on a *TIME* article reporting that President Trump had boasted, "I think my base is so strong, I'm not sure that I have to [reach out to swing voters]."  Ex. B (quoting Trump).  Waldman expressed surprise at that sentiment.  He opined that President Trump's campaign strategy would include heavy emphasis on himself and fear-mongering in a way that would likely drive high turnout among Democrats, as it did in the 2018 mid-term elections.  *Id.*

Next, Waldman predicted that "the 2020 election will obviously be distinct in all kinds of ways we can't yet anticipate."  *Id.*  He then posed the following rhetorical question, which is the only statement at issue here:  "For instance, who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that [Trump] has invited them to offer their assistance?"  *Id.*  The word "invited" included a hyperlink to the transcript of the ABC News interview in which the President stated that he would "take" research on an opponent offered by foreign nations, including specifically Russia or China.  *Id.*

### D.    Plaintiff Files a Series of Lawsuits Against the Press, Including the Post.

More than eight months later, on March 3, 2020, Trump for President filed this lawsuit against the Post, asserting a single cause of action for libel based upon the Sargent and Waldman columns.  *See* Compl. ¶¶ 24-31.  Trump for President filed similar complaints against the New York Times and CNN at approximately the same time.  *See Donald J. Trump for President, Inc.*

11

*v. N.Y. Times Co.*, Case No. 152099/2020 (N.Y. Sup. Ct. filed Feb. 26, 2020); *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, No. 1:20-cv-01045-MLB (N.D. Ga. filed Mar. 6, 2020). Collectively, these appear to be the first libel suits brought by a sitting president or his campaign against the press in our nation's history.

## LEGAL STANDARD

### A.     The Rule 12(b)(6) Standard.

To survive dismissal, a complaint must plead facts sufficient to support every element of each cause of action.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8. If the facts alleged, taken as true, do not "'state a claim to relief that is plausible on its face,'" the complaint must be dismissed.  *Iqbal*, 556 U.S. at 678; Fed. R. Civ. P. 12(b)(6).

"[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits" in order "[t]o preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth."  *Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017).  Indeed, courts in this Circuit have long recognized that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails."  *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (affirming dismissal) (quoting *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)); *see also, e.g.*, *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018) ("Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." (quotation marks omitted)) (granting motion to dismiss).

**B.      New York Law Applies to Issues As to Which State Law Governs.**

In a diversity action such as this one, the court applies "the choice of law rules prevailing in the District of Columbia" to issues as to which state law governs.  *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 140 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017) .  The first step of this inquiry is to "determine whether there is a genuine conflict between the laws of the involved jurisdictions."  *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995).  In this case, the substantive laws of two states could apply:  New York, Plaintiff's home state, Compl. ¶ 9; and the District of Columbia, the law of the forum and the Post's home state.  These laws are similar but not identical: the New York Constitution provides broader protections for matters of opinion.  *See, e.g.*, *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1278 (N.Y. 1991) (the "'protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by' the Federal Constitution").  However, this difference is not a "true conflict," because application of the laws of either jurisdiction should lead to the same ultimate outcome here: dismissal of the Complaint.  See *Barimany v. Urban Pace LLC*, 73 A.3d 964, 967 (D.C. 2013).

Nevertheless, New York law applies because its "policy would be advanced by application of its law."  *See Long*, 877 F. Supp. at 11.  In a multistate defamation case like this one, the District of Columbia follows the Restatement (Second) of Conflict of Laws, under which the law to be applied is not that of the forum where the offending publication was prepared, but rather, "the place where the plaintiff suffered injury by reason of his loss of reputation."  *Hourani*, 164 F. Supp. 3d at 140 (quotation marks omitted) (citing Restatement (Second) of Conflict of Laws § 150 (Am. Law Inst. 1971));); *see Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1496 (D.D.C. 1987) (summarizing that the District of Columbia follows the Restatement in defamation cases).  For a corporation, that place is presumptively its

13

"principal place of business."  *See* Restatement (Second) of Conflict of Laws § 150; *see, e.g.*, *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 (D.D.C. 2011) ("[I]n multi-state defamation cases the princip[al] place of business of a corporation is the place where a company's reputation will usually be 'most grievously affected' and hence that jurisdiction's law will apply." (quoting Restatement (Second) Conflict of Laws § 150, cmt. f)).  In this case, Plaintiff's principal place of business is Trump Tower, in New York, and has been through the entire relevant time period; no other state has such a significant connection to Plaintiff.  Compl. ¶ 9; *see Groop Internet Platform Inc. v. Psychotherapy Action Network*, 2020 WL 353861, at *2 n.2 (D.D.C. Jan. 21, 2020) (explaining that New York law would likely apply to defamation action involving plaintiff corporation with principal place of business in New York).

This case also involves substantial federal constitutional issues arising out of the First Amendment.  For these issues, the D.C. District Court applies the decisions and precedent of the D.C. Circuit.  *See, e.g.*, *Pearce*, 664 F. Supp. at 1501-02.

## ARGUMENT

To recover for libel under New York law, a plaintiff must establish, among other things, (1) a false statement of fact (2) "of and concerning" the plaintiff (3) that is defamatory and (4) published with the requisite degree of fault.  *Greene v. Paramount Pictures Corp.*, 340 F. Supp. 3d 161, 168 (E.D.N.Y. 2018), *aff'd*, --- F App'x ---, 2020 WL 3095916 (2d Cir. June 11, 2020).  Here, the Complaint fails to state a claim because (1) the challenged statements in both columns are protected opinion as they, *inter alia*, disclosed the facts on which they were based and the Complaint does not challenge those underlying facts; (2) the Complaint does not plausibly allege that the Post published the columns with the requisite fault, actual malice; (3) the Sargent column is protected by the New York fair report privilege; and (4) the Waldman column

14

contains no allegedly false and defamatory statement that is "of and concerning" Plaintiff Trump for President.

