**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:20-cv-00626-KBJ |
| ) | |
| **WP COMPANY LLC** ) | |
| **d/b/a** *The Washington Post*, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**</u>

David C. Tobin, Esq. (D.C. No. 395959)
TOBIN O'CONNOR & EWING
5335 Wisconsin Avenue NW, Suite 700
Washington, D.C. 20015
Telephone: (202) 362-5900
DCTobin@Tobinoconnor.com

Charles J. Harder, Esq.
HARDER LLP
132 South Rodeo Drive, Fourth Floor
Beverly Hills, California 90212
Telephone: (424) 203-1600
CHarder@HarderLLP.com

## **TABLE OF CONTENTS**

INTRODUCTION ………………………………………………………………....1

SUMMARY OF ALLEGATIONS IN COMPLAINT ……………………………………...2

ARGUMENT ………………………………………………………………………..3

     A.     Legal Standards for a Motion to Dismiss ....……………………………… 3

     B.     The Sargent Article Contains a False Statement of Fact …………………………4

     C.     The Waldman Article Makes a False Statement of Fact …………………………5

     D.     The Articles Are Not Protected By the Opinion Rule …………………………....6

          i.     General Legal Principles ……………………………………………....6

          ii.     The Articles Contain Factual Statements That Do Not Fall
                Within the Opinion Rule …………………………………………………7

     E.     The Complaint Properly Alleges Actual Malice …………………………………12

     F.     The Fair Report Privilege Does Not Protect the Sargent Article ……………….14

     G.     The Waldman Article is "Of And Concerning" the Campaign …………………17

CONCLUSION …………………………………………………………………………18

i

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

*Arpaio v. Cottle*, 404 F. Supp. 3d 80, 85-86 (D.D.C. 2019) …………………………………….. .13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ……………………………………………………… 3

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ……………….. 14

*Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 174 (W.D.N.Y. 2003) …………….... 17

*Harris v. D.C. Water & Sewer Authority*, 791 F.3d 65, 68 (D.C. Cir. 2015) …………………… 3

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 140 (D.D.C. 2016) …………………… 4

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) …………………………………… 6, 7

*Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995) …………………………………… 8

*Shipkovitz v. Washington Post Co.*, 571 F. Supp. 178, 183 (D.D.C. 2008) …………………… 14

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)……………………… 3

*Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971) ……………………………………………….. 12

*Washington Alliance of Technology Workers v. U.S. Department of Homeland Security*, 892 F.3d 332, 338-39 (D.C. Cir. 2018) …………………………………………………… 2

*Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) ……………………...…… 4

*Zimmerman v. Al Jazeera*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017) …………...…………… 12

## STATE CASES

*Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) ……………………………11

*Holy Spirit Ass'n v. New York Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979) ……………… 14

*Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1273-74 (N.Y. 1991) ……………...7, 9, 10

*Martin v. Daily News L.P.*, 990 N.Y.S.2d 473, 480-81 (N.Y. App. Div. 2014) ...………………10

*Parks v. Steinbrenner*, 520 N.Y.S.2d 374, 375 (N.Y. App. Div. 1987) ………………………… 8

*Polish-American Immigrant Relief Committee v. Relax*, 596 N.Y.S.2d 756, 759
  (N.Y. App. Div. 1993) …………………………………………………………………… 11

*Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986) ……………………………………… 9

## STATUTES AND RULES

N.Y.C.R.L. § 74 ………………………………………………………………………….. 14

Fed. R. Civ. P. 12(b)(6) …………………………………………………………………... 3, 13

## OTHER AUTHORITIES

*Merriam-Webster Online Dictionary* ……………………………………………………………16

## I.      INTRODUCTION

The *Washington Post* published two articles that contained false statements of fact which contradicted well-established facts of and concerning the Plaintiff, Donald Trump for President, Inc. (the "Campaign"), which operates the reelection campaign of the President.  The *Post* did this with full knowledge of what the actual facts were.  Under established defamation law, this is actionable, and the *Post* is not entitled to a dismissal of its claims at the pleadings stage, where the plausible allegations in the Complaint are taken as true.

Specifically, the *Post* published the factual claim that the Mueller Report said that the Campaign tried to conspire with the Russian government.  The Mueller Report actually says the opposite: that the evidence did *not* establish an attempted conspiracy.  The *Post* also published a claim, posed as the premise for a rhetorical question, that the Campaign had sought assistance from North Korea.  That claim was false and there is no factual basis whatsoever for it.

