UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., | |
| Plaintiff, | |
| v. | No. 1:20-cv-00626-KBJ |
| WP COMPANY LLC, d/b/a THE WASHINGTON POST, | |
| Defendant. | |

**REPLY MEMORANDUM IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS**

Kevin T. Baine
Thomas G. Hentoff
Nicholas G. Gamse
Anna Johns Hrom*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
kbaine@wc.com

*Counsel for The Washington Post*

* Admitted only in North Carolina.  Practice
supervised by D.C. Bar members pursuant to D.C.
Court of Appeals Rule 49(c)(8).

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.    THE CHALLENGED STATEMENTS ARE CONSTITUTIONALLY
PROTECTED STATEMENTS OF OPINION. ...................................................2

      A.    The Sargent Column Is Protected Opinion. ........................................2

      B.    The Waldman Column Is Protected Opinion. .......................................8

II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE ACTUAL MALICE. ...............12

      A.    The Complaint Does Not Plausibly Allege that the Sargent Column Was
Published with Actual Malice. ..............................................................12

      B.    The Complaint Does Not Plausibly Allege that the Waldman Column Was
Published with Actual Malice. ..............................................................15

III.    THE SARGENT COLUMN IS PROTECTED BY THE FAIR REPORT
PRIVILEGE. ................................................................................................16

IV.    THE WALDMAN COLUMN WAS NOT "OF AND CONCERNING," AND
DID NOT DEFAME, TRUMP FOR PRESIDENT. ...........................................18

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbas v. Foreign Policy Grp.*, 783 F.3d 1328 (D.C. Cir. 2015).........................................9

*\*Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013)........................4

*\*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ...........................................3

*\*Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019)..................................................15

*Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157 (S.D.N.Y. 1992) ................................................................................................................................19

*\*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017) .........................20

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998) ..............................................4

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 442 F. Supp. 3d 37 (D.D.C. 2020).....................13, 14

*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017)...............................................19

*Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167 (W.D.N.Y. 2003) ................19

*\*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ......................................... *passim*

*Gilman v. Spitzer*, 902 F. Supp. 2d 389 (S.D.N.Y. 2012)...........................................18

*Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986)............................................6

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ...........................13

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)....................................16

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ............................14, 16

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) ................................................12

*Luhn v. Scott*, 2019 WL 5810309 (D.D.C. Nov. 7, 2019) ............................................18

*Moldea v. N.Y. Times Co. (Moldea I)*, 15 F.3d 1137 (D.C. Cir. 1994).......................4, 5

*\*Moldea v. N.Y. Times Co. (Moldea II)*, 22 F.3d 310 (D.C. Cir. 1994) ............................4, 5, 8, 10

*Authorities upon which counsel chiefly rely are marked with asterisks.*

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) .......................................................16

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc) ................................. *passim*

*Palin v. N.Y. Times*, 2020 WL 5086531 (S.D.N.Y. Aug. 28, 2020) ..............................15

*Palin v. N.Y. Times*, 940 F.3d 804 (2d Cir. 2019) .......................................................15

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir. 1992) ....................9

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012) ................14

*Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1 (D.D.C. 2019) ....................12, 13

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc) ...................................12

*Time, Inc. v. Pape*, 401 U.S. 279 (1971) ..............................................................12, 13

*Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265 (E.D.N.Y. Oct. 25, 2019) ...............4, 10

### STATE CASES

*Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903 (N.Y. App. Div. 1990) ...................19

*Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797 (N.Y. App. Div. 2012) ...........................19

*Gross v. N.Y. Times Co.*, 623 N.E.2d 1163 (N.Y. 1993) .............................................11

*Holy Spirit Ass'n v. N.Y. Times Co.*, 399 N.E.2d 1185 (N.Y. 1979) ...........................16

*Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991) ..................................8

*Mann v. Abel*, 885 N.E.2d 884 (N.Y. 2008) .................................................................7

*Polish Am. Immigr. Relief Comm. v. Relax*, 596 N.Y.S.2d 756 (N.Y. App. Div. 1993) ...............................................................................................................11

*Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986) ...................................3, 5, 6, 8

### OTHER AUTHORITIES

N.Y. Civ. Rights Law § 74 ............................................................................................16

1 Robert D. Sack, *Sack on Defamation* § 7:3.5[B] (5th ed. 2017 & Supp. 2020) .........14

## INTRODUCTION

Plaintiff, Donald J. Trump for President, Inc., can only oppose the Post's motion to dismiss by mischaracterizing what the Post published.

- Opining on the Mueller Report, Greg Sargent *actually* wrote that: "Mueller . . . concluded that Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of [Russian] efforts. Yet Mueller did not find sufficient evidence of a criminal conspiracy." Ex. A to Post Br. But in its warped interpretation, Plaintiff argues that the column should be read to say the opposite—"that the Campaign *did* conspire with the Russians." Opp'n 16 (emphasis in original).