## I.   THE CHALLENGED STATEMENTS ARE CONSTITUTIONALLY PROTECTED STATEMENTS OF OPINION.

"A statement of opinion that 'does not contain a provably false factual connotation' is not actionable under the First Amendment, and receives 'full constitutional protection.'" *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247-48 (D.D.C. 2016) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017). In addition, "when a writer gives a statement of opinion that is based upon true facts that are revealed to readers or which are already known to readers, such opinions generally are not actionable so long as the opinion does not otherwise imply unstated defamatory facts." *Farah*, 736 F.3d at 539 (quoting *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir. 1994) (*Moldea I*)); *see also Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313-15 (D.C. Cir. 1994) (*Moldea II*); *Ollman v. Evans*, 750 F.2d 970, 984-85 (D.C. Cir. 1984) (en banc). To determine whether a statement is one of opinion or fact, "the publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed. The First Amendment demands that the court assess the disputed statements in their proper context." *Farah*, 736 F.3d at 535 (quotation marks omitted).

As the New York Court of Appeals has recognized, the New York Constitution independently provides that "[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008); *see also Immuno AG.*, 567 N.E.2d 1270 at 1277-1280 (1991). New York courts must similarly "consider the content of the communication as a whole, as well as its tone and apparent purpose and in particular should look

to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Mann*, 885 N.E.2d at 885-86; *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289-293 (1986) (citing *Ollman*).  The opinion defense protects everyone's right to express their views on important public issues, including Plaintiff and President Trump themselves, who as libel defendants defeated a lawsuit on the ground of protected opinion.  *See Jacobus v. Trump*, 51 N.Y.S.3d 330, 337 (N.Y. Sup. Ct.), *aff'd*, 156 A.D.3d 452 (N.Y. 2017).

Of particular significance here, both the federal and New York constitutions provide complete protection to statements of opinion that are based on disclosed facts.  Where an author sets forth the facts upon which his interpretation is based, leaving the reader "free to draw his or her own conclusions based upon those facts," the author's opinion is protected by the First Amendment and "is not actionable in defamation."  *Farah*, 736 F.3d at 535, 539 (quoting *Moldea I*, 15 F.3d at 1144-45); *see Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) ("When an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 731 (1st Cir. 1992) (publications are non-actionable opinion where they did not indicate that the author "had more information about [plaintiff's] marketing practices than was reported in the articles"); *Parks v. Steinbrenner*, 131 A.D.2d 60, 62 (N.Y. App. Div. 1987) ("A non-actionable 'pure opinion' is defined as a statement of opinion which either is accompanied by a recitation of the facts upon which it is based, or, if not so accompanied, does not imply that it is based upon undisclosed facts."); Restatement (Second) of Torts § 566 cmt. c. (Am. Law Inst. 1971).

For online publications such as the ones at issue here, the underlying facts may be "disclosed" either by reference in the text of the publication itself, or with hyperlinks, which are "the twenty-first century equivalent of the footnote for purposes of attribution in defamation law." *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017). Thus, courts across the country routinely dismiss defamation cases where, as here, stated opinions are based on facts disclosed through hyperlinks. *See, e.g.*, *id.*; *Biro v. Condé Nast*, 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d Cir. 2015); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999) (providing "a hyperlink for immediate access to such articles . . . adequately disclosed the facts underlying the opinion expressed"); *Abbas v. Foreign Policy Grp.*, 975 F. Supp. 2d 1, 18 n.7 (D.D.C. 2013) (holding that hyperlinks disclosed underlying facts for purposes of fair comment privilege), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).[8]

Here, the statements at issue appear in columns that were expressly labeled "Opinion"; they contain subjective language indicative of opinion; and they disclosed (and hyperlinked to) the facts upon which they were based. For all of these reasons, they are nonactionable statements of opinion.

###### A.      Both Columns Are Clearly Labeled "Opinion."

Like the article in *Ollman*, which appeared on the Op-Ed page of the *Washington Post*, the two columns here were published on an opinion blog on the Post's website. *See Ollman*, 750

---

[8] *See also, e.g.*, *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 538 n.33 (W.D. Va. 2019) (inclusion of hyperlinks to supporting material "alleviates whatever defamatory potential existed in the first place"); *Sandals Resorts Int'l Ltd. v. Google Inc.*, 925 N.Y.S.2d 407, 415 (N.Y. App. Div. 2011) (hyperlinks constitute disclosure of facts supporting opinion); *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704–05 (D. Md. 2000) (dismissing defamation claim based in part on facts disclosed in hyperlinked documents).

F.2d at 990.  Each webpage includes a clearly labeled "Opinion" header, with a byline that reads "Opinion by [Greg Sargent or Paul Waldman], Columnist."  *See* Exs. A, B; *see also* Greg Sargent and Paul Waldman, *The Plum Line*, https://www.washingtonpost.com/blogs/plum-line/; *cf. Ollman*, 750 F.2d at 986.  Readers of such opinion columns are "fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere" in the Post, and they expect to find "strong statements, sometimes phrased in a polemical manner." *Abbas*, 975 F. Supp. 2d at 17; *see also Farah*, 736 F.3d at 540 ("Any reasonable reader of political blog commentary knows that it often contains conjecture and strong language."); *Biro*, 2014 WL 4851901, at *4 (similar); *Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995) ("[T]he common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion."); *West v. Thomson Newspapers*, 872 P.2d 999, 1019 (Utah 1994) ("Courts are much more likely to construe statements as opinion when they are made by participants in, and people who comment on, political campaigns.") (citing cases, including *Ollman*).