The *Post* claims these statements are protected opinions, but they are not.  Established law holds that false factual statements that a reasonable reader will take as making factual claims do not become "opinions" just because they are placed within a piece that may contain other statements that do not make factual claims.  The *Post* also contends that actual malice was not sufficiently pleaded, but this is wrong—the Complaint explicitly takes on the issue and pleads specific, plausible facts that, if proven, would establish that the *Post* published with reckless disregard for the truth.  The Fair Report Privilege does not apply, because the *Post* did not accurately state the contents of the Mueller Report.  Finally, the statements explicitly reference the Campaign and are thus "of and concerning" the Campaign.

The *Post*'s motion attempts to deflect from its false and defamatory statements and shift the focus to how the *Post* feels about President Trump and the Campaign's tactics and other

irrelevant matters.  In the process, the *Post* effectively confirms at least a portion of the Campaign's theory of malice in the Complaint.  The *Post*'s motion is not so much an analysis of why the articles at issue supposedly cannot support a legal claim, and more about attacking President Trump, who is not a party to this case, essentially implying that because Plaintiff is associated with the President, it does not have the same right that any other public figure would have to file a libel claim.  The *Post* essentially asks this Court to dismiss this case because the *Post* does not like President Trump and feels his campaign files too many libel suits.  No law supports that request.  The motion should be dismissed, and the case should go forward.

## II.   SUMMARY OF ALLEGATIONS IN COMPLAINT[1]

The Complaint alleges that on June 13, 2019, the *Post* published an article by Greg Sargent claiming that Special Counsel Robert Mueller concluded that the Campaign "tried to conspire with" a "sweeping and systematic" attack by Russia against the 2016 United States presidential election. *Complaint* ¶ 2.  This was, and is, false.  The Mueller Report concluded there was no conspiracy between the Campaign and the Russian government, and no United States person intentionally coordinated with Russia's efforts to interfere with the 2016 election. *Complaint* ¶ 3.  The statement was made with actual malice—the contents of the Mueller Report were well known to the *Post* at the time of publication.  *Complaint* ¶ 20.

The Complaint also alleges that on June 20, 2019, the *Post* published an article by Paul Waldman that said "who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that he has invited them to offer their assistance?"  *Complaint* ¶ 4.  This was a false statement of fact as well.  There has not been any reporting that the Campaign has been in contact with North Korea, and the Campaign has expressly disavowed seeking aid from the

---

[1] "The "allegations of the complaint are generally taken as true for purposes of a motion to dismiss." *Washington Alliance of Technology Workers v. U.S. Department of Homeland Security*, 892 F.3d 332, 338-39 (D.C. Cir. 2018).

Russian government in the 2020 election. *Complaint* ¶ 5. This statement was also made with

actual malice. Extensive public information has confirmed the Campaign is not seeking aid from

Russia, and there has been absolutely no reported contacts between the Campaign and North

Korea. *Complaint* ¶ 20.

The statements made by the *Post* have occurred in the larger context of extensive

evidence that the *Post*, and its two writers, Mr. Sargent and Mr. Waldman, oppose the President

and the Campaign and are biased against it. *Complaint* ¶¶ 18-19.

### III.    ARGUMENT.

#### A.    Legal Standards for a Motion To Dismiss.

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint by raising the

question of whether or not the complaint contains "sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Harris v. D.C. Water & Sewer Authority*, 791

F.3d 65, 68 (D.C. Cir. 2015) (internal quotation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678.

When evaluating a Rule 12(b)(6) motion, the "court must accept as true all of the

allegations contained in a complaint[,]" *Harris*, 791 F.3d at 68 (internal quotation marks omitted)

(quoting *Iqbal*, 556 U.S. at 678), and "grant plaintiff the benefit of all inferences that can be

derived from the facts alleged". *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C.

Cir. 2000) (internal quotation omitted).

The Campaign agrees with the *Post* that controlling D.C. Circuit authority provides that

New York law applies to this action, because that is the location of the Campaign's principal

place of business and is thus where the injury was suffered. *Weyrich v. New Republic, Inc.*, 235
F.3d 617, 626 (D.C. Cir. 2001); *see Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 140
(D.D.C. 2016).