- Following an ABC News interview in which President Trump infamously said that there was "nothing wrong with listening" to "information on your opponent" presented by a foreign power, Ex. E to Post Br., Paul Waldman *actually* wrote, "[W]ho knows what sort of aid Russia and North Korea will give to the Trump campaign, now that [President Trump] has invited them to offer their assistance?" Ex B to Post Br. But in its retelling, Trump for President argues the column should be read to say "the Campaign asked for and will be receiving aid from North Korea." Opp'n 6.

In short, unable to make out a claim for libel based on the actual statements at issue, Plaintiff has undertaken to rewrite them. When the Post's columns are judged on their own terms, they fall well within the protection of the First Amendment and the common law: the statements at issue are constitutionally protected expressions of opinion, not false statements of fact; Plaintiff has not plausibly alleged that they were published with actual malice; the Sargent column is protected by the fair report privilege; and the Waldman column is neither "of and concerning" Trump for President nor defamatory of it.

These overlapping protections apply with special urgency in this case, for nowhere is the force of the First Amendment more keenly felt than in the context of political commentary on a presidential campaign.  It is for the courts to enforce those protections by weeding out unmeritorious defamation suits at the outset.  *See, e.g.*, *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013).  And it is for this Court in this particular case to make clear that this President and his campaign are no more immune to critical commentary than all the Presidents and all the presidential campaigns that came before them.  The Complaint should be dismissed with prejudice and without delay.

## ARGUMENT

### I.   THE CHALLENGED STATEMENTS ARE CONSTITUTIONALLY PROTECTED STATEMENTS OF OPINION.

The Opposition mischaracterizes the statements at issue in this case and fails altogether to account for the context in which they were published.  As explained below, the two statements at issue are subjective expressions of opinion, labeled as such, based on disclosed facts, and, therefore, fully protected under state and federal law.

#### A.   The Sargent Column Is Protected Opinion.

The statement at issue in the Sargent column is the columnist's interpretation of the Mueller Report.  He wrote: "Mueller also concluded that Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of those efforts.  Yet Mueller did not find sufficient evidence of a criminal conspiracy."  Ex. A to Post Br.  Sargent not only hyperlinked to the full text of the Mueller Report but also to another column in *The Atlantic* that conveniently set forth specific examples from the Report that supported Sargent's interpretation

of the Report.  Post Br. 10-11.[1]  The Post's initial brief discussed some of the factual statements

in the Mueller Report upon which Sargent's interpretation was based.  And notably, the

Opposition is not based on any contention that any of those factual statements in the Mueller

Report was false: Plaintiff confirms that "[t]his case does *not* allege that the Muller [sic]

Report . . . contained a false statement."  Opp'n 15 (emphasis added).[2]  The only question is

whether Sargent's interpretation of the factual findings in the Mueller Report, which mirrored

that of *The Atlantic's* columnist, is protected as an expression of subjective opinion.

To answer this question, Plaintiff asks the Court to apply the four-factor test first

articulated by the D.C. Circuit in *Ollman v. Evans,* 750 F.2d 970 (D.C. Cir. 1984) (en banc), and

later adopted by the New York Court of Appeals in *Steinhilber v. Alphonse,* 501 N.E.2d 550

(N.Y. 1986).  *See* Opp'n 9.  Those factors are "(1) whether the specific language in issue has a

precise meaning . . . or is indefinite and ambiguous; (2) . . . whether the statement is capable of

being objectively characterized as true or false; (3) . . . the full context of the communication in

which the statement appears; and (4) . . . the broader social context or setting surrounding the

communication including the existence of any applicable customs or conventions which might

'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'"

508 N.E.2d at 554 (quoting *Ollman*, 750 F.2d at 983).

---

[1] There is no dispute that hyperlinking to the Report satisfactorily disclosed it both for purposes of the opinion defense and fair report privilege defense; Plaintiff failed to challenge or discuss the many cases cited by the Post that have so held.  *See* Post Br. 17 & n.8, 32; *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013) (explaining that hyperlinks are "the twenty-first century equivalent of the footnote for purposes of attribution in defamation law"), *aff'd*, 876 F.3d 413 (2d Cir. 2017) (per curiam).

[2] Nor does the Opposition challenge the accuracy of anything in *The Atlantic's* summary of the Mueller Report.

The D.C. Circuit, however, which first articulated the four-factor test, has made clear that the analysis can be simpler when, as in this case, the statement at issue is an "assessment . . . supported by revealed premises" that are not themselves alleged to be false.  *Moldea v. N.Y. Times Co.* (*Moldea II*), 22 F.3d 310, 317 (D.C. Cir. 1994).  "[T]his type of statement is not actionable in defamation," the Court explained, "[e]ven if the . . . assertion . . . is verifiable," "[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts."  *Id.*; *see also, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 16 (D.D.C. 2013) ("Where the factual basis for a conclusion is outlined in the article . . . those statements are protected by the First Amendment."), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) (citing *Moldea II*); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1067-68 (9th Cir. 1998) ("an assertion, even if verifiable, is not actionable if it is 'supported by revealed premises' that are not false") (quoting *Moldea II*).