Where, as here, the general context of the columns at issue makes the reader "predisposed to view what the critic writes as opinion," "courts are rightly wary of finding statements to be defamatory, unless the statements . . . clearly go beyond the realm of interpretation."  *Ollman*, 750 F.2d at 988.  That should be especially true in this case, given that the subject of both columns was unquestionably one of grave public significance.  "If the First Amendment's guarantees of freedom of speech and of the press are to ensure that these rights are meaningful not simply on paper, but also in the practical context of their exercise, then a[n] Op–Ed column

discussing a subject of public interest must surely be accorded a high level of protection, lest the expression of critical opinions be chilled." *Abbas*, 975 F. Supp. 2d at 17.

      **B.**    **The Sargent Column Is Protected Opinion.**

     The passage at issue in the Sargent column is a classic example of an opinion based on disclosed facts.  Sargent wrote:

> Special counsel Robert S. Mueller III's investigation concluded
> that Russia's 'sweeping and systematic' attack involved massive
> cybertheft aimed at one major U.S. political party and
> disinformation warfare designed to divide the country along racial
> and social lines.  Mueller also concluded that Trump and/or his
> campaign eagerly encouraged, tried to conspire with, and happily
> profited off of those efforts. Yet Mueller did not find sufficient
> evidence of a criminal conspiracy.

Ex. A.  Notably, in challenging a portion of this passage, the Complaint fails to include the last sentence.  Plaintiff bases its claim on a selective combination of language in the prior two sentences: that the Mueller investigation "concluded" that "Trump and/or his campaign . . . tried to conspire with" "Russia's 'sweeping and systematic' attack" against the 2016 United States presidential election."  Compl. ¶ 13.  Plaintiff alleges that these words were false because "there was no conspiracy between the Campaign and the Russian government." Compl. ¶ 14.

     The challenged language, of course, must be evaluated in the context of the whole column.  *Farah*, 736 F.3d at 535; *Mann*, 885 N.E.2d at 885-86.  This includes the very next sentence that Plaintiff ignores:  "Mueller did not find sufficient evidence of a criminal conspiracy."  Ex. A.  The Complaint does not even attempt to articulate how the prior statements could be considered false in light of this clarifying point.

     In any case, Sargent's column clearly discloses the underlying facts on which his statement was based, through explicit reference to the Mueller Report, reinforced by two hyperlinks directly within the statement at issue.  Specifically, the word "concluded" in the first

sentence contains a direct link to the Mueller Report.  *See* Ex. A.  The Report presents Mueller's findings in extraordinary detail, set forth in over one hundred pages describing the contacts and links between Russian operatives and individuals associated with the 2016 Trump campaign. For example, as discussed above, the facts disclosed included (1) that after "WikiLeaks posted thousands of hacked [Democratic National Committee] documents," the "Trump Campaign[] aides reacted with enthusiasm to reports of the [Russian] hacks," Trump indicated "that more releases of damaging information would be coming," and the Campaign planned "a communications strategy based on" additional document releases; (2) that Donald Trump Jr. "had direct electronic communications with WikiLeaks during the campaign period," even after "the federal government" released a "statement directly link[ing] Russian hacking to the releases on WikiLeaks, with the goal of interfering with the presidential election"; (3) that President Trump publicly said "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing," which led Russian military intelligence to target Hillary Clinton's private office within "five hours"; and (4) that senior campaign officials, including the campaign chairman, met with a Russian lawyer in response to an offer from the "[c]rown prosecutor of Russia . . . to provide the Trump Campaign with some official documents and information that would incriminate Hillary [Clinton] and her dealings with Russia."  *See generally supra* pp. 5-6.

The second sentence again expressly refers to the Mueller Report.  And, in this sentence, the word "concluded" contains a link to the Wittes piece.  As discussed above, Wittes analyzes the Report and summarizes: "[i]f there wasn't collusion on the hacking, it sure wasn't for lack of trying."  Ex. D (citing various facts from the Mueller Report); *see generally supra* pp. 7-9.

In both instances, the "hyperlinked source material . . . serve[d] to put the reader on notice that the piece [was] one of opinion."  *Abbas*, 975 F. Supp. 2d at 16.  "There is nothing in

20

the article that implies that [it] is based upon facts known only to its author." *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at *9 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 2020 WL 3864950 (2d Cir. July 9, 2020); *Adelson*, 973 F. Supp. 2d at 491. Rather, the facts supporting what Mueller "concluded" are clearly disclosed through hyperlinks in both sentences. The reader is, therefore, "free to review" the facts contained in the Mueller Report and Wittes article and "to draw his or her own conclusions based upon those facts." *Farah*, 736 F.3d at 539; *Moldea I*, 15 F.3d at 1144-45.

Whether a reader would agree with Sargent's commentary is irrelevant. "So long as the opinion is accompanied by a recitation of the facts upon which it is based it is . . . afforded complete immunity even [if] the facts do not support the opinion." *Parks*, 131 A.D.2d at 66; *see also Hayashi v. Ozawa*, 2019 WL 1409389, at *4 (S.D.N.Y. Mar. 28, 2019) ("Because Defendant does not indicate that his statements are based on undisclosed facts to which the [reader] is not privy, they do not cross over into actionable 'mixed opinion.'"); *Wexler*, 2019 WL 5485265, at *9. That is precisely what happened here: Sargent expressed his opinion about what the Mueller Report found and linked to both the Wittes analysis and the Report itself, allowing readers to judge for themselves.

Under these circumstances, the statements at issue are constitutionally protected statements of opinion under federal and New York law. *Farah*, 736 F.3d at 539; *Wexler*, 2019 WL 5485265, at *9; *Adelson*, 973 F. Supp. 2d at 491.