**B.    The Sargent Article Contains a False Statement of Fact.**

The Greg Sargent article, after colorfully describing the claims of Russian interference in
the 2016 election discussed in the Mueller Report (claims that are not the subject of this action),
then states: "Mueller also concluded that Trump and/or his campaign eagerly encouraged, tried
to conspire with, and happily profited off of those efforts." The *Post*'s motion does not identify
a single sentence in the Mueller report wherein Mueller concludes that the Campaign "tried to
conspire with" the Russian government in its alleged interference in the 2016 election.

In fact, Mueller found there was insufficient evidence to support this claim. Here's the
language from Mueller's executive summary: "[T]he evidence was not sufficient to charge that
any member of the Trump Campaign conspired with representatives of the Russian government
to interfere in the 2016 election." *Mueller Report* at 9 (at https://www.justice.gov/
storage/report.pdf).

The *Post*'s argument relating to this issue is twofold. First, it claims that Sargent's *other*
claims—that there was Russian interference, and the Campaign encouraged it, and happily
profited from it—were supported by parts of the Mueller Report. However, in many ways this is
the entire point of this lawsuit: the Campaign disagrees with certain of Special Counsel Mueller's
conclusions, but does *not* object to any publication that accurately describes them. Yes, Mueller
did conclude that the evidence supported the claim that there was Russian interference in the
election, and that he believed there were contacts between people associated between the

Campaign and the Russian government.  Those statements are contained in the Mueller Report.  However, Mueller specifically found that the evidence was *not* sufficient to show a conspiracy.

This is important because Sargent does not present his claim of an attempted conspiracy as his own opinion, but instead falsely inserts the opinion into the mouth of Mueller.  Instead of the statement coming from the writer, where it can be evaluated by readers as an opinion, the *Post* falsely says that a government investigator, Robert Muller, after a wide-ranging investigation, made a conclusion that he actually did not make at all, but rather specifically *rejected* on the grounds of insufficient evidence.

The *Post*'s other argument is that another author (Benjamin Wittes) interpreted the Mueller Report the same way.  However, the relevance of this is not explained.  If two different people publish a defamatory statement, there is no legal rule that says that unless the plaintiff sues both publishers, there is no cause of action for defamation.  In any event, this is an evidentiary issue not cognizable in this proceeding.  At a trial, perhaps the *Post* can present evidence that Mueller's conclusions (despite being clearly set forth in the Report's executive summary) were so vague that another writer made the same mistaken conclusion about the Mueller Report that the *Post* did.  It is possible this would be admissible as an attempt to rebut the theory of actual malice plausibly pleaded in the Complaint, because the *Post* was arguably negligent rather than acting recklessly or intentionally.  Such a factual matter, however, cannot be resolved on a motion to dismiss.

### C.    The Waldman Article Makes a False Statement of Fact.

The Waldman Article asks the question "who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that he has invited them to offer their assistance?".

While posed as a rhetorical question, the factual premise of this statement is that the Campaign asked for and will be receiving aid from North Korea.

The *Post* claims this is not false because it linked to a quotation from an interview between the President and George Stephanopoulos, in which the President spoke of listening if *Norway* were to offer assistance or information to the Campaign.  "I think you might want to listen, there's nothing wrong with listening.  If somebody called from a country, Norway, 'we have information on your opponent.'  Oh, I think I'd want to hear it."

Waldman turned a statement about Norway into one about North Korea.  The President never said anything about North Korea.  Mr. Stephanopoulos never mentioned North Korea either (he mentioned Russia and China, but the President did not mention either of those countries in his response).  Where did the *Post* get North Korea from? Again, despite filing extensive motion to dismiss papers, the *Post* has not identified any information that it relied on to conclude that the Campaign was seeking assistance from North Korea.  Waldman made that up out of whole cloth.

### D.    The Articles Are Not Protected By the Opinion Rule.

#### i.  General Legal Principles.

Despite what the *Post* claims, neither the constitutional opinion rule or the New York opinion privilege holds that merely by slapping the label "opinion" on a piece, or hyperlinking to a source that offers no support for a factual claim, a defendant may proceed to make any false statement of fact it wishes to.

The U.S. Supreme Court states the federal constitutional rule on opinions in *Milkovich v. Lorain Journal Co.*:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth. Even if the speaker

> states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (holding that sports columnist could be held liable for defamation for false statements of fact in newspaper *opinion* column).