That is the case here.  It was crystal clear to the reader of the Sargent column that the author was providing his interpretation of the Mueller Report.  There was no suggestion to the reader—and there is no contention by the Plaintiff—that Sargent had access to or was referring to any undisclosed facts.  *See Moldea II*, 22 F.3d at 317; *Wexler v. Dorsey & Whitney, LLP*, 2019 WL 5485265, at *9 (E.D.N.Y. Oct. 25, 2019), *aff'd*, 2020 WL 3864950 (2d Cir. July 9, 2020). He "revealed [his] premises," *Moldea II*, 22 F.3d at 317, by hyperlinking to the Mueller Report and to another column that set forth specific facts in the Mueller Report supporting the interpretation that he and the other columnist shared.  And the reader was, therefore, free to review the facts and to "'draw his or her own conclusions based upon those facts.'"  *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (quoting *Moldea v. N.Y. Times Co.* (*Moldea*

*I*), 15 F.3d 1137, 1144-45 (D.C. Cir. 1994)).  For this reason, the Sargent statement is "not

actionable in defamation."  *Moldea II*, 22 F.3d at 317.

The conclusion would be no different if the Court were to apply all of the four factors

identified in *Ollman* and *Steinhilber*.  First, "the specific language in issue"—that "Trump and/or

his campaign eagerly encouraged, tried to conspire with, and happily profited off of" Russia's

cybertheft and disinformation campaigns—"does not have "a precise meaning," but is "indefinite

and ambiguous."  *Steinhilber*, 501 N.E.2d at 554; Ex. A to Post Br.  The actor was indefinite—

"Trump *and/or* his campaign."  And the actions were also ambiguous—what precisely does it

mean that one or the other "eagerly encouraged," or "tried to" conspire with, or "happily

profited" off of Russia's interference on behalf of the campaign?

Second, it is difficult to characterize such indefinite and ambiguous language as "true or

false."  Whether someone "eagerly encouraged" or "tried to conspire with" or "happily profited

off of" certain efforts is inherently a matter of subjective determination.  Trump for President

itself acknowledges that "Mueller did conclude that . . . there was Russian interference in the

election, and that he believed there were contacts between people associated between [sic] the

Campaign and the Russian government."  Opp'n 4-5.  Sargent interpreted these contacts as

suggesting "tr[ying]" to conspire, Ex. A to Post Br., as did Benjamin Wittes, cited in Sargent's

column, who wrote that "If there wasn't collusion on the hacking, it sure wasn't for lack of

trying," Ex. D to Post Br.  Sargent's analysis of Trump and/or his campaign's intent and attitude

toward Russia's interference is "of a kind typically generated in a spirited . . . dispute in which

judgment, loyalties, and subjective motives of the parties are reciprocally attacked and defended

in the media and other public forums" and hence "less likely to be understood as a statement of

fact rather than as a statement of opinion." *Ollman*, 750 F.2d at 977 n.12 (quotation marks omitted).

Third, the "context of the communication" was an online political blog explicitly labeled as "Opinion." The webpage had a one-word header, "Opinion," and the byline read "Opinion by Greg Sargent, columnist." As the cases cited in the Post's opening brief make clear, those labels, in addition to the use of hyperlinks to source material supporting the commentary, plainly signal that what is being offered are the subjective views of the columnist. *See* Post Br. 17-19.

Fourth, "the broader social context or setting surrounding the communication" was that of a political campaign, where the "customs or conventions" would surely "'signal to readers . . . that what is being read . . . is likely to be opinion, not fact.'" *Steinhilber*, 501 N.E.2d at 554 (quoting *Ollman*, 750 F.2d at 983). Trump for President argues that the Court should disregard the "broader social context" because of the language used. Opp'n 10. But it cites no authority for this proposition, and there is none. It also ignores the contrary authority cited by the Post. *See, e.g.*, *Farah*, 736 F.3d at 539 (noting that "[a]ny reasonable reader of political blog commentary knows that it often contains conjecture and strong language particularly where the discussion concerns such a polarizing topic as [President Obama's] birth certificate") (citation omitted); *see also Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1303 (8th Cir. 1986) ("[W]hen determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment.").

In short, all of the factors that may be considered on the question confirm that Sargent's assessment of the Mueller Report was a protected matter of opinion, not a false assertion of objective fact.

Plaintiff's argument that Sargent published a false statement of fact relies on distortions of the Sargent column and the Mueller Report.  Plaintiff argues that "the *Post* published the factual claim that the Mueller Report said that the Campaign tried to conspire with the Russian government.  The Mueller Report actually says the opposite: that the evidence did *not* establish an attempted conspiracy."  Opp'n 1.  But the Mueller Report did not say "that the evidence did not establish an *attempted* conspiracy" of any kind; it said that "[t]he investigation did not establish that the contacts described in [the Report] amounted to an agreement to commit *any substantive violation of federal criminal law*."  Ex. C to Post Br., vol. I at 181 (emphasis added).  And Sargent dutifully reported that fact when he wrote that Mueller "did not find sufficient evidence of a *criminal* conspiracy."  Ex. A to Post Br. (emphasis added).