### C. The Waldman Column Is Protected Opinion.

The challenged passage in the Waldman column is likewise a statement of political commentary that is not objectively verifiable. Indeed, it begins with a *question*, not a factual statement. Waldman rhetorically asks, "*who knows* what sort of aid Russia and North Korea will give to the Trump campaign . . . ?" Ex. B (emphasis added). The question is posed in the future

tense, and the focus is prospective, without a definitive answer.  Such "questions are not factual representations."  *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1338 (D.C. Cir. 2015).  They "put the reader on notice that what is being read is opinion," *Ollman*, 750 F.2d at 983; *see also Phantom Touring*, 953 F.2d at 729-30 (where allegedly libelous portion of the writing "was posed rhetorically" as a question, it "reasonably could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact").

Plaintiff alleges repeatedly that there has been no report of any contact between Plaintiff and North Korea, Compl. ¶¶ 5, 6, 17, 20, but Waldman does not state any fact to the contrary. His question was *provocative* and designed to make the reader ask "what if?" not to tell the reader "implicitly . . . that only one conclusion was possible."  *Phantom Touring*, 953 F.2d at 731.  The question emphasizes the serious implications of the President's statements by asking readers to consider how Russia or North Korea might act in view of the President's position that "there's nothing wrong with listening."  Exs. B, E.  This is, at most, the kind of "'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation," *Farah*, 736 F.3d at 536, and "that must be accepted in the rough and tumble of political argument," *Ollman*, 750 F.2d at 993 (Bork, J., concurring); *see also Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13-14 (1970) (use of the word "blackmail" was "no more than rhetorical hyperbole"); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 283-87 (1974) (holding that "Jack London's 'definition of a scab' [wa]s merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

The remainder of the challenged passage is also rhetorical in nature and supported by disclosed facts: "who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that [Trump] *has invited them to offer their assistance*?"  Ex. B (emphasis

added).  Obviously, Waldman was not reporting some new factual information that the President had issued some formal "invitation" to Russia and North Korea.  The word "invited" was used in a loose, rhetorical sense, rather than a literal one.  *See Milkovich*, 497 U.S. at 21; *Ollman*, 750 F.2d at 987.  It was no more than a "colorful" expression reflecting the author's take on the President's interview with George Stephanopoulos.  *See, e.g.*, *Ollman*, 750 F.2d at 977; *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 313 (S.D.N.Y. 2017).  And, of particular importance, the word "invited" was hyperlinked to the interview, making clear that it was how the author interpreted that interview.  "There is nothing in the [column] that implies [it] is based upon facts known only to its author."  *Wexler*, 2019 WL 5485265, at *9; *Adelson*, 973 F. Supp. 2d at 491.  To the contrary, the reader is empowered to judge for herself whether she agrees with Waldman that the President had in effect "invited" foreign assistance by saying that he would "listen" to opposition research offered by "Russia," "China," or "someone else."  Ex. B; *see Trump*, 616 F. Supp. at 1437 (opinion is nonactionable where "[i]t was [Trump's] own statements, conveyed to the press through an interview [Trump] himself arranged, which formed the factual basis of the opinions expressed in the defendants' article").  In short, the word "invited" was no more than a colorful expression of opinion that was explicitly based on fully disclosed facts.  It is, therefore, fully protected by the New York and U.S. constitutions.  *See, e.g.*, *Farah*, 736 F.3d at 536; *Trump*, 616 F. Supp. at 1437.

<div align="center">*       *       *</div>

For all these reasons, the two statements at issue here are protected statements of opinion based on disclosed facts.  No amendment to the pleadings can change that legal conclusion, and the Complaint, therefore, should be dismissed with prejudice.

## II.   THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT THE POST PUBLISHED THE CHALLENGED STATEMENTS WITH ACTUAL MALICE.

By its own admission, Trump for President is a public figure.  Compl. ¶ 28.  Public figures, of course, cannot recover in a defamation action unless they can prove by clear and convincing evidence that a defendant published a false statement of fact about them "with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times*, 376 U.S. at 279-80; *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967).  "Because free debate inevitably leads to some mistaken statements and punishment of these statements would chill the freedom of speech, reckless disregard requires *a 'high degree of awareness of . . . probable falsity*.'"  *Fairbanks*, 314 F. Supp. 3d at 85, 92 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)) (emphasis added).  As the D.C. Circuit has emphasized: "it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant *in fact harbored subjective doubt*."  *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (emphasis added); *see also St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (requiring proof that the publisher "*in fact entertained serious doubts as to the truth*") (emphasis added).

This is a deliberately "daunting" standard.  *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996); *see Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (emphasizing that "when the plaintiff is a public figure" and "the subject matter of the supposed libel touches on a matter of public concern," "the constitutional protection of the press reaches its apogee").  Courts in this Circuit and across the country routinely dismiss defamation claims on Rule 12(b)(6) motions for failure to set forth plausible factual allegations that the defendant acted with actual malice.  *See, e.g.*, *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 91 (D.D.C. 2019); *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84-85 (D.D.C. 2019); *Fairbanks*, 314 F. Supp. 3d at 93; *Deripaska v.*

*Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017); *Hourani*, 164 F. Supp. 3d at 144;

*Parisi v. Sinclair*, 774 F. Supp. 2d 310, 319 (D.D.C. 2011); *Sinclair v. TubeSockTedD*, 596 F.

Supp. 2d 128, 134 (D.D.C. 2009); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702

(11th Cir. 2016) ("[E]very circuit that has considered the matter has applied the *Iqbal/Twombly*

standard and held that a defamation suit may be dismissed for failure to state a claim where the

plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.").

Here, the Complaint "does not come close to adequately pleading facts of actual malice."