While New York ostensibly adds an opinion privilege on top of the federal rule, the New York opinion privilege does not hold that anything labeled an opinion is non-actionable. Instead, New York looks to the totality of the circumstances. On this point, the New York Court of Appeals (the state's highest court) held:

> The key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact. In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to "opinion" immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person.

*Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1273-74 (N.Y. 1991).

Thus, under both applicable rules, the inquiry is never as simple as "the defendants labeled the piece an opinion." Rather, the issue is whether a reasonable person would interpret the publications as making factual claims.

### ii. The Articles Contain Factual Statements That Do Not Fall Within the Opinion Rule.

Both the Sargent and Waldman Articles make factual claims. Sargent says the Mueller Report says the opposite of what it says: that Mueller concluded the Campaign attempted to conspire with the Russian government in its interference in the 2016 election. Waldman says that the Campaign invited North Korea to assist it in the 2020 election.

7

The *Post* seeks refuge in the rule that where facts are disclosed to the reader as the basis of an opinion, this can immunize a publication from defamation liability.  However, the *Post* ignores the predicate of this rule: that the facts must be deployed in support of an *opinion*, not a factual claim.

Here's the difference:  If Sargent had said that in his (Sargent's) opinion, the evidence in the Mueller report was sufficient to establish a conspiracy despite Mueller's conclusion that it did not, and cited or linked to the materials in the Mueller report that the *Post* cites to in its brief, that would be an opinion based on disclosed facts and non-actionable even if Sargent is wrong about the existence of a conspiracy.

However, that is not what Sargent did here.  Rather, his piece said that *Mueller* concluded the Campaign attempted to conspire with the Russians.  This is not an opinion; it is a factual claim regarding what is contained in the Mueller Report.

*Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995), cited by the *Post*, states the "disclosed facts" rule accurately:  "When an author outlines the facts available to him, *thus making it clear* that the challenged statements represent *his own interpretation* of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.") (emphasis added).  New York law is in accord: for something to be a "pure opinion" based on disclosed facts, it has to be a statement of *opinion*, not fact, in the first instance.  *Parks v. Steinbrenner*, 520 N.Y.S.2d 374, 375 (N.Y. App. Div. 1987) ("A non-actionable 'pure opinion' is defined as a statement of *opinion* which either is accompanied by a recitation of the facts upon which it is based, or, if not so accompanied, does not imply that it is based upon undisclosed facts.") (emphasis added).

8

Here, Sargent and Waldman did no such thing.  Sargent was telling his readers what *Mueller* concluded, not what he (Sargent) concluded.  Waldman was telling his readers that the Campaign had solicited support from North Korea, not merely interpreting the President's statement about Norway.

Under New York law, to determine whether something is fact or opinion, courts should rely on the test set out in *Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986).  *See Moor-Jankowski*, 567 N.E.2d at 1280 ("[T]he standard articulated and applied in *Steinhilber* furnishes the operative standard in this State for separating actionable fact from protected opinion.").

The *Steinhilber* standard is a four-part test:  "The four factors are: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."  501 N.E.2d at 554 (internal quotation omitted).

Under the *Steinhilber* test, neither article at issue constitutes a protected opinion.  First, both factual claims have precise meanings.  Sargent claims that Mueller concluded that the Campaign tried to conspire with the Russians, and Waldman claims that the Campaign could receive aid from North Korea now that the President has invited them to offer assistance.

Second, both statements are capable of objective characterization as true or false.  Mueller either did or did not conclude that the Campaign tried to conspire with the Russians, and the Campaign either did or did not invite North Korea to offer assistance to it.

9

Third, the full context shows that the statements are making factual claims.  The *Post* makes much of the fact that the pieces were labeled as "opinion", but under controlling New York Court of Appeals precedent, merely labeling something opinion does not protect the writer from liability for false *factual* statements within the piece.  *Moor-Jankowski*, 567 N.E.2d at 1273-74; *Martin v. Daily News L.P.*, 990 N.Y.S.2d 473, 480-81 (N.Y. App. Div. 2014) (holding newspaper opinion column, headlined "Corruption" and accusing a judge of being corrupt and taking payoffs to decide cases, made *factual* claims and thus was not protected by the opinion rule).