Plaintiff argues, however, that Sargent's acknowledgment that there was insufficient evidence of a criminal conspiracy contradicted and amounted to a "retract[ion]" of the statement in his previous sentence that Trump and/or his campaign "tried to conspire" with the Russians.  Opp'n 11.  The two sentences appeared as follows:

> Mueller also concluded that Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of those efforts. Yet Mueller did not find sufficient evidence of a criminal conspiracy.

Ex. A to Post Br.  The second sentence was obviously not a retraction of the first: the two sentences were part of the *same* communication.  Nor did the second sentence contradict the first.  The second sentence—that there was insufficient evidence of a "criminal conspiracy"— provided an important qualification that fairly placed the first sentence in context, limited its meaning, and foreclosed any unwarranted legal inference that could be drawn from it.  It is, of course, a fundamental rule, cited in the Post's brief but ignored by the Plaintiff, that "the publication must be taken as a whole."  *Farah*, 736 F.3d at 535; *see also Mann v. Abel*, 885

N.E.2d 884, 886 (N.Y. 2008) (similar); Post Br. 15-16 (citing cases).  In this instance, readers would surely understand that in addition to a precise report of Mueller's legal conclusion, they were being presented with a subjective analysis of a complicated report, set forth in a political blog clearly labeled as Opinion, and published in the course of a political campaign where strongly stated opinions are the coin of the realm.

Plaintiff acknowledges that Sargent's statement would have been protected if he had said "*that in his (Sargent's) opinion*, the evidence in the Mueller report was sufficient to establish a conspiracy."  Opp'n 8 (emphasis added).  But that concession comes close to conceding the whole case, given that the two columns at issue here were in fact labeled "Opinion."  It is hardly necessary, however, for a writer to explicitly add the words "in my opinion" when it is clear that he is offering his "interpretation" of "revealed premises," and "the reader is free to draw his or her own conclusions," *Moldea II*, 22 F.3d at 317, or when the language, context and broader social setting otherwise signal that what is being presented is subjective opinion rather than objective fact, *Steinhilber*, 501 N.E. at 554-55.[3]

### B.   The Waldman Column Is Protected Opinion.

The challenged statement in the Waldman column is also a statement of constitutionally protected political commentary and rhetorical hyperbole.  Waldman wrote: "The 2020 election will obviously be distinct in all kinds of ways we can't yet anticipate. For instance, who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that he has invited them to offer their assistance?"  Ex. B to Post Br.  That passage contains two thoughts: an assertion that President Trump "has invited" foreign assistance; and a question "who knows

---

[3] Indeed, in the very case that Plaintiff cites, the New York Court of Appeals cautioned that the presence or absence of such a phrase does not "entitle a media defendant to 'opinion' immunity *or a libel plaintiff to go forward with its action*."  *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991) (emphasis added); *see* Opp'n 7.

what sort of aid Russia and North Korea will give to the Trump campaign?" as a result.  As demonstrated in the Post's opening brief, both of these thoughts were protected as the author's opinion: the observation that Trump had "invited" foreign assistance was Waldman's subjective interpretation or characterization of the interview to which his comment was linked; and the question Waldman posed based on that response was not an affirmative statement of historical fact, but merely a rhetorical question about what might happen in the future.  Post Br. 21-23.

Trump for President argues that the passage was false and defamatory because it supposedly asserts that "the Campaign asked for and will be receiving aid from North Korea." Opp'n 6.  But the column said no such thing.  It did not state that the Campaign "asked for" anything; it said that "he," i.e., *President Trump*, invited assistance.  And the column did not state that the Campaign "will be receiving aid from North Korea."  It only posed a rhetorical question: "[W]ho knows?"  As explained in the Post's opening brief, such "questions are not factual representations."  *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1336 (D.C. Cir. 2015); Post Br. 21-22.  Instead, they "put[ ] the reader on notice that what is being read is opinion." *Ollman*, 750 F.3d at 983; *see also Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 729-30 (1st Cir. 1992); Post Br. 22 (citing cases).

Trump for President argues further that the passage was false because President Trump supposedly only discussed interference from Norway, not North Korea.  *See* Opp'n 6 ("Waldman turned a statement about Norway into one about North Korea."); *id.* at 9 ("Waldman was telling his readers that the Campaign had solicited support from North Korea, not merely interpreting the President's statement about Norway.").  But the ABC News transcript shows that Trump's statement was not so limited:

> *Stephanopoulos*: Your campaign this time around, *if foreigners, if Russia, if China, if someone else offers you information on opponents, should they accept it or should they call the FBI*?
>
> *President Trump*: I think maybe you do both. I think you might want to listen, there's nothing wrong with listening. If somebody called from a country, Norway, "we have information on your opponent." Oh, I think I'd want to hear it.