*Zucker*, 414 F. Supp. 3d at 91.  The Complaint does not allege any concrete "facts supporting the

claim that [the Post] made statements knowing they were false or with reckless disregard to their

truth."  *Hourani*, 164 F. Supp. 3d at 144; *Parisi*, 774 F. Supp. 2d at 319.  Indeed, it offers little

more than conclusory allegations as to the Post's subjective understanding of the facts, *see, e.g.*,

Compl. ¶ 6 ("The Post was well aware at the time of publishing the foregoing statements that

they were not true."); ¶ 17 (allegation was "made up out of whole cloth"); ¶ 31 ("The Post acted

with malice or reckless disregard for the Campaign's rights").

Plaintiff alleges generally that Sargent, Waldman, and the Post are "extremely biased

against the Campaign."  Compl. ¶¶ 18-19.  But "caselaw resoundingly rejects the proposition that

a motive to disparage someone is evidence of actual malice."  *Parsi v. Daioleslam*, 890 F. Supp.

2d 77, 90 (D.D.C. 2012); *see also, e.g.*, *Jankovic*, 822 F.3d at 590 ("'[I]ll will toward the plaintiff

or bad motives are not elements of actual malice,' and 'such evidence is insufficient by itself to

support a finding of actual malice.'" (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir.

1987) (en banc))); *Fairbanks*, 314 F. Supp. 3d at 92-93.[9]  Similar allegations have been

---

[9] As Judge Bates has explained, "[t]his rule makes sense: authors will often want to write about
those who they strongly ideologically oppose, but such ideological opposition does not *ipso facto*
make their writings untrustworthy.  If ideological opposition alone showed actual malice,

repeatedly rejected, including in two cases concerning campaign coverage that were dismissed

by this court in the past year alone. *See Zucker*, 414 F. Supp. 3d at 92; *Cottle*, 404 F. Supp. 3d at

85. As Judge Lamberth held in one of those cases, "the motivations behind defendants'

communications—inspired by political differences or otherwise—do not impact whether

defendants acted with actual malice as a matter of law. . . . Allegations of 'leftist enmity' cannot

trump the guarantees of the First Amendment." *Zucker*, 414 F. Supp. 3d at 92.

 Plaintiff also alleges that the Post did not seek comment prior to publication. Compl.

¶ 21. But "[i]f the caselaw is clear on any point it is that an author is under no duty to divulge

the contents of a book prior to publication in order to provide the subject an opportunity to

reply." *Secord v. Cockburn*, 747 F. Supp. 779, 788 (D.D.C. 1990) (citing cases); *see also*

*Lohrenz v. Donnelly*, 350 F.3d 1272, 1285-86 (D.C. Cir. 2003) (the "failure to verify statements

with the plaintiff . . . do[es] not amount to reckless disregard of the truth"). After all, "[t]he

decision of an author of what to specifically include in a [publication] is the quintessential

exercise of her First Amendment rights and to impose the duty that an author must first apprise

the subject of the [publication] of her substantive decisions would fundamentally undermine that

exercise." *Secord*, 747 F. Supp. at 788. Plaintiff simply "cannot rely" on the Post's decision not

to seek comment "as evidence of actual malice." *Id.* at 789.

 Plaintiff also alleges broadly that the Post disregarded "public information, known and

available to The Post," which allegedly showed that "the Campaign has not sought Russian help

in the 2020 election and has disavowed such assistance, and that there have been no reported

contacts between the Campaign and North Korea relating to any United States election." Compl.

---

valuable investigative journalism would be threatened by defamation laws, a result completely
contrary to *New York Times* and its progeny." *Parsi*, 890 F. Supp. 2d at 91.

¶ 20.  But as described below, this allegation cannot create a plausible inference of actual malice, because it does not undermine the challenged statements that the Post actually made in any material respect.

> **A.   The Complaint Does Not Plausibly Allege that the Sargent Column Was Published with Actual Malice.**

The portion of the Sargent column at issue focused squarely on the 2016 election.  Ex. A.  And notably, the Complaint does not (and cannot) disclaim that individuals associated with the 2016 campaign encouraged Russian efforts in the 2016 election.  *See id.*; *see also supra* pp. 4-7.  Plaintiff's allegations to the effect that "the Campaign has not sought Russian help *in the 2020 election*" has nothing to do with whether Sargent knew that what he wrote about *the 2016 election* was false.  *See* Compl. ¶ 20 (emphasis added).

The Complaint might be read to suggest broadly that the Mueller Report somehow contradicted Sargent's statement.  *See* Compl. ¶¶ 6, 14, 20.  But there can be no serious dispute that Sargent's column is a "rational interpretation" of the Mueller Report, which is all that need be said to rebut any allegation that Sargent acted with actual malice in describing it.  *See Time, Inc. v. Pape,* 401 U.S. 279, 290 (1971) (holding that a "rational interpretation" of a lengthy government report forecloses a finding of actual malice); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 512-13 (1984) ("The choice of such language, [even where] reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella."); *Von Kahl*, 856 F.3d at 117 (emphasizing that an "honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully").

Plaintiff does not dispute that Mueller found a "sweeping and systemic attack" by Russia on the 2016 election—that conclusion is squarely presented on the first page of the Mueller

Report.  *See* Ex. C vol. I at 1.  And it was hardly irrational for Sargent to interpret the Report to mean that "Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of those efforts."  As discussed above, the Mueller Report included more than one hundred pages discussing the substantial contacts and links between the 2016 Trump campaign and Russian operatives.  *See generally supra* pp. 4-7; *see also, e.g.*, Ex. C vol. I at 173 (emphasizing that "the investigation established multiple links between Trump Campaign officials and individuals tied to the Russian government," that "[t]hose links included Russian offers of assistance to the Campaign," and that "[i]n some instances, the Campaign was receptive to the offer").