Fourth, there is nothing in the broader social context that would disclose that the *Post* writers were stating opinions rather than facts.  Of course, the articles contained criticism of a presidential campaign, as the *Post* points out.  However, there is no reason that just because the articles covered political subject matter, that a reasonable reader would conclude that they are not stating facts, particularly given the definitive language each writer uses.

Next, the *Post* argues that the Sargent article discloses facts from the Mueller report that supposedly support his claim, and Sargent also acknowledges that the Mueller report does not find sufficient evidence of a conspiracy.  However, as noted above, the factual findings in the Mueller Report that Sargent refers to do support his other statements about the Mueller report: that Mueller concluded that Russia interfered with the 2016 election and that the Campaign was supposedly "happy" to reap the benefits of it.  However, the Post does not identify *any* statement in the Mueller Report that supports Sargent's false claim that Mueller supposedly found an attempt to conspire.  There is no such statement in the Muller Report.  Sargent, rather, makes it up, and it is false, as alleged in the Complaint.

10

The fact that Sargent immediately retracted his false statement after making it—within the same article—is insufficient to immunize him from defamation liability.  (Rather, it shows consciousness that his statement was false at the time he made it.)  To rule otherwise would mean that those seeking to publish defamation could simply state the most breathtaking, false and defamatory claims, hoping readers would believe them, so long as they contradict themselves somewhere later in the article.  Under the *Post*'s standard, the statement: "A government report found John Smith committed murder.  But the government report did not find sufficient evidence of deliberate homicide", would be immunized from defamation liability even if the murder allegation was specifically found in the report to be unsupported by the evidence.  After all, the author contradicts the false and defamatory statement in the next sentence.  This cannot be the law.

With respect to Waldman, the *Post* omits the factual predicate of Waldman's question, in an attempt to put it within a purported "rhetorical question" rule.  However, if the Waldman statement is read in its entirety, it is not merely a rhetorical question: Waldman says flat out that the Campaign asked North Korea for assistance.  (Nor does merely phrasing something as a question mean that it cannot contain a defamatory factual implication anyway.  The famous example of this is: "When did you stop beating your wife?")

Nor is Waldman's statement rhetorical hyperbole.  Rhetorical hyperbole consists of statements that no reasonable reader would take as factual.  *Polish-American Immigrant Relief Committee v. Relax*, 596 N.Y.S.2d 756, 759 (N.Y. App. Div. 1993).  For instance, in the statement: "John is a thief.  He stole my heart", the word "thief" is rhetorical hyperbole because no reasonable reader would take the statement as alleging criminal theft or that the plaintiff unethically stole something.  *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993).

A reasonable reader would read Waldman as making a factual assertion, not using outrageous, colorful language.  Waldman was not using North Korea as a metaphor.  He was saying, as a matter of fact, that the Campaign invited its assistance.

### E.    The Complaint Properly Alleges Actual Malice.

This motion is a challenge to the pleadings.  At this stage, a plaintiff need merely allege a plausible theory of actual malice: "the complaint's allegations [must] support a reasonable inference that [the defendant] in fact entertained serious doubts as to the truth".  *Zimmerman v. Al Jazeera*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017).  The Complaint meets this standard.

With respect to Sargent, the theory of actual malice pleaded is that Sargent and the *Post* had the Mueller Report in their possession, obviously read it, and yet the *Post* knowingly or recklessly published a statement that completely misstated the conclusions of the Report.  These allegations easily clear the pleading standard.  It is an entirely reasonable inference that if the *Post* misstates the conclusions of the Mueller Report, it entertained serious doubts about the truth of such statements.  To conclude otherwise would be to assume the *Post* does not even read government reports before publishing reports on what they say.

The *Post* contends that Sargent's article was a "rational interpretation" or "honest misinterpretation" of the Mueller report.  *See Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971) (holding summary of long governmental report rationally interpreted it and was thus not actionable).  However, Special Counsel Mueller's conclusions as to the conspiracy claim were not some vague, prolix text subject to differing interpretations.  His conclusions were in his executive summary and were clear and explicit:  "[T]he evidence was not sufficient to charge that any member of the Trump Campaign conspired with representatives of the Russian government to interfere in the 2016 election."  The *Post*'s argument is essentially that it is

rational to interpret "up" to mean "down."  If the "rational interpretation" rule were extended to this, it would mean that publishers could always deliberately lie about the contents of long government reports and never face defamation liability, by claiming: "the report was long, it was an 'honest misinterpretation'".  It stretches the doctrine to the breaking point to apply it here.