Ex. E to Post Br. (emphasis added).  As the transcript makes clear, President Trump did not merely say he would listen to Norway.  He said "there's nothing wrong with listening" to "foreigners" including "Russia," "China," or "someone else."  And that is precisely how ABC News interpreted its interview of the President.  *See* Ex. E to Post Br. ("President Trump opined on the Russia investigation, telling Stephanopoulos he would consider accepting damaging information about his political rivals *from foreign nations*." (emphasis added)).

In short, Waldman did not mischaracterize Trump's statement as extending to Russia and North Korea.  It was certainly not "false" for Waldman to interpret Trump's response to Stephanopoulos's question to include those countries, or for him to characterize Trump's response as having "invited" assistance from them.  That was Waldman's subjective interpretation of the interview, and by linking to the interview he allowed the reader to judge for herself whether she agreed with his interpretation.  *Moldea II*, 22 F.3d at 317.  His interpretation was, therefore, a classic opinion based on disclosed facts or "revealed premises."  *Id.*; *see also Farah*, 736 F.3d at 536; *Wexler*, 2019 WL 5485265, at *9; Post Br. 22-23 (citing cases).

Waldman's characterization of Trump's response to George Stephanopoulos's question was, at most, the "kind of hyperbole that must be accepted in the rough and tumble of political argument," *Ollman*, 750 F.2d at 998 (Bork. J., concurring), protected under a long line of cases. *See* cases cited at Post Br. 22-23.  Trump for President argues that a reasonable reader might somehow interpret the question "who knows what sort of aid . . . North Korea will give to the

Trump campaign?" as a factual statement, rather than a rhetorical question.  Opp'n 11-12.  But it is difficult to comprehend how a *reasonable* reader could think any such thing.  "The test . . . is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)."  *Farah*, 736 F.3d at 537; *see also id.* (emphasizing that the inquiry focuses on "article's primary intended audience—that is, readers of" the blog).  The question Waldman posed addresses what *might* happen *in the future*, not what *has* happened *in the past*.  It could not conceivably be understood as a statement of historical fact.[4]

Trump for President makes much of its allegation that there have been no reports of any contact between Plaintiff and North Korea.  Compl. ¶¶ 5, 6, 17, 20, Opp'n 3, 5-6.   But Waldman did not state that any such contacts had occurred.  Post Br. 22.  And the mere allegation that they have not occurred does not transform Waldman's future-oriented question into a false statement of historical fact.

Finally, the four factors identified in *Ollman* and *Steinhilber* confirm that Waldman's question would be protected as opinion even if it were construed as an affirmative statement rather than a speculative question.  As to the first two factors, Waldman's question, as actually written, neither carries a precise meaning nor asserts anything that could be proven false.  And as

---

[4] Plaintiff ignores all of the Post's cases on the issue of rhetorical hyperbole.  And while it cites two cases, neither involved a rhetorical question on an online opinion blog, and neither supports its position.  *See* Opp'n 11.  In *Gross*, the court held that an allegation that the plaintiff was "corrupt" was not a mere rhetorical flourish where it followed a "lengthy, copiously documented newspaper series" that "was written only after what purported to be a thorough investigation," and presented "in the news section."  *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993).  Thus, the "common expectations that apply to . . . more opinionated journalistic endeavors," such as op-ed columns "were inapplicable."  *Id.*  And, in *Polish American*, the court held that the statement at issue was, in fact, "clearly rhetorical hyperbole."  *Polish Am. Immigr. Relief Comm. v. Relax*, 596 N.Y.S.2d 756, 758 (N.Y. App. Div. 1993).

to the third and fourth factors, here too the context is an "Opinion" blog published about a highly

charged presidential campaign where strong rhetoric is commonplace.

*      *      *

For these reasons, the two statements at issue are protected statements of opinion

providing the authors' subjective interpretation of the Mueller Report and the Stephanopoulos

interview.

## II.     THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE ACTUAL MALICE.

Plaintiff concedes that in order to survive this Motion, it must set forth factual allegations

plausibly establishing that the Post acted with actual malice.  Opp'n 12.  But its allegations fall

far short of that standard.

### A.     The Complaint Does Not Plausibly Allege that the Sargent Column Was Published with Actual Malice.

For two principal reasons, Trump for President does not and cannot plausibly allege that

Sargent acted with actual malice in characterizing the Mueller Report—first, because Sargent

carefully explained that "Mueller did not find sufficient evidence of a criminal conspiracy," Ex.

A to Post Br., and second, because Sargent's assessment was, at the very least, a "rational

interpretation" of a lengthy and complicated government report, *Time, Inc. v. Pape,* 401 U.S.

279, 290 (1971).

As for the first reason, Plaintiff has no response to the Post's cases establishing that the

inclusion of favorable qualifying information cutting against the supposedly defamatory

inference "'tend[s] to *rebut* a claim of malice.'"  Post Br. 28 (quoting *Lohrenz v. Donnelly*, 350

F.3d 1272, 1286 (D.C. Cir. 2003)); *see also, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C.

Cir. 1987) (en banc) (similar); *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 14 (D.D.C.