Sargent's interpretation of the Mueller Report was not only rational; it was precise and accurate, carefully capturing the nuance of the Report.  In a critical sentence that Plaintiff omits in the Complaint, Sargent expressly acknowledged that "Mueller *did not* find sufficient evidence of a criminal conspiracy."  Ex. A (emphasis added).  Courts have uniformly held that the inclusion of information that cuts against the allegedly defamatory statement "'tend[s] to *rebut* a claim of malice, not to establish one.'"  *Lohrenz*, 350 F.3d at 1286 (emphasis original); *see also, e.g.*, *Tavoulareas*, 817 F.2d at 799 n.17 (similar).  Sargent's clear acknowledgement of the Mueller Report's ultimate conclusion on criminal conspiracy, and his link making the Report available to his readers, overcomes any possible allegation that he published his account of the Report with actual malice.

Finally, any suggestion that Sargent published his interpretation of the Mueller Report with a "high degree of awareness of . . . probable falsity," *Garrison*, 379 U.S. at 74, is negated by the fact that the Benjamin Wittes column in the *The Atlantic,* to which his interpretation was linked, interpreted the Report the same way.  As explained *supra*, Wittes noted that "If there

wasn't collusion on the hacking, it sure wasn't for lack of trying.  Indeed, the Mueller report *makes clea*r that Trump personally ordered an attempt to obtain Hillary Clinton's emails; and people associated with the campaign pursued this believing they were dealing with Russian hackers."  Ex. D (emphasis added); *see also, e.g.*, *id.* (emphasizing that "the campaign showed eagerness to benefit from Russian activity" when "senior staff took a meeting with Russian representatives who promised disparaging information on Clinton").  Wittes' consonant interpretation further underscores the point that Sargent did not publish with a "high degree of awareness" that his interpretation was "probabl[y] fals[e]."  *Garrison,* 379 U.S. at 74; *see also, e.g.*, *Cottle*, 404 F. Supp. 3d at 85 (rejecting plaintiff's argument that statements in column were self-evidently false where there was contemporaneous support, and dismissing complaint for failure to plausibly plead actual malice).

### B.   The Complaint Does Not Plausibly Allege that the Waldman Column Was Published with Actual Malice.

With regard to the Waldman column, the Complaint notably does not (and cannot) cast any doubt on Waldman's reliance on the ABC News interview, in which President Trump stated his willingness to "listen" to information on an opponent presented by a foreign power in the 2020 election, Ex. B; *see also* Ex. E ("I think I'd take it.").[10]  Indeed, ABC News summarized its transcript of the interview with a brief introduction that said, "President Trump opined on the Russia investigation, telling Stephanopoulos *he would consider accepting damaging information about his political rivals from foreign nations*."  Ex. E (emphasis added).  The Complaint cannot plausibly allege that Waldman acted with actual malice where he was relying upon a direct quote from President Trump himself, as well as ABC News' interpretation of that quote.

---

[10] President Trump also said "[t]he FBI Director [was] wrong" to suggest that if Russia offered such information, it should be referred to the FBI.  Ex. E.

Waldman's provocative invocation of the idea that North Korea or Russia might offer assistance to the campaign in response to President Trump's public comment may have stung, but his rhetoric falls comfortably within the "breathing space" afforded a columnist commenting on the grave public question of whether the President of the United States should accept damaging information about a political opponent from a foreign power. *See N.Y. Times*, 376 U.S. at 270; *see also, e.g.*, *Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 508 (3d Cir. 1978) ("[T]he publication of 'hyperbole,' even if caustic and irritating, cannot by itself support the inference that the publisher evidenced 'actual malice.'"); *Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 45, 52 (D.D.C. 1997), *supplemented,* 977 F. Supp. 52 (D.D.C. 1997), *aff'd,* 190 F.3d 556 (D.C. Cir. 1999) (the use of "rhetorical hyperbole" is privileged and falls "far short of actual malice").  The Complaint simply fails to allege any facts that could plausibly show that Waldman or the Post had subjective doubts about the truthfulness of any fact allegedly stated in Waldman's column. *See Parsi*, 890 F. Supp. 2d at 90.

<p style="text-align:center">*       *       *</p>

Because Plaintiff does not plausibly allege that the Post published either column with actual malice—and Plaintiff cannot do so—the Complaint must be dismissed with prejudice. *Zucker*, 414 F. Supp. 3d at 91; *Parisi*, 774 F. Supp. 2d at 319; *Biro*, 2014 WL 4851901, at *2.

## III.    THE FAIR REPORT PRIVILEGE SHIELDS THE ANALYSIS OF THE MUELLER REPORT IN THE SARGENT COLUMN.

New York's "fair report privilege" provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding."  N.Y. Civ. Rights Law

§ 74.[11]  The privilege is "absolute."  *BuzzFeed, Inc. v. DOJ*, 318 F. Supp. 3d 347, 360 (D.D.C.

2018) (analyzing New York law).  It applies broadly to "newspaper accounts of legislative or

other official proceedings," including investigative reports, and is applied with "some degree of

liberality."  *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 399

N.E.2d 1185, 1187 (N.Y. 1979).  "The test 'is whether the report concerns actions taken by a

person officially empowered to do so.'"  *Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F.

Supp. 2d 584, 588 (S.D.N.Y. 2009) (citations omitted); *see also id.* ("New York courts have

broadly construed the meaning of an official proceeding as used in Section 74.").

New York courts similarly give the requirement of a "fair and true report" "a liberal

interpretation . . . so as to provide broad protection to news accounts of [official] proceedings."