The *Post* also relies on the contention that Benjamin Wittes supposedly made the same claim about the Mueller Report that Waldman did.  The *Post* offers no citation to any case that holds that the mere fact that some other author said the same thing as the defamatory publication is enough to dismiss a claim *at the pleadings stage* for failure to plead actual malice.  The one case the *Post* cites, *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 85-86 (D.D.C. 2019), contains no such holding; it dismisses a complaint as failing to allege actual malice where the content of court files lent support to the defendants' article.

The Wittes article may be evidence that the *Post* can present to a jury to rebut evidence of actual malice.  But it has no place in a Rule 12(b)(6) proceeding where the plaintiff's allegations are taken as true.

With respect to Waldman, the fact that, notwithstanding a huge amount of reporting on, and a vast investigation into, alleged contacts with Russia, *nobody*, including the *Post*'s reporters, has reported that the Campaign solicited any assistance from North Korea, gives rise to a powerful inference that the *Post* entertained serious doubts about the veracity of Waldman's claims when it published them.

The *Post* makes three arguments in response:  First, it tries to fit this case within the rule that Complaints that simply recite the element of actual malice are subject to a motion to dismiss. However, the Complaint does not do this.  Paragraph 20 articulates specific factual allegations as to how the *Post* acted with reckless disregard for the truth.

13

Second, the *Post* argues that the allegations that the *Post* is biased against the Campaign cannot, by themselves, establish actual malice.  Again, though, those allegations are not the only allegations of malice—the Complaint specifically pleads why the Campaign contends that the *Post* acted with reckless disregard for the truth.  The law permits courts to consider ill will *along with* other evidence of actual malice when evaluating the sufficiency of a claim.  *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Evidence of ill will *combined with* other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.") (Emphasis added).

Finally, the *Post* argues that the Waldman piece is rhetorical hyperbole.  That argument is answered in section 2d above.

### F.    The Fair Report Privilege Does Not Protect the Sargent Article.

To receive protection under the fair report privilege, a report of an official proceeding must be "fair and true."  N.Y.C.R.L. § 74.  The *Post*'s discussion of this rule is highly misleading.  The *Post* effectively implies that *any* report of an official proceeding is fair.  This is not correct.  The "fair and true" requirement limits the privilege to publications where "the substance of the article be substantially accurate."  *Holy Spirit Ass'n v. New York Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979).

This rule is consistent with the purpose of the fair report privilege, which is to prevent defamation liability in the situation where a journalist accurately reports what is said in a governmental proceeding or hearing, and the underlying information happens to be false.  Normally, republishing false information can subject a party to defamation liability, but the fair report privilege exempts a form of republication from this general rule.  *Shipkovitz v. Washington*

14

*Post Co.*, 571 F. Supp. 178, 183 (D.D.C. 2008) ("This 'fair report privilege' is an exception to the general rule that a republisher of a defamation is held to have adopted the defamation as its own.").

To place this rule in the context of the Mueller Report: obviously the Campaign disputes a number of allegations made against it in the Mueller Report.  But a journalist who accurately quotes some false statement in the Report in a story is not liable to the Campaign for republishing a defamatory statement, because the Mueller Report is an official proceeding and the journalist is fairly reporting its contents.

The fair report privilege is not applicable here.  The Campaign is alleging that the *Post* falsely stated the contents of the Mueller Report, and did so with actual malice.  The gravamen of the allegation here is that the *Post* misquoted and grossly mischaracterized a sentence in the executive summary of the Mueller Report. This case does not allege that the Muller Report itself contained a false statement.  That latter situation *would* give rise to the fair report privilege, but it is not an issue in this case.  The former situation (the *Post* misquoting the Muller Report) is the matter at issue here, and it falls squarely outside of the fair report privilege.

Put in the language of the case law, the Complaint alleges that the *Post* published a statement that was not substantially accurate concerning Mueller's conclusions.  The Sargent article claimed that the Mueller Report concluded that the Campaign attempted to conspire with Russia, and the Mueller Report rejected that conclusion as not supported by sufficient evidence. There is nothing "substantially accurate" about the *Post*'s statement.