2019) (similar, granting 12(b)(6) dismissal).  These cases are dispositive here.  If the Post had

12

published with knowledge of falsity or reckless disregard for the truth, why would it have gone out of its way to state that there was insufficient evidence to charge criminal conspiracy?  This is the opposite of actual malice.  *See, e.g.*, *Tah*, 413 F. Supp. 3d at 14.  Plaintiff offers no response.

As for the second reason, Plaintiff does not dispute that a rational interpretation would be protected under the actual malice standard, but contends that the statement at issue was not a "rational interpretation" of the Mueller Report.  As explained in the Post's opening brief, Sargent's interpretation was fully supported by the factual findings in the Report.  Post Br. 27-29.  But even if Sargent had misinterpreted the document, his reading would certainly be a *rational* one.  Plaintiff argues that Mueller's ultimate legal conclusion was not "prolix" and not subject to "differing interpretations."  Opp'n 12.  But Sargent accurately reported that legal conclusion.  What is at issue is his interpretation of the lengthy recitation of facts in the Report that formed the basis for his interpretation that Trump and/or his campaign "eagerly encouraged, tried to conspire with, and happily profited off of" Russian efforts.  Ex. A to Post Br.  The cases cited by the Post on this issue involved documents far shorter than the two-volume, 450-page Mueller Report.  *See Pape,* 401 U.S. at 281 (misinterpretation of 307-page government report does not give rise to actual malice); *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 117 (D.C. Cir. 2017) (misinterpretation of 28-page mandamus petition does not give rise to actual malice).  It is an indisputable matter of public record (and recent case law in this district) that there *were* differing interpretations drawn about the lengthy Mueller Report, even as between Attorney General Barr and Special Counsel Mueller himself.[5]  There is simply no plausible

---

[5] After Attorney General Barr issued a letter purporting to summarize the very conclusion that Plaintiff now contends was "clear and explicit," Opp'n 12, Special Counsel Mueller sent a response noting that "'[t]here [was] now public confusion about critical aspects of the results of [Mueller's] investigation.'"  *See, e.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 442 F. Supp. 3d 37, 42 (D.D.C. 2020) (first and second alterations in original) (quoting the letter).  Indeed a court

argument that Sargent's reading was anything other than a rational interpretation of the Mueller tome.

That Sargent's column interpreted the Mueller Report in the same way as another column to which it linked, Wittes' column in *The Atlantic*, further shows that Sargent's interpretation was rational and not published with a "high degree of probable falsity."  Plaintiff raises an eyebrow at the rule that a publisher can reasonably rely on a reputable source like *The Atlantic*. Opp'n 13.  But it is well settled that "good faith reliance on previously published accounts in reputable sources . . .  precludes a finding of actual malice as a matter of law."  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (finding no plausible claim of actual malice where challenged statement was based on previously published newspaper reports); 1 Robert D. Sack, *Sack on Defamation* § 7:3.5[B] (5th ed. 2017 & Supp. 2020) (citing cases). Indeed, even if Sargent had not relied on Wittes's column in *The Atlantic*, the fact that another reputable commentator interpreted the Mueller Report in the same way as Sargent underscores that Sargent's interpretation was a rational one.

---

in this district recently "concurre[d] with Special Counsel Mueller's assessment that Attorney General Barr distorted the findings in the Mueller Report," because Barr's "summary failed to indicate that Special Counsel Mueller 'identified multiple contacts—'links,' in the words of the Appointment Order—between Trump campaign officials and individuals with ties to the Russian government,' and that Special Counsel Mueller only concluded that the investigation did not establish that 'these contacts involved or resulted in coordination or a conspiracy with the Trump campaign and Russia, including with respect to Russia providing assistance to the Trump campaign in exchange for any sort of favorable treatment in the future,' because coordination— the term that appears in the Appointment Order—'does not have a settled definition in federal criminal law.'").  *Id.* at 49 (brackets and citation omitted).  These are, of course, the same contacts that support Sargent's interpretation that the Campaign had tried to conspire.  *See* Post Br. 28.

Finally, Plaintiff concedes, as it must, that ill will standing alone is insufficient to support actual malice.  Opp'n 14; Post Br. 25-26.  The purported ill will alleged here is simply a generic allegation of liberal bias that could be invoked against any of the President's perceived "enemies" in the press.  But such "[a]llegations of 'leftist enmity' cannot trump the guarantees of the First Amendment."  *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019); Post Br. 25-26.

There is, in short, no conceivable basis alleged upon which an inference could be drawn that Sargent published his assessment of the Mueller Report with knowledge of falsity or reckless disregard for the truth. [6]

### B. The Complaint Does Not Plausibly Allege that the Waldman Column Was Published with Actual Malice.

Plaintiff's complaint also falls far short of plausibly alleging that the Waldman column was published with knowledge of falsity or reckless disregard for the truth.  Plaintiff argues that the Post must have entertained serious doubts as to the truth of the column, because "*nobody* . . . has reported that the Campaign solicited any assistance from North Korea."  Opp'n 13.  But again, the Post did not report that *the Campaign* invited foreign assistance.  And Waldman's comment that the President himself did so was fully supported not only by the President's own words during the ABC interview, but also by ABC's own interpretation of its interview.  Post Br.