*Kinsey v. N.Y. Times Co.*, 2020 WL 1435141, at *6 (S.D.N.Y. Mar. 23, 2020).  Thus, "[f]or a

report to be characterized as 'fair and true' within the meaning of the statute . . . it is enough that

the substance of the article be substantially accurate."  *Holy Spirit*, 399 N.E.2d at 1187.  "[T]he

language used therein should not be dissected and analyzed with a lexicographer's precision . . .

because a newspaper article is, by its very nature, a condensed report of events which must, of

necessity, reflect to some degree the subjective viewpoint of its author."  *Id.*

The statement at issue in Sargent's column constitutes an account of an official

proceeding—the Mueller Report.  "Given the range of investigatory proceedings that have been

held to be official proceedings for purposes of Section 74, there can be no doubt that" the

Mueller Report—arguably the most prominent investigative report of the century—"constitutes

---

[11] The District of Columbia also recognizes a substantively similar common law fair report
privilege.  *See, e.g.*, *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990).
The Sargent column would be protected under D.C.'s fair report privilege for the same reasons
stated herein.

an official proceeding." *Test Masters*, 603 F. Supp. 2d at 588 (citing cases); *see also, e.g.*, *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 (2d Cir. 1988) (statement by head of New York FBI office regarding the execution of a warrant is an official proceeding); *Sweeny v. Ottaway Newspapers, Inc.*, 84 A.D.2d 899 (N.Y. App. Div. 1980) (report of state investigation into ticket fixing is an official proceeding).

To benefit from the protection of the privilege, the publication must "clearly attribute the statement in question to the official proceeding or document on which it is reporting or from which it is quoting." *Adelson*, 973 F. Supp. 2d at 482 (internal quotation marks omitted). That is precisely what happened here. As discussed *supra*, Sargent expressly tied the challenged portion of his column to the Mueller Report, with multiple textual references to the Report, a hyperlink to the full Report, and a hyperlink to the Wittes column about the Report. Ex. A. This goes well beyond the simple attribution required for the privilege to apply. *See* 1 Robert D. Sack, Sack on Defamation § 7:3.5[B] (5th ed. 2017 & Supp. 2020) (emphasizing "that attribution need not be explicit in the text—a hyperlink will do") (citing cases); *see also, e.g.*, *Adelson*, 973 F. Supp. at 485-86 (applying fair report privilege where challenged article linked to an AP article describing the official declaration at issue); *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1319-20 (S.D. Fla. 2018) (applying fair report privilege where the challenged article linked to a separate CNN article, even though the challenged article did not explicitly recount the official action).

Sargent's report also fairly represented the Report's conclusions in a way that was substantially accurate. The Complaint excerpts the column in a misleading fashion and fails to acknowledge that the column accurately explained that "*Mueller did not find sufficient evidence of a criminal conspiracy.*" Ex. A (emphasis added). In context, Sargent's statement that "Trump and/or his campaign . . . *tried* to conspire" necessarily means some action short of creating an

actual agreement to commit a criminal act. *See, e.g.*, *Holy Spirit*, 399 N.E.2d at 1187 (an article must not be "parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used"). Plaintiff does not even attempt to explain how the column could be construed as unfair in light of this clear statement.

More specifically, Sargent's characterization that Trump and/or his campaign tried to conspire with Russian efforts is a substantially accurate interpretation of the Mueller Report's findings. To take just two examples, the Mueller Report stated that after candidate Trump notoriously called for Russia to help find Hillary Clinton's emails, Russian military intelligence targeted "Clinton's private office" within five hours. *See supra* pp. 5-6. In addition, senior representatives of the Trump Campaign met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government. *See supra* p. 5. To be sure, the Mueller Report concluded that there was not sufficient evidence to indict individuals in Trump's campaign organization with criminal conspiracy, as Sargent expressly noted. Ex. C vol. I at 2; Ex. A. Nevertheless, in the words of Wittes' own synthesis of the Mueller report, "[i]f there wasn't collusion on the hacking, it sure wasn't for lack of trying." Ex. D.

Sargent's column is "not misleading"; it is "substantially accurate." *Holy Spirit*, 399 N.E.2d at 1187. That is all that is required. It need not stand up to "dissect[ion] and analy[sis] with a lexicographer's precision." *Id.*; *see Glantz v. Cook United, Inc.*, 499 F. Supp. 710, 716 (E.D.N.Y. 1979) ("To require, as a matter of law, that reporters of [official] proceedings recite the precise legal reasons for [official] action and provide their readers with definitions of terms whose meanings are heatedly argued over by those trained in the law would effectively eviscerate the protection of [section] 74."). The Sargent column is therefore privileged and

cannot give rise to a claim for libel.  Because this defect cannot be resolved through amendment, the Complaint's claim on the Sargent column should be dismissed with prejudice.

## IV.      THE WALDMAN COLUMN NEITHER CONCERNS NOR DEFAMES PLAINTIFF.

To survive a motion to dismiss, a plaintiff must "advance colorable claims of having been identified and described by defamatory comment"—that is, the plaintiff must set out a plausible claim that the allegedly defamatory statement was "of and concerning" him.  *Church of Scientology v. Time Warner*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), *aff'd*, 238 F.3d 168 (2d Cir. 2001).  "Whether a challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court, which "should ordinarily be resolved at the pleading stage."  *Gilman v. Spitzer*, 902 F. Supp. 2d 389, 394 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013).  Indeed, courts in this Circuit and across the country routinely dismiss cases for failure to allege a defamatory statement that was of and concerning the plaintiff.  *See, e.g.*, *id.*; *Luhn v. Scott*, 2019 WL 5810309, at *4 (D.D.C. Nov. 7, 2019); *Marsh v. Hollander*, 339 F. Supp. 2d 1, 9 n.10 (D.D.C. 2004); *Alf v. Buffalo News, Inc.*, 100 A.D.3d 1487, 1488 (N.Y. App. Div. 2012), *aff'd*, 995 N.E.2d 168 (N.Y. 2013).[12]

Just as a false and defamatory statement must be "of and concerning" the plaintiff, a statement that is "of and concerning" the plaintiff must be false and defamatory: it must "expose [the plaintiff] to shame in the minds of right-thinking persons."  *Michtavi v. New York Daily News*, 587 F.3d 551, 552 (2d Cir. 2009).  "Whether particular words are defamatory" is also "a legal question to be resolved by the court in the first instance."  *Id.*; *Tavoulareas*, 817 F.2d at

---

[12] The Court could dismiss the claim on substantially similar grounds even if it were to apply D.C. law.