The *Post*'s responses to this issue are to argue that there is a distinction between "attempting to conspire" and "conspiring" and to argue that two incidents in the Mueller Report described "attempted conspiracy."  These arguments are meritless.  First, there is no distinction

between "attempting to conspire" and "conspiring."  A conspiracy is "to join in a secret agreement to do an unlawful or wrongful act or an act which becomes unlawful as a result of the secret agreement".  *See Merriam-Webster Online Dictionary*, "conspiracy" and "conspire" (at https://www.merriam-webster.com/dictionary/conspire ).  In other words, the thing that makes something a conspiracy is an *agreement*.  What, exactly, could "attempting to conspire" mean other than making such an agreement?  The *Post* is not saying that the Campaign attempted to make an agreement with the Russians but the Russians rebuffed them.  The only possible meaning of "attempting to conspire" was that the Campaign *did* conspire with the Russians.

The *Post*'s examples from the Report are not examples of conspiracies, because there is no evidence of a secret agreement—very likely one reason why Mueller concluded there was insufficient evidence of a conspiracy.  So if, as the *Post* says, Russian Military Intelligence targeted Hillary Clinton's e-mails five hours after the President made a public statement about Russia and Secretary Clinton's e-mails, that is not evidence of a *secret* agreement.  And if Campaign representatives met with Russian nationals hoping they might receive some information about the 2016 campaign, as Mueller alleges, this is not evidence that anyone attempted to enter into an agreement with Russia, as opposed to simply receiving whatever information they had.

Ultimately, Mueller found some issues he felt warranted an investigation, he investigated them, and he concluded there was insufficient evidence of a conspiracy.  The *Post*, biased against President Trump and upset that Mueller had honestly assessed the evidence and concluded that it did not establish a conspiracy, asserted that Mueller had found the *opposite* of what he actually found.  This is the *antithesis* of a fair report.

### G.      The Waldman Article Is "Of And Concerning" the Campaign

The *Post* argues the Waldman article was not "of and concerning" the Campaign.  This is incorrect.  First, the sentence at issue specifically mentions the Campaign: it asks if North Korea is going to help the Campaign: "who knows what sort of aid Russia and North Korea will give to the Trump *campaign*, now that he has invited them to offer their assistance?" (emphasis added.)

Second, the sentence clearly connects the alleged actions of the President to the Campaign, and clearly implies that the President was acting on the Campaign's behalf (a reasonable inference for a reader to draw, especially given that the Campaign is dedicated to reelecting the President).

In any event, even if Waldman had not named the Campaign, the "of and concerning" requirement is not strictly limited to publications that name the plaintiff.  The requirement is merely that a reasonable reader who knows the plaintiff understand that the plaintiff is being referred to.  "In determining whether the 'of and concerning' requirement has been sufficiently pleaded, the court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement."  *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 174 (W.D.N.Y. 2003).

The *Post* does not refute this point; it simply says that it is "unclear" whether the statement is of and concerning the President or the Campaign.  However, this argument is not true: the statement mentions the Campaign and is clear in its context that the President was purportedly acting on behalf of his Campaign when he made his nonexistent appeal for North Korean assistance.  The statement also would not supply the grounds for a motion to dismiss even if it did, because the factual allegations in the Complaint are taken as true on a motion to dismiss.

17

## IV.     CONCLUSION

For the reasons set forth above, the motion to dismiss should be denied in its entirety.


Dated: August 24, 2020                          Respectfully submitted,

                                                TOBIN O'CONNOR & EWING

                                                By: /s/ David C. Tobin
                                                     David C. Tobin, Esq., D.C. No. 395959
                                                     TOBIN O'CONNOR & EWING
                                                     5335 Wisconsin Avenue NW, Suite 700
                                                     Washington, D.C. 20015
                                                     Telephone: (202) 362-5900
                                                     DCTobin@Tobinoconnor.com

                                                     Charles J. Harder, Esq.
                                                     HARDER LLP
                                                     132 South Rodeo Drive, Fourth Floor
                                                     Beverly Hills, California 90212
                                                     Telephone: (424) 203-1600
                                                     CHarder@HarderLLP.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of August, 2020, the foregoing Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion To Dismiss was filed electronically.  Service of this filing to all Parties, including those listed below, will be accomplished via electronic mail and regular U.S. mail upon the following:

Thomas G. Hentoff, Esq.
Williams & Connolly LLP
725 12th Street, N.W.
Washington D.C. 20005
thentoff@wc.com

/s/ David C. Tobin
David C. Tobin

19