---

[6] In the case cited in Plaintiff's Notice of Supplemental Authority, *Palin v. New York Times Co.*, 2020 WL 5086531 (S.D.N.Y. Aug. 28, 2020), the court reaffirmed that an allegation of "political opposition 'does not constitute actual malice.'"  *Id.* at *11 (quoting *Palin v. N.Y. Times*, 940 F.3d 804, 814 (2d Cir. 2019)); *see* Opp'n 14; Compl. ¶¶ 18-20.  Palin had alleged that the *Times* had falsely linked one of her political action committee's ads to the 2011 shooting of Congresswoman Gabrielle Giffords and others.  The court denied summary judgment on the issue of knowledge of falsity or reckless disregard for the truth because (a) the editorial page editor had asked a writer to research whether there was a link between the ad and the shooting; (b) the journalist found no such link and drafted the editorial to omit any such link; (c) the draft hyperlinked to a published article saying there was no such link; and (d) the editorial page editor wrote that there was a link anyway.  There is nothing like that alleged here.

9, 11; *Liberty Lobby*, 838 F.2d at 1297.  Here too, Waldman's interpretation, like ABC's, was certainly a "rational" one.

*        *        *

It would be remarkable indeed if the actual malice standard did not protect the kind of commentary that Waldman (and Sargent) provided in this case.  For it was designed to protect "vehement, caustic, and sometimes unpleasantly sharp attacks" upon public official and public figures, and to provide "breathing space" in which a free press can thrive.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  "Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments."  *Lane v. Random House, Inc.*, 985 F. Supp. 141, 148 (D.D.C. 1995) (quotation marks omitted).  The Complaint should be dismissed for failure to plausibly allege actual malice.

## III.   THE SARGENT COLUMN IS PROTECTED BY THE FAIR REPORT PRIVILEGE.

New York's absolute "fair report privilege" provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any . . . official proceeding."  N.Y. Civ. Rights Law § 74.  Plaintiff concedes that "the Mueller Report is an official proceeding" within the scope of the privilege.  *See* Opp'n 15; *see also* Post Br. 31-32.  Trump for President also admits that a publication is "fair and true" within the meaning of the statute if it is "substantially accurate."  Opp'n 15; *see Holy Spirit Ass'n v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979).  The only issue in dispute, therefore, is whether the Sargent article presented a "substantially accurate" summary of the Mueller Report.  It did.

Plaintiff argues that the Sargent column was not substantially accurate because it "claimed that the Mueller Report concluded that the Campaign attempted to conspire with

16

Russia." Opp'n 15-16. Of course, the column said "Trump and/or his campaign." Ex. A to Post Br. That consideration aside, Plaintiff maintains that "[t]he only possible meaning of 'attempting to conspire' was that the Campaign *did* conspire with the Russians." Opp'n 16. But the two statements are not at all the same—especially when the statement that "Trump and/or his campaign . . . tried to conspire" was followed immediately with the statement that "Mueller did not find sufficient evidence of a criminal conspiracy." Post Br. 32-33; Ex. A to Post Br. It is impossible to read the statement that Mueller "*did not*" find evidence of a criminal conspiracy to mean that Trump or his campaign "*did conspire*" with the Russians.

Given the numerous examples in the Mueller Report of contacts between the Trump campaign and Russian operatives, it was not unfair or inaccurate for Sargent to say that the Report showed that Trump and/or his campaign "tried" to conspire with Russians who were seeking to influence the election in his favor. *See* Post Br. 33. Plaintiff quibbles with some of these examples—arguing, for example, that President Trump's publicly urging Russia to leak Hillary Clinton's emails, which Russia promptly did, is irrelevant because that was not done in "secret." Opp'n 16. Here Plaintiff relies upon one online dictionary definition of a "conspiracy." But the same online dictionary says that to conspire is "to act in harmony toward a common end." https://www.merriam-webster.com/dictionary/conspire.[7] When the Mueller Report described candidate Donald Trump's urging Russia to release his opponent's stolen emails, that can fairly and accurately be described as an effort by Trump to get Russia to "act in harmony" with him toward their "common end" of securing his election. And the fact that

---

[7] Mueller did not define a conspiracy to require secrecy, either. *See* Ex. C to Post Br., vol. I at 2 (requiring "an agreement—tacit or express—between the Trump Campaign and the Russian government on election interference" including "more than the two parties taking actions that were informed by or responsive to the other's actions or interests").

Trump was acting in the open, rather than in secret, hardly shows that he wasn't trying to get Russia to act in support of that end.