779.  Courts regularly dismiss cases for failure to plead a sufficiently defamatory statement as well.  *See, e.g.*, *Michtavi*, 587 F.3d at 552; *Deripaska*, 282 F. Supp. 3d at 149.

Here, the allegedly false and defamatory statement at issue in the Waldman column—that President Trump had "invited" foreign assistance—is of and concerning Trump, not Plaintiff.  And the only arguable reference to Plaintiff—the question of whether Russia and North Korea will "give" assistance to "the Trump campaign"—is neither false nor defamatory.

Plaintiff alleges that the entire statement—"who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that *he* has invited them to offer their assistance," Compl. ¶ 4 (emphasis added)—is false and defamatory because Plaintiff purportedly has "disclaimed any intention to seek Russia's help in the 2020 election" and "is [not] seeking North Korea's help in the 2020 election," *id.* ¶¶ 16-17.  But Waldman's column does not say the campaign organization invited assistance—it unambiguously states that the invitation was made by *President Trump*, who is not a named plaintiff.   The column "would lead the average reader to conclude that [the President], not [P]laintiff [it]self," has invited foreign assistance in the 2020 election.  *Alf*, 100 A.D.3d at 1488.

A statement that is about President Trump cannot give rise to a defamation claim for Plaintiff, his campaign corporation.  "New York courts have repeatedly recognized that statements that refer only to a company's owner or employee are not 'of and concerning' the corporation itself."  *First Manhattan Co. v. Sive*, 2020 WL 70398, at *4 (N.Y. Sup. Ct. Jan. 07, 2020) (citing cases); *see also, e.g.*, *Church of Scientology*, 806 F. Supp. at 1161 ("Allegations of defamation by an organization and its members are not interchangeable," and "[s]tatements which refer to individual members of an organization do not implicate the organization." (quoting *Provisional Gov't of the Republic of New Afrika v. Am. Broad. Cos.*, 609 F. Supp. 104,

108 (D.D.C. 1985))); *Cohn v. Nat'l Broad. Co.*, 67 A.D.2d 140, 146 (N.Y. App. Div. 1979),

*aff'd*, 50 N.Y.2d 885 (1980) (law firm cannot bring claim arising out of film portraying one of its

members, Roy Cohn); *Arts4All, Ltd. v. Hancock*, 5 A.D.3d 106, 110 (N.Y. App. Div. 2004).  The

same is true of statements about an individual like President Trump, who is not even alleged to

be an officer or member of Trump for President.  In short, Trump for President cannot claim that

it was libeled by the statement that President Trump invited foreign assistance.

Trump for President may argue that the rhetorical question "who knows what sort of aid

Russia and North Korea will give *to the Trump campaign?*" is "of and concerning" Trump for

President.  *See* Ex. B (emphasis added).  But that is not at all clear: the reference would more

naturally be read to refer to efforts to advance Trump's re-election, rather than efforts to assist a

specific corporate entity.  And even assuming the vague reference to the "Trump campaign"

could be understood to refer to the corporation Trump for President, it is not actionable for

multiple reasons.  As noted above, it is a rhetorical question, not a statement of fact.  And even if

one were to assume it is a statement of fact—that Donald J. Trump for President, Inc. will

receive assistance from foreign nations—it is neither false nor defamatory.  Such an assertion

would be, at most, a *prediction* of *future* events, which cannot be proven false.  And the

statement does not mischaracterize Trump or his campaign in any way that is false and

defamatory.  President Trump himself has said that he thinks it is acceptable to take opposition

research from foreign countries.  When asked what he would do "if foreigners, if Russia, if

China . . . offers you information on opponents" in the 2020 election, he told George

Stephanopoulos that "*there's nothing wrong with listening. . . .  I think I'd take it.*"  Ex. E

(emphasis added).  President Trump even suggested it was a widespread practice in Congress to

accept such "oppo research" from foreign entities:  "you go and talk honestly to congressmen, they all do it, they always have.  And that's the way it is."  *Id.*

    If Plaintiff's candidate insists that he would "take" information from a foreign nation, it cannot be false and defamatory to suggest that a foreign nation might "give" such assistance to his campaign.  Trump for President may be embarrassed by its candidate's position, but that does not give rise to a defamation claim against the Post.  President Trump is the standard-bearer of his party and the man who defines what Trump for President stands for, and it is neither false nor defamatory of him or his campaign to report or comment on what he says about this or any other issue.  That is especially true in this case, given President Trump's insistence that, in his opinion, congressmen "all do it," and "always have."  Ex. E.

## CONCLUSION

    For the foregoing reasons, the Complaint should be dismissed with prejudice.


Date: July 20, 2020                Respectfully submitted,

                                  /s/ Kevin T. Baine

                                  Kevin T. Baine (D.C. No. 128600)
                                  Thomas G. Hentoff (D.C. No. 438394)
                                  Nicholas G. Gamse (D.C. No. 1018297)
                                  Anna Johns Hrom* (D.D.C. No. D00558)
                                  WILLIAMS & CONNOLLY LLP
                                  725 Twelfth Street, N.W.
                                  Washington, D.C.  20005
                                  Telephone:  (202) 434-5000
                                  kbaine@wc.com

                                  *Counsel for The Washington Post*

                                  * Admitted only in North Carolina (N.C. Bar No. 50280).  Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2020, I electronically filed the foregoing Motion to Dismiss and related papers with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

<div align="right">
/s/ Kevin T. Baine                      

*Counsel for The Washington Post*
</div>