Plaintiff also dismisses the meeting in which Campaign representatives met with Russian operatives in Trump Tower, arguing that that meeting was merely to "receive some information" rather than to enter into any agreement.  Opp'n 16.  But again, it was fair and accurate to characterize the Report's account of that meeting as an attempt by Trump Campaign representatives to get the Russians to "act in harmony" with them to advance Trump's election. And here, of course, the meeting *was* held in secret.

In short, it was fair and accurate for Sargent to summarize the evidence and findings contained in the Mueller Report as he did: "Mueller . . . concluded that Trump and/or his campaign eagerly encouraged, tried to conspire with, and happily profited off of those efforts. Yet Mueller did not find sufficient evidence of a criminal conspiracy."  Ex. A to Post Br. Accordingly, Sargent's column is absolutely privileged under New York's fair report statute.

## IV.    THE WALDMAN COLUMN WAS NOT "OF AND CONCERNING," AND DID NOT DEFAME, TRUMP FOR PRESIDENT.

Finally, the challenged passage in the Waldman column is neither "of and concerning" nor defamatory of Plaintiff, President Trump's corporate campaign organization.  The passage says that it was President Trump himself, not any corporate entity, who had invited foreign assistance; it did not say that Trump for President had done or said anything.

Citing no authority, Plaintiff seeks to dodge dismissal by suggesting that the "of and concerning" issue cannot be resolved on a motion to dismiss.  Opp'n 17.  But to the contrary, "[w]hether a challenged statement reasonably can be understood as of and concerning the plaintiff is a question of law for the Court," which "should ordinarily be resolved at the pleading stage."  *Gilman v. Spitzer*, 902 F. Supp. 2d 389, 394 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d

Cir. 2013); Post Br. 34 (citing cases).  The element must be plausibly pled, *see, e.g.*, *Elias v. Rolling Stone LLC*, 872 F.3d 97, 107 (2d Cir. 2017), and cases are regularly dismissed for failure to do so, *see e.g.*, *Luhn v. Scott*, 2019 WL 5810309, at *4 (D.D.C. Nov. 7, 2019); Post Br. 34 (citing multiple 12(b)(6) dismissals).

Plaintiff fails to show that, in context, a reasonable reader would understand Waldman's allegedly defamatory statement to be about the Trump for President campaign organization. Plaintiff argues that "the sentence at issue specifically mentions Trump for President," because it says "who knows what sort of aid Russia and North Korea will give to the Trump campaign, now that he has invited them to offer their assistance?"  Opp'n 17 (emphasis omitted).  Quite apart from the fact that this passage only refers to Trump's "campaign," not to the corporate entity Trump for President, it does not say that any entity other than Trump himself had said or done anything.  It said that Trump had invited foreign assistance, and it said "who knows?" what assistance might be forthcoming.  That says nothing about "Trump for President"—certainly nothing defamatory.

Indeed, the only case Plaintiff cites in this entire section of its brief makes clear that a plaintiff must show it "was the *target* of the allegedly libelous statement."  *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 3d 167, 174 (W.D.N.Y. 2003) (emphasis added); *see Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157, 1161 (S.D.N.Y. 1992) (similar), *aff'd*, 238 F.3d 168 (2d Cir. 2001).  This rule applies even where a plaintiff is named or otherwise identifiable.  *See, e.g.*, *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 904 (N.Y. App. Div. 1990) (holding that statement that "Bill Button, *the owner of Afftrex*, is also an evil man" is not of and concerning Afftrex (emphasis added)); *see also, e.g.*, *Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797, 799 (N.Y. App. Div. 2012), *aff'd*, 995 N.E.2d 168 (N.Y. 2013) (dismissing case

brought by chairperson and sole shareholder of company, because "the articles read as a whole . . . would lead the average reader to conclude that [plaintiff's company], not plaintiff himself, had cheated the government," even though the articles named plaintiff and referenced his plea deal); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 144-46 (D.D.C. 2017).

This case is similar to *Deripaska*, in which the plaintiff, a Russian oligarch, brought a defamation action against the Associated Press for statements that Paul Manafort had worked for the oligarch to benefit the Russian government, had failed to disclose that lobbying work to the Justice Department, and may have violated the Foreign Agent Registration Act as a result. 282 F. Supp. 3d at 145-46. The court held that any defamatory implication did not extend to the oligarch, even though he was the presumed beneficiary of potentially illegal lobbying. *Id.* So too, here: the statement that President Trump invited foreign interference does not attribute malfeasance to Plaintiff, even if it might be a beneficiary of such assistance in the future.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Date: September 14, 2020

Respectfully submitted,

/s/ Kevin T. Baine

Kevin T. Baine (D.C. No. 128600)
Thomas G. Hentoff (D.C. No. 438394)
Nicholas G. Gamse (D.C. No. 1018297)
Anna Johns Hrom* (D.D.C. No. D00558)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
kbaine@wc.com

*Counsel for The Washington Post*

\* Admitted only in North Carolina (N.C. Bar No. 50280).  Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2020, I electronically filed the foregoing Reply Memorandum in Support of Defendant's Motion to Dismiss with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

/s/ Kevin T. Baine
*Counsel for The Washington Post*

22