```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2   _____

 3   Donald J. Trump for           ) Civil Action
     President, Inc.,              ) No. 1:20-cv-00626-KBJ
 4                                 )
                      Plaintiff,   )
 5                                 ) Motion Hearing
     vs.                           ) (via Zoom)
 6                                 )
     WP Company LLC,               ) Washington, D.C.
 7                                 ) December 10, 2020
                      Defendant.   ) Time:  2:30 p.m.
 8   _____

 9          Transcript of Motion Hearing (via Zoom)
                        Held Before
10       The Honorable Ketanji Brown Jackson (via Zoom)
                 United States District Judge
11   _____

12                   A P P E A R A N C E S

13   For the Plaintiff:       Charles J. Harder
     (via Zoom)               HARDER LLP
14                            132 South Rodeo Drive, Fourth Floor
                              Beverly Hills, California 90212
15
                              David C. Tobin
16                            TOBIN, O'CONNOR & EWING
                              5335 Wisconsin Avenue, Northwest
17                            Suite 700
                              Washington, D.C. 20015
18
     For the Defendant:       Kevin T. Baine
19   (via Zoom)               Nicholas G. Gamse
                              Thomas G. Hentoff
20                            Anna J. Hrom
                              WILLIAMS & CONNOLLY LLP
21                            725 12th Street, Northwest
                              Washington, D.C. 20005
22
     Also Present:            Kalea Clark
23                            Jay Kennedy
                              James McLaughlin
24   _____

25
```

1    _____

2    Stenographic Official Court Reporter:
     (via Zoom)                 Nancy J. Meyer
3                               Registered Diplomate Reporter
                                Certified Realtime Reporter
4                               United States Courthouse, Room 6509
                                333 Constitution Avenue, Northwest
5                               Washington, D.C. 20001
                                202-354-3118
6    _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2            (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3   limitations of technology associated with the use of
technology, including but not limited to telephone and video
4   signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5   reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7            THE COURTROOM DEPUTY:  Your Honor, this is Civil

8   Action 20-626, Donald J. Trump for President, Inc. v. WP

9   Company, LLC.

10           Starting with plaintiff's counsel, I'm going to please

11   ask that you state your appearance for the record and introduce

12   any parties that you may have on the videoconference.

13           MR. HARDER:  Thank you.  Good afternoon.  Charles

14   Harder on behalf of the plaintiff, Donald J. Trump for

15   President, Inc.

16           THE COURT:  Good afternoon, Mr. Harder.

17           MR. TOBIN:  David Tobin also here, Your Honor, on

18   behalf of the plaintiff.  Good afternoon.

19           THE COURT:  Thank you, sir.

20           MR. BAINE:  Your Honor, this is Kevin Baine from

21   Williams & Connolly representing the defendant, The Washington

22   Post.  With me on the line but not visible on video are my

23   co-counsel Mr. Hentoff, Mr. Gamse, and Ms. Hrom.  And James

24   McLaughlin, assistant general counsel for The Washington Post

25   is also on the line.

1            THE COURT:  Good afternoon to all of you.

2        Let me start by reiterating that since we are proceeding

3    by videoconference technology and also teleconference

4    technology for the benefit of the public, it is a violation of

5    the District Court rules to have any recording or

6    rebroadcasting of today's proceedings.

7        This Court has scheduled this hearing in order to give

8    the parties in this matter the opportunity to provide argument

9    and hopefully insight with respect to the pending dispositive

10   motion which is The Washington Post's motion to dismiss the

11   Trump campaign's one-count complaint pursuant to Federal Rule

12   of Civil Procedure 12(b)(6).  In the complaint, the campaign

13   claims that The Post is liable for its publication of two

14   articles in 2019 that concern foreign interference in American

15   elections because, according to the complaint, the articles

16   contain false and defamatory statements about the campaign.  In

17   its motion, The Post contends that the campaign's complaint

18   failed to state a claim upon which relief can be granted for a

19   variety of reasons that I hope we'll be able to touch upon in

20   the time that we have this afternoon.

21       I want to say at the outset that I have reviewed your

22   briefs, that I'm familiar with your arguments, and I'm also

23   acutely aware of the limitations that we face with respect to

24   the kinds of robust discussions that I ordinarily like to have

25   given that we are proceeding in a virtual format.  My recent

1    experience has been that when we're on videoconference,

2    sometimes there are time lags between questions and answers,

3    and occasional problems with hearing when people's comments

4    overlap.

5          So this has meant that I have had to scale back in terms

6    of my ordinary level of engagement, which might be a relief to

7    you, but for me it means that I will necessarily be asking

8    fewer questions than I ordinarily do and will be mindful of the

9    time.  There is only so long that we can all stare at screens,

10   as we've now learned.

11         As far as the process that we will follow, I hope to

12   follow my ordinary course, which is not imposing any time

13   limits.  I'd like to just have a discussion of the issues that

14   the claims and the motion raises; and I also follow a slightly

15   unconventional pattern with respect to motions to dismiss

16   insofar as I typically ask plaintiff's counsel to speak first,

17   to provide an overview of the case, the claim that is being

18   made, and then I allow the movant, defendant's counsel, to

19   respond by explaining why the claim that the plaintiff has just

20   articulated and that is reflected in the complaint has to be

21   dismissed.  I then give the plaintiff an opportunity to respond

22   to -- directly to defendant's arguments about dismissal and

23   entertain any replies.

24         All right.  So I do know that this is a bit unorthodox

25   and perhaps defense counsel had been prepared to start us off,

1    but let me ask Mr. Harder, are you going to be arguing on -- on

2    behalf of the campaign?

3            MR. HARDER:  Yes, Your Honor.

4            THE COURT:  So maybe you can just start us off with a

5    general understanding of what you say is -- is wrong with the

6    articles at issue and -- and why you have brought this

7    complaint.

8            MR. HARDER:  Yes, Your Honor.  Thank you.

9        So the defendant has published two articles, and each

10   article has a defamatory statement in it, and those defamatory

11   statements are harmful to the campaign.  And the campaign sent

12   a letter to retract, apologize, and there was no retraction or

13   apology, and so the lawsuit was filed.

14       The first article has a statement by Greg Sargent who

15   writes -- and -- and we acknowledge that it says that it's an

16   opinion article, and there are some opinions in the article,

17   but also there are factual statements in the article as well.

18   And the factual statement that's at issue from that article is

19   that Robert Mueller, the Special Counsel, who was investigating

20   the President, "concluded" -- and that's a keyword --

21   "concluded that Trump and/or his campaign eagerly encouraged,

22   tried to conspire with" -- and those are keywords -- "and

23   happily profited off of those efforts," referring to an effort

24   of Russia's involvement in the 2016 election.  The keywords are

25   Mueller concluded that the Trump campaign tried to conspire

1   with Russia.

2          THE COURT:  All right.  Well, let me just clarify to

3   begin with.  You're not concerned about eagerly encouraged or

4   happily profited off?

5          MR. HARDER:  That's correct, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          MR. HARDER:  And it's -- it's not -- it's not an

8   opinion, this statement.  It's a statement of fact because the

9   writer is saying that it was Mueller's conclusion.  It's a

10  factual statement saying Mueller's -- Mueller, who wrote a

11  report -- it's a 450-page report.  It had come out shortly

12  before this article.  That Mueller concluded in his

13  investigation -- it was wildly known to the public that

14  Mr. Mueller was engaged in a long investigation and his report

15  was very thorough and had 448 pages, to be exact, of -- of

16  information in it.  And -- and that report had an executive

17  summary in it which stated what his conclusions were.

18          THE COURT:  All right.  Can I ask you a question,

19  Mr. Harder, because the fact that Mr. Sargent in this article

20  is explicitly referencing a statement or -- or explicitly

21  describing what Mueller said, means, I think, that he wasn't

22  purporting to speak from any personal or self-reported

23  knowledge about the campaign's actions or activities; right?

24  So this statement is a description of what Mueller said.

25          And what I'm trying to assess is whether that matters

1    for the purpose of this defamation claim in the following

2    sense; right?  In a typical defamation scenario, you know, just

3    the average defamation claim, you have a statement of fact that

4    is itself the representation of the author; right?  It would be

5    as if Mr. Sargent said straight off the bat:  The Trump

6    campaign tried to conspire with Russia, without any reference

7    to Mueller or anything else.  And it seems as though he is

8    making that statement.

9         But here Mr. Sargent's statement is about what Mueller's

10   report said.  So what, I guess, I'm trying to understand is

11   isn't Mueller the actually injured party in terms of the false

12   statement?  He is misrepresenting, according to you, what the

13   Mueller report said.  So why is that defamatory with respect to

14   the campaign?

15        MR. HARDER:  Thank you, Your Honor.

16        It's defamatory to the campaign because the campaign did

17   not try to conspire with Russia, and the Mueller report agrees

18   with that statement I just made.

19        Mr. Sargent says the opposite, though.  He says the

20   Trump campaign did try to conspire with Russia.

21        THE COURT:  But not of his own accord.  He is

22   mischaracterizing, according to you, the Mueller report.  So if

23   Mueller -- you know, isn't Mueller the real party in interest

24   here in terms of this real defamatory statement?

25        I mean, I could give you an example.  This is just, sort

1    of, a very rough hypothetical.  If the Mueller report said the

2    sky is blue and Mr. Sargent, reading that report, said the

3    Mueller report said the sky is red, I'm trying to understand,

4    isn't the Mueller report -- isn't Mueller the one who's being

5    harmed in the sense that his statements are being

6    mischaracterized?  He's the one who should be claiming that we

7    have a problem with what Sargent said.

8             MR. HARDER:  I don't know if Mueller would have a

9    cause of action.  I don't know if his feelings were hurt or if

10   he even read this article, because there were lots of articles,

11   but it's the campaign that was harmed because the campaign is

12   the subject of the sentence.

13            THE COURT:  All right.  Well, let me ask you this:

14   Since Mr. Sargent was characterizing a widely publicized,

15   well-advertised, easily accessible report, I'm wondering

16   whether that has some implications for your ability to claim

17   defamation.  Why can't the campaign just say:  No.  No.  He's

18   wrong.  Here is the report.  It's easily refutable, isn't it?

19            MR. HARDER:  Well, Your Honor, defamations can be

20   refuted, absolutely, but we have defamation laws so that people

21   and companies and entities that are harmed by false statements

22   have a cause of action for defamation so that they can seek

23   damages and they can seek an injunction to stop the harm that's

24   being caused.

25            THE COURT:  But I guess I'm -- I guess I'm asking you

1  about that harm.  To what extent is it actually harmful when

2  the statement at issue is a characterization of a widely

3  publicized, well-established report, which you say says the

4  opposite of what the statement says?  So what is really the

5  harm when the report is out there and, in fact, it's linked to

6  this very article and anyone can see, according to you, that

7  what Mr. Sargent said wasn't true?

8       MR. HARDER:  Well, Your Honor, the -- the report is

9  448 pages long, and the normal reader doesn't sit down and read

10  448 pages.  They read an article that summarizes for them what

11  the report says so that they don't have to go to the report and

12  read the report.  And if that summary says Mueller concluded

13  that the campaign tried to conspire with Russia, then the

14  reader is going to be left with the impression that the

15  campaign engaged in conspiracy, and that's --

16       THE COURT:  All right.

17       MR. HARDER:  And that's defamatory.

18       THE COURT:  Okay.  What about the other article?

19       MR. HARDER:  The other article is the Waldman

20  article, and the statement there by Mr. Waldman was ". . . who

21  knows what sort of aid Russia and North Korea will give to the

22  Trump campaign, now that he" -- referring to Mr. Trump -- "has

23  invited them" -- the countries -- "to offer their assistance."

24  The defamation there is that the implication is that the actual

25  statement is the Trump campaign will be receiving aid from

1  Russia and from North Korea because of something that Mr. Trump

2  had said, and that's false.

3         THE COURT:  It doesn't say they will be.  It says,

4  ". . . who knows what sort of aid . . ."

5         MR. HARDER:  ". . . what sort of aid Russia and North

6  Korea will give . . ."  It's -- it's essentially saying Russia

7  and North Korea will give the Trump campaign aid; who knows

8  what sort of aid it will be.

9         THE COURT:  So is that the defamatory part or -- I

10  thought it was more the invitation.

11         MR. HARDER:  Well, as to the campaign, the primary

12  defamation is the statement that the Trump campaign will be

13  receiving aid in the election.  This is -- this is not like

14  financial aid.  This is aid in the election, to get elected.

15  So hacked information, for example.  So the -- the defamatory

16  statement is that the Trump campaign will be receiving aid from

17  Russia and from North Korea.

18         THE COURT:  And you believe that's a provable fact?

19         MR. HARDER:  Yes, it is, because the Trump campaign

20  never received -- as far as the reelection, the Trump campaign

21  never received aid from either of them.  And as to any

22  election, the Trump campaign never received any aid from

23  North Korea.

24         THE COURT:  Correct.  But the statement is not

25  referencing the past.  Do you at least concede that?

1              MR. HARDER:  Yes, it's as to the reelection, because

2      the article came out during the reelection campaign.

3              THE COURT:  Right.  So it's not a representation

4      of whether the Trump campaign previously received aid.  It

5      appears to be discussing -- even if I accept your

6      characterization of it, it seems to be discussing what will

7      happen -- will happen -- in the future, and I guess I'm trying

8      to understand whether that is a provable fact for the purpose

9      of defamation.

10             MR. HARDER:  It is, Your Honor, because when somebody

11     said that the Trump campaign will receive aid from Russia and

12     will receive aid from North Korea and it's not true, that's a

13     provable fact.

14             THE COURT:  All right.  Let me -- before I turn to

15     defense counsel and have him embark on the arguments made in

16     the motion to dismiss, let me ask you one more question, which

17     is -- this is outside the context of the statement and more

18     about the litigation.

19             If you assume for the purpose of this question that I

20     agree with the defendant that your complaint fails to state a

21     claim and has to be dismissed, do you have a position as to

22     whether or not that dismissal should be with or without

23     prejudice?  The defendant says with prejudice.  I noted that

24     you didn't speak to that directly in your opposition.  So are

25     you -- would you be seeking the opportunity to cure, if

1    possible, or not?

2          MR. HARDER:  Well, if Your Honor were to indicate

3    that there were facts missing that are necessary to allege --

4    for example, if we failed to -- inadvertently failed to include

5    an element of a cause of action, we would ask that we have

6    leave to fix that error.

7          But if Your Honor is saying that you're going

8    to dismiss because the First Amendment completely wipes out

9    this entire cause of action and there's no hope it will survive

10   and nothing that we can say or do is going to change your mind,

11   I'm not asking for leave to amend because it sounds like the

12   Court is not inviting any additional information or -- or

13   allegation.

14          THE COURT:  I understand.  That just wasn't in your

15   brief.  So I'm trying to, sort of, sort through whether or not

16   you forfeited any such request by not actually making it in

17   that context.  I haven't written this down, so I don't know.

18   But at least it's helpful to know at this point that you would

19   potentially seek to cure depending upon what my ruling said in

20   that circumstance.

21          All right.  Let me turn to defendant's counsel,

22   Mr. Baine.

23          MR. BAINE:  Yes, Your Honor.  Good afternoon.

24          THE COURT:  Good afternoon.

25          MR. BAINE:  Over the past four years, Donald Trump

1    has complained of fake news, he has attacked the press as the

2    enemy of the people, and he's called for changes in the law of

3    libel.  And our point here today is simply that it would have

4    to be major changes in the law of libel for this lawsuit to

5    survive.

6        The complaint, as Your Honor noted, is not that *The Post*

7    originated some false claim about the President or his

8    campaign.  It is that *The Post* misread or mischaracterized what

9    the Mueller report said and what President Trump himself said

10   in an ABC interview about his willingness to accept damaging

11   information about his opponent from a foreign country.  Of

12   course, Mr. Trump's willingness to accept foreign assistance of

13   this kind was very much part of the political debate in recent

14   years.  The Mueller report and the President's statements in

15   the ABC interview were themselves widely reported and analyzed,

16   and they were subject to differing interpretations by the

17   President's supporters and his detractors.

18       THE COURT:  All right.  Well, let me start by asking

19   you, sort of, the -- the same question that I asked Mr. Harder,

20   which is:  Are you suggesting that as -- somehow as a matter of

21   law that because *The Post* was not originating these

22   representations, that they were characterizing other published

23   and widely disseminated statements, that there is no basis for

24   claiming libel on that ground?  In other words, that -- is that

25   enough alone to say that he -- he fails to state a claim?

1          MR. BAINE:  Pretty much so, yes, Your Honor.

2          Let me direct the Court's attention to what the

3    D.C. Circuit said in *Moldea v. New York Times*, 22 F.3d 310 at

4    page 316.  I'm reading from the *Moldea* opinion, and it refers

5    to two Supreme Court cases, Masson against The New Yorker and

6    Pape v. Time -- *Time v. Pape*.  And this is what the

7    D.C. Circuit said, quoting *Masson* explaining *Pape*.

8          *Masson* explained that *Pape*, quote, distinguished between

9    a direct account of events that speak for themselves and an

10   article descriptive of what the commission had reported.  In

11   the *Pape* case they're talking about a Civil Rights Commission

12   report.  Here we're talking about a Special Counsel report.

13   *Moldea* continues to say, "*Time, Inc.*" *against* "*Pape* took into

14   account the difficult choices that confront an author who

15   departs from direct quotation and offers his own interpretation

16   of an ambiguous source."

17         So, Your Honor, there are two related principles here

18   that are themselves dispositive, either one of which is

19   dispositive of this case.  The first one is that whenever any

20   author sets forth an opinion or an interpretation of what

21   happened or what someone said and reveals the underlying

22   facts or statements upon which his or her interpretation or

23   opinion is based, the opinion or interpretation is protected.

24   Period.

25         THE COURT:  So can I just pause, because I do want to

1     hear your two principles, but I'm trying to flesh it out.

2          You seem to be suggesting that this is an opinion versus

3     fact; that it is an interpretation, which I think at least

4     Mr. Harder would agree that Mr. Sargent was referencing the

5     Mueller report; that his comment and his statements concerned

6     the Mueller report, but he appears to be -- he, Sargent --

7     appears to be making a statement that is originated with him

8     about what Mueller said.

9          So, you know, to the extent that you're talking about

10    the sort of underlying representations about what the Trump

11    campaign did, fine.  That's something that Mueller was

12    commenting on, and we know that Sargent wasn't making an

13    original or direct comment about that, but he is making an

14    original or direct comment insofar as he says Mueller

15    concluded that.  So why does that create a whole other level

16    of -- you know, a whole other reason why there is no defamation

17    liability here?  He's still making a statement that seems like

18    a statement of fact and that the campaign says is untrue.

19          MR. BAINE:  Well, Your Honor, it is -- it is an

20    interpretative statement, and I want to talk about that a

21    little bit more later, because the second principle that I want

22    to get to -- and I'll come back to your question.  The second

23    principle is that when an author is interpreting another

24    literary work, the Supreme Court made the -- the court in

25    *Moldea* said that interpretation is protected as long as it's a

1   reasonable or supportable one, even if the author hasn't set

2   forth or disclosed or linked to the facts upon which his

3   interpretation is based.  So that's the second principle.

4        But let's get back to the -- to the first one.  Is it

5   enough that Mr. Sargent disclosed or revealed the basis for his

6   interpretation by hyperlinking to the Mueller report?  All the

7   courts say that it's sufficient to hyperlink.  That's a 21st

8   version of a footnote, and multiple cases we cite in our brief

9   say that constitutes disclosure of your underlying facts.

10       This is what *Moldea* says, and this is at page 317 of

11  that same opinion.  It says, ". . . even if" a book "review's

12  assertion that the book contains 'too much sloppy journalism'

13  is verifiable . . ." -- in other words, even if that's not

14  exactly what we think as pure opinion, but even if it's, kind

15  of, a factual statement that's verifiable, that assessment was

16  protected because it was supported by revealed premises.

17            THE COURT:  But, of course, the statement -- I'm

18  not looking at the case that you just read, but if the

19  statement is this work contains "too much sloppy journalism,"

20  that's obviously opinion.  He's describing the underlying

21  work as opposed to making a statement that seems like fact

22  insofar as it is announcing what the underlying work actually

23  said.

24            MR. BAINE:  I would agree with you, Your Honor, that

25  that is an opinion.  It sounds like an opinion, but the court

1    said right in the passage I just read, well, even if you don't

2    think it sounds like opinion, even if it's verifiable -- and

3    one of the key distinctions that -- that people draw between

4    opinions and facts is that facts can be proven true or false.

5    They're verifiable.

6         The court says here, even if that statement is

7    verifiable, it's protected because the basis is revealed.  And

8    if you think about -- that's the critical point here.  As

9    Your Honor said before, anybody who's wondering about that

10   statement can click on the link and see exactly what it was

11   that was the basis for that conclusion.  Now --

12             THE COURT:  Well, let me just be clear, because I had

13   sort of appreciated the linking issue as relevant to actual

14   malice.  What you're saying is it also relates to opinion in

15   this way?

16             MR. BAINE:  Yes, Your Honor, it -- it relates to the

17   principle that a statement -- certainly a statement that's

18   interpreting another report -- is protected as long as you

19   disclose the underlying facts.  In this case, the underlying

20   report.  And so the cases that we cite in our brief -- I think

21   it's page 8, if I remember correctly, but I could be wrong on

22   that.  We cite at least half a dozen cases that say for

23   purposes of the principle that an opinion based on disclosed

24   facts is protected, it's a sufficient disclosure for you to

25   hyperlink to the underlying material.

1          So the hyperlink is as if it's dropped into a footnote,

2     and that is the basis for your statement.  And so the -- the

3     principle that an opinion based upon disclosed facts applies

4     when the disclosed facts are revealed by a link.  So that's our

5     first ground for seeking dismissal of this complaint about the

6     Sargent piece.

7          The second ground is that even if you don't think that

8     that was an adequate disclosure of the underlying material,

9     Mr. Harder says:  Well, it's a long document.  It's hard to

10    read.  Well, it's a long document.  That's why columnists have

11    to try their best to characterize -- to interpret it, to

12    synthesize it so that the reader will have something to go on.

13    And this is what you would expect a political blogger to do,

14    not to regurgitate 498 [sic] pages, but to try to offer some

15    interpretation.

16          THE COURT:  All right.  So is this the fair report

17    privilege now?  Is that where we are in terms of the legal

18    analysis that you're applying to this argument?

19          MR. BAINE:  I haven't gotten there yet.  That's a

20    third argument.

21          THE COURT:  Okay.  So this is still about opinion?

22          MR. BAINE:  Argument No. 1, opinion based on

23    disclosed facts are protected.

24          Argument No. 2, even if you haven't disclosed your

25    facts, if you are offering interpretation of what someone else

1    wrote -- and that's what was at issue in *Moldea* -- your

2    interpretation is protected as long as it's reasonable or

3    supportable.

4         And -- and there are actually two subparts to that,

5    Your Honor, if I can get complicated here.  Time against Pape,

6    the Supreme Court decision, reaffirmed in the *Masson v.*

7    *New Yorker* case and in the case of Bose against Consumers

8    Union, says that when you are interpreting a document, a

9    lengthy document, that bristles with ambiguity, you can't be

10   found to have acted with actual malice if your interpretation

11   is reasonable.

12        And so in that case, the court said it was reasonable

13   for *Time, Inc.* -- *Time* magazine -- to report that allegations

14   referred to in a Civil Rights Commission report were actually

15   findings of the Commission.  The Commission report said that in

16   this lawsuit the following allegations were made.  And the

17   reporter kind of misinterpreted that and reported as the

18   Commission making findings to that effect.  And the

19   Supreme Court said, well, yeah, there really weren't findings

20   but -- but that -- that whole document bristled with ambiguity

21   and we can't say that wasn't a rational reading of the entire

22   document.  And so --

23             THE COURT:  All right.  But why -- I -- I guess

24   I'm -- I'm trying to understand why you think that the Mueller

25   report bristles with ambiguity on this point?

1          MR. BAINE:  Okay.

2          THE COURT:  I'm seeing that the introduction to

3    Volume 1, page 2, right up at the top, at least as you have

4    filed this, where it says, ". . . the investigation did not

5    establish that members of the Trump Campaign conspired or

6    coordinated with the Russian government in its election

7    interference activities."  It doesn't seem like an ambiguous

8    statement in terms of the Trump campaign's coordination with

9    the Russian government.

10         MR. BAINE:  I think that what Mr. Mueller said on the

11   general issue of cooperation and coordination and conspiracy,

12   in fact, is ambiguous, so let me explain.

13         Mueller concluded and Sargent reported that there was

14   not sufficient evidence to charge a criminal conspiracy.  What

15   Mueller found was something less than a criminal conspiracy,

16   and that's what Sargent described or characterized as eagerly

17   encouraging, trying to conspire, and happily profiting.  Now,

18   remember, Sargent said no legal conspiracy.  So he wasn't

19   speaking in legal terms when he said that Trump and/or his

20   campaign were eagerly encouraging, trying to conspire, and

21   happily profiting.

22         The dictionary definition of conspiracy, the ordinary

23   lay reader's definition of conspiracy is this -- and I'm

24   quoting from the dictionary, I believe, that plaintiff's

25   counsel cited in their brief.  Conspiracy means, quote, to act

1    in harmony toward a common end.

2         Here's what the Mueller report said about acting in

3    harmony toward a common end, which is conspiracy in the lay

4    sense.  Quote, the Special Counsel investigation established

5    that the Russian government perceived it would benefit from a

6    Trump presidency and worked to secure that outcome, and that

7    the Campaign expected it would benefit electorally from

8    information stolen and released through Russian efforts.

9    So --

10        THE COURT:  Wait, wait, Mr. Baine.  Don't stop there.

11   Don't stop there.

12        MR. BAINE:  Okay.

13        THE COURT:  We're now getting to the point that I

14   pointed out before.

15        MR. BAINE:  Right.

16        THE COURT:  It -- right?  ". . . electorally from

17   information stolen and released from Russian efforts, the

18   investigation did not establish that members of the Trump

19   Campaign conspired or coordinated with the Russian government

20   in its election interference activities."

21        MR. BAINE:  That's right.  And Sargent didn't say

22   they conspired.  He said "tried to conspire."  And let me tell

23   you why I think that's appropriate.

24        Okay.  When Mueller explained -- this is on page 2 of

25   his report.  When he explained that he didn't find a legal

1    conspiracy, he said that's because that requires -- and I'm

2    quoting -- ". . . more than the two parties taking actions that

3    were informed by or responsive to the other's actions or

4    interests."

5         But he found lots of evidence of that.  Lots of evidence

6    of Russia and the Trump campaign, quote, taking actions that

7    were informed by or responsive to the other's actions or

8    interests.  In other words, lots of evidence of conspiracy in

9    the lay sense, and so it wouldn't be unreasonable or irrational

10   to say that at the very least all of these findings amounted to

11   trying to conspire in the lay sense.

12        When -- when then-candidate Trump's campaign manager and

13   his son and son-in-law met in Trump Tower to seek information

14   from the Russians about Hillary Clinton; when Donald Trump told

15   his campaign manager that, quote, more releases of damaging

16   information would be coming, and the campaign should plan,

17   quote, a communications strategy based on those stolen emails;

18   when Trump said, Russia, if you're listening, I hope you'll be

19   able to find the 3,000 [sic] emails that are missing, which

20   prompted Russian intelligence for the first time to target

21   Clinton's personal office; when WikiLeaks published emails

22   stolen by the Russian intelligence agency, and Donald Trump

23   promptly obtained a link from WikiLeaks to help him dig through

24   those emails; and the list goes on, all of that sure looks to

25   me like trying to conspire with the Russians in the lay sense

1    as --

2            THE COURT:  But you're distinguishing between trying

3    to conspire and conspiracy or conspire, which is what the

4    report says there was no -- not no evidence, but that the

5    report says that the investigation did not establish that the

6    campaign conspired.

7            MR. BAINE:  Not establish and --

8            THE COURT:  You perceive a difference between that

9    and interpreting the investigation as saying the campaign tried

10   to conspire.

11           MR. BAINE:  I think that Mr. Mueller said very

12   clearly we didn't find a legal conspiracy in the sense of an

13   actual agreement, but he made clear that that was something way

14   more than acting in response to and encouraging each other.

15   That is --

16           THE COURT:  Well, can I -- can I -- I mean, we've

17   spent a fair amount of time on the sort of underlying basis,

18   but, again, defamation pertains to the particular statement

19   that is being made.

20           So let me ask you this:  There is a statement -- the

21   next sentence after the challenged language in Mr. Sargent's

22   piece says, "Yet Mueller did not find sufficient evidence of a

23   criminal conspiracy."  Do you concede that that is a statement

24   of fact, or do you think that's an opinion as well?

25           MR. BAINE:  That is an accurate statement of

1    Mueller's legal finding.

2              THE COURT:  Well, what is -- what is the difference

3    between that and the sentence before?  It's all a paragraph

4    that talks about what Mueller found.

5              MR. BAINE:  The difference is that that's almost word

6    for word what Mueller said.  And when Sargent said that he

7    found that -- that there was -- eagerly encouraging and trying

8    to conspire, what that means is -- and he links to the report,

9    there's a lot of evidence that amounts to trying to conspire in

10   a lay sense.

11        So he has distinguished in those two sentences between

12   the legal criminal sense of a conspiracy and trying to

13   conspire in a lay sense.  And what I am saying is that the

14   language that he used is well within the freedom granted to a

15   political commentator to offer his interpretation, his

16   characterization, his understanding of what all those other

17   findings amount to.

18             THE COURT:  All right.  So if I disagree with that,

19   are your arguments about -- are your arguments about actual

20   malice in the alternative?

21             MR. BAINE:  Yes.  So --

22             THE COURT:  Okay.

23             MR. BAINE:  -- if the Court were to find that

24   contrary to our view this is not a protected opinion based on

25   disclosed facts, that it must be analyzed as a pure statement

1  of fact, then you have to ask yourself two questions.  Number

2  one, is there an allegation of actual malice here that can

3  survive a motion to dismiss?  And, number two, is it,

4  nevertheless, within the freedom of the First Amendment?

5       And so Time, Inc., against Pape, the case I talked about

6  before involving the Civil Rights Commission report, held that

7  a mischaracterization of an allegation as a finding, was

8  protected by the First Amendment, could not be the basis for a

9  finding of actual malice because it wasn't an entirely

10  irrational interpretation of that report taken as a whole.

11       And so what I am saying is that it's not an entirely

12  irrational interpretation.  To say that all that other evidence

13  in the Mueller report amounted to trying to conspire in a lay

14  sense, the exact interpretation offered by the author of the --

15  of *The Atlantic* column to which Sargent linked in the very

16  sentence where he said, Mueller concluded that -- that Trump or

17  his campaign tried to conspire.  Right there in that sentence,

18  he linked to another columnist in *The Atlantic*.

19       THE COURT:  I understand what you're saying,

20  Mr. Baine, but I guess I'm a little confused because I

21  understood actual malice to relate to the subjective intentions

22  of the author.  And you seem to be setting it up as a standard

23  that has something to do with the rationality or irrationality

24  of the author's interpretation; whereas, I'm just trying to

25  understand whether this complaint says enough about the

1  subjective intentions of the author to -- to give rise to a

2  reasonable inference of actual malice.

3       MR. BAINE:  Okay.  The only thing the complaint says

4  about that is there was ill will.  You can say that there was

5  ill will and bias about every commentator that appears on

6  MSNBC, CNN, Fox News, and the writers' opinions in *The*

7  *Washington Post* and the *New York Times*.  That has never held to

8  be enough to constitute an allegation of actual malice.

9       THE COURT:  But, of course, how -- how -- how can

10  they say anything in the complaint if I'm right that the

11  standard has to do with the knowledge of the -- of the author?

12  Don't we have to let this complaint go through to at least

13  summary judgment so we have some evidentiary basis for

14  evaluating his subjective knowledge?

15       MR. BAINE:  Well, the law at this point is that he

16  has to allege facts that would be sufficient to establish a

17  plausible case of actual malice.  And what I'm saying is that

18  three Supreme Court cases have reaffirmed the principle that

19  if -- that when you are dealing, as I said before, not with

20  historical facts but with interpretations of other literary

21  material, lengthy 490[sic]-page reports, that there cannot, as

22  a matter of law, be a finding of actual malice if what the --

23  what the reporter or author wrote amounts to at least a

24  rational or reasonable interpretation of the lengthy, complex

25  document.

1          And what I am saying is that you can look at all the

2     findings laid out in our -- in our brief and see that there's

3     no way in the world you can call it completely irrational to

4     characterize those findings as amounting to a campaign trying

5     to act in harmony with Russian agents toward a common end.

6     That is not only not irrational, it seems to be the only

7     conceivable interpretation of this report.

8          That if you take the lay definition of a conspiracy and

9     you point out that you're not saying an agreement was entered

10    into, you're only saying that someone tried to do something,

11    that has to be a reasonable interpretation for purposes of this

12    principle.  And it is a matter of law in -- in the *Time, Inc.*

13    *v. Pape* case.  And the principle reaffirmed in -- in -- both in

14    the *Masson* and *Bose* cases that irrational interpretations means

15    no actual malice.

16         But let's go beyond that.  Let's look at *Moldea* v. Time,

17    Inc., [sic] in the D.C. Circuit, the case I mentioned before.

18    That was not an actual malice case.  The plaintiff wasn't the

19    public figure.  But the Supreme Court said that when you are

20    interpreting another literary work, as long as your

21    interpretation is supportable, reasonable -- reasonable or

22    supportable -- by reference of the work, it's protected by the

23    First Amendment.  Period.  Forget actual malice.  Forget

24    subjective intent.

25         And the reason for that is, I would say, twofold, but

1   both reasons relate to each other.  If something is a

2   reasonable interpretation of a complicated, very difficult to

3   penetrate document, it's very hard to say that it's

4   demonstrably false, which is the burden in every libel case.

5   But apart from that, what the court said in the *Moldea* case is

6   that -- is that the First Amendment provides license --

7   interpretative license, was the term that the court used on --

8   that's on page 316.  The Court says, "Masson, Bose and Pape

9   recognized that some materials by their very nature require

10   interpretation . . ."  I would dare say that 498[sic]-page

11   document, for it to be accessible to the general public,

12   requires interpretation.

13           THE COURT:  All right.  I think I understand, but

14   it's interesting that you're sort of filtering all of these

15   arguments through the context of this being an interpretation

16   of another work.

17       We should talk about the Waldman statement that is not

18   so similarly situated, correct, in terms of its -- in terms of

19   its nature.  And then also I'm -- I'm interested in your fair

20   reporting privilege argument and -- and how that fits into all

21   of this.

22           MR. BAINE:  May I take the fair report privilege

23   argument first because that relates to Sargent and not to

24   Waldman?

25           THE COURT:  Yes.  Yes.

1          MR. BAINE:  So the fair report is still a -- a fourth

2     layer, if you will, after opinion based on fact, after it can't

3     be malice, and after *Moldea*'s statement that it's protected as

4     a First Amendment license, then you get to the privilege to

5     report on an official report.  A fair and accurate account of

6     the Mueller report is protected -- has always been protected by

7     the common law.  That privilege is not quite as broad as the

8     First Amendment privilege recognized in subsequent cases, but

9     that privilege itself would cover this because we would say

10    that -- that taken as a whole, the Sargent statement is fair

11    and accurate.

12          You cannot take that first sentence in isolation -- and

13    the plaintiff likes to do that.  You must take the two

14    sentences together.  One, that "Trump and/or his campaign

15    eagerly encouraged, tried to conspire, happily profited," all

16    rhetorical flourishes that are the kind of thing you expect

17    to see in a political blog, the kind of things you hear

18    every day on Morning Joe and Fox News, but the next sentence

19    says, "Yet Mueller did not find sufficient evidence of a

20    criminal conspiracy."  Those two sentences combined are a fair

21    summary, and so it would be privileged even under the common

22    law.

23          THE COURT:  So do those two arguments, the argument

24    that you made at the beginning about this being a reasonable

25    and supportable interpretation and the fair and accurate

1    reporting privilege that you're talking about now, do they rise

2    and fall together?

3              MR. BAINE:  They're very similar, Your Honor.  I

4    guess I would only say that the reasonable interpretation

5    standard is even more generous to us because you could

6    conclude, oh, I don't think it was fair and accurate, but,

7    yeah, it's not totally unreasonable.  So I think the -- the

8    reasonableness standard is even more generous to us, but they

9    are quite similar, Your Honor.

10             THE COURT:  All right.  Let's turn --

11             MR. BAINE:  So on Waldman --

12             THE COURT:  Yes.

13             MR. BAINE:  -- the first thing that's apparent about

14   the Waldman statement is it's a question, and the questions

15   can't be actionable as this court -- as the D.C. Circuit said,

16   to the extent Judge Kavanaugh said in the *Abbas v. Foreign*

17   *Policy* case.

18             The second thing to say is that it doesn't say anything

19   about -- anything defamatory about Trump for President, Inc.

20   It says that Donald Trump invited assistance.  And if I heard

21   Mr. Harder correctly before, they're not even quarreling at

22   this point with the word "invited assistance" as much as

23   they're quarreling with the idea that there will be assistance.

24   And I was struck by the fact that in the brief, they don't seem

25   to have any quarrel with the sentences referenced to Russia;

1    and in fact, they didn't complain about any of the three

2    sentences in the Sargent case that say that Trump invited

3    foreign assistance.  In fact, that was the whole point of the

4    Sargent piece.  That was the headline of Sargent.

5              THE COURT:  All right.  But that doesn't -- but that

6    doesn't mean that they can't --

7              MR. BAINE:  No.

8              THE COURT:  -- bring a --

9              (Indiscernible simultaneous cross-talk.)

10             MR. BAINE:  So what I think -- what I think I

11   understand Mr. Harder now to be saying is that the defamatory

12   import of this sentence, in his view, is that there will be aid

13   coming from North Korea to the Trump campaign.  And that's

14   what, I believe, Counsel is now saying is the defamatory.  And

15   I guess I would say, that is not a historical statement of fact

16   that can be true or false.  That is at most a prediction about

17   what might happen in the future.  It's more fairly

18   characterized as complete speculation and certainly can't be a

19   provably false statement.

20             I would also say it's not defamatory to say that a

21   campaign had received foreign assistance if you're not also

22   saying that it asked for it or sought it.  The mere receipt of

23   something can't itself hold you up to public scorn or hatred or

24   contempt.  It would only be --

25             THE COURT:  Is that really your position, Mr. Baine?

1     I mean, you're -- I'm really surprised by that.  So you're --

2     you're suggesting now that the only thing that would be

3     defamatory would be the suggestion that the campaign solicited

4     but not that the campaign received?

5          MR. BAINE:  Let me be clear.  Since the kind of

6     assistance we're talking about is information, if something

7     came in over the transom, a piece of information, and it

8     happened to originate in a foreign country, that's not the same

9     as soliciting it or seeking it.  Things come over the transom

10    all the time.

11         I guess all I'm saying is if you -- if you divorce the

12    "will receive" from the "invite," I don't think it'll be

13    defamatory depending on the context to say:  Oh, North Korea

14    just lent some assistance to the Trump campaign, maybe just

15    by -- by releasing, itself, a bunch of emails without going

16    through the Trump campaign.  That would be assisting the

17    campaign, but there would be nothing wrong with it if you

18    didn't encourage them to do it.

19         So -- but the main point here, Your Honor -- I don't

20    want to get too tied up on the defamatory point.  The main

21    point is it's not provably true or false.  It's speculative

22    about the future.

23         And, finally, if -- if the plaintiff is complaining

24    about the word "invited," what I'd like to say about that is

25    that is clearly an interpretative statement based on disclosed

1    facts.  The word "invited" was hyperlinked to the George

2    Stephanopoulos interview where, when President Trump was asked

3    whether he would accept information about his opponents from

4    Russia, China, or some other foreign country, and his answer

5    was, "Oh, I think I'd want to hear it;" "I think I'd take it."

6    To call that an invitation to assistance is the kind of

7    rhetorical flourish one expects to see in a political blog and

8    that one hears every day, every morning, afternoon, and

9    evening, on cable television, and that is what people

10   anticipate they're going to hear in a column.  That word is

11   clearly an interpretation of a very specific question and

12   answer that are hyperlinked at that point in the column.

13        So the reader --

14        THE COURT:  All right.  I'm going to let Mr. Harder

15   come back, unless there's something else you wanted to say at

16   this point.  You'll have another opportunity, Mr. Baine.

17        MR. BAINE:  Thank you very much, Your Honor.

18        THE COURT:  All right.  So, Mr. Harder, obviously you

19   can begin and end however you wish, but I will ask you at some

20   point if you will clarify with respect to the Waldman article

21   whether the essence of the defamatory statement, in your view,

22   is the part about what will -- what sort of aid will be given

23   to the Trump campaign or the invitation of the offer of --

24   invitation to them to offer assistance or both.

25        MR. HARDER:  The answer is both, Your Honor.  It's --

1    because they're both in the same sentence, and they both are

2    joined together.  The concept is that Mr. Waldman is saying,

3    number one, the President, connected with his campaign, of

4    course, has, quote/unquote, invited assistance from Russia and

5    North Korea and, therefore, Russia and North Korea will be

6    giving aid to the Trump campaign.  So it's both.

7         The -- the President did not invite Russia or

8    North Korea to give assistance to his campaign.  That's just --

9    there is no evidence whatsoever that that occurred.  There was

10   an exchange in an interview between Mr. Stephanopoulos and

11   Mr. Trump, and Mr. Trump gave a hypothetical that if Norway

12   were to say we have information, would he listen to the

13   information that they had, and I believe he said:  Yes.

14   Possibly.  I mean, I don't have the exact words.  Yes.

15   Possibly.

16        THE COURT:  Well, I do, Mr. Harder.  And,

17   in fairness, the whole Norway insertion is actually in the

18   midst of the conversation.  So George Stephanopoulos asked,

19   "Your campaign this time around, if foreigners, if Russia, if

20   China, if someone else offers you information on opponents,

21   should they accept it or should they call the FBI?"

22        The President responds, I think you may be due --

23   excuse me.  "I think maybe you do both.  I think you might

24   want to listen, there's nothing wrong with listening.  If

25   somebody called from a country, Norway, 'we have information on

1    your opponent.'  Oh, I think I'd want to hear it."  So just

2    be -- you know, in fairness, the question was posited to him

3    broader than Norway.  Russia was specifically mentioned.  And

4    before he said Norway, he suggested that he would want to

5    listen.

6        So under those circumstances, why isn't Mr. Baine

7    correct that what we have with respect to the Waldman article

8    is a -- an interpretative characterization of this

9    conversation?

10        MR. HARDER:  Because, Your Honor, it's -- Mr. Waldman

11    states in factual terms.  He says, first, the President has

12    invited Russia and invited North Korea, and that's not what the

13    President did.  The President said maybe, might, and listen.

14    He didn't say I have asked Russia, I have asked North Korea.

15    Mr. Waldman is saying that.

16        THE COURT:  But Mr. Waldman is an opinion columnist.

17    Opinion columnists say all sorts of things.  He -- he is

18    listening to this interview and interpreting it as,

19    quote/unquote -- in hyper quotes -- an invitation to foreign

20    countries insofar as the President has said he would be open to

21    listening to such information.

22        Why isn't that the fairest characterization?  He's not

23    page 1, I'm reporting on the George Stephanopoulos interview

24    and exactly what the President said.

25        MR. HARDER:  Well, Your Honor, I think we're seeing

1    it differently.  The President did not invite.  The President

2    said that in a hypothetical situation if Norway were to say

3    that they have something, that he maybe, might listen.  That's

4    what he said.

5         And Mr. Waldman is taking those words and changing them

6    all around to say it was an invitation and now Russia and

7    North Korea will be giving aid -- he says will give to the

8    Trump campaign.  The question happens to be what sort of aid.

9    We don't know what sort of aid, but Russia and North Korea will

10   give aid to the Trump campaign.

11        THE COURT:  All right.  Well, Mr. Baine says it's

12   still not defamatory with respect to the campaign.  There is

13   nothing in this statement that indicates that the campaign was

14   the one that made the invitation, and I took Mr. Baine to be

15   saying insofar as something will follow from that invitation,

16   that is at least questionable as to whether or not that's a

17   defamatory statement with respect to the campaign.  What's your

18   response to that?

19        MR. HARDER:  It absolutely is of and concerning the

20   campaign because it says "the Trump campaign" right in the

21   sentence, and Mr. Trump is the candidate for the campaign.

22   They work together.  And so if the President -- I'm sorry.  If

23   the candidate, who was also the President, was making an

24   invitation, which he wasn't, and then from that invitation aid

25   is going to come from Russia and North Korea to the campaign,

1   the campaign absolutely is -- is implicated in the statement.

2   And -- and the defamation is that the campaign will be

3   receiving foreign aid in terms of the election.  It was

4   false --

5           THE COURT:  Wouldn't the Court -- wouldn't the Court

6   be reading out the words "who knows" and the question mark?

7   Mr. Baine says Justice Kavanaugh, when he was on the

8   D.C. Circuit, said a question cannot give rise to a defamation

9   claim in the way that you're making.

10      So this is -- just like "the Trump campaign" is in the

11  sentence, we have the words "who knows" and a question mark.

12  So why isn't that the end of it in terms of your claim?

13          MR. HARDER:  Well, Mr. Kavanaugh had a footnote, and

14  he said, "To be sure, as Judge Sack notes and as case law bears

15  out, questions that contain embedded factual assertions may

16  sometimes form the basis for a successful defamation claim."

17  That's footnote 7, and it cites to Robert Sack, Sack on

18  Defamation, a treatise.  And there are many instances where

19  questions which have factual statements embedded in them are

20  held to be defamatory.  This is such a statement because it's a

21  statement that's factual and it's false and it's harmful.

22          THE COURT:  And you say it's provable even though

23  it's predictive?

24          MR. HARDER:  It's -- we can easily prove it now

25  because the campaign's over and Russia and North Korea never

1     gave any aid.  That's very easy to prove.

2            THE COURT:  Now.  But, I mean, at the time the

3     statement was made, it was future facing, predictive,

4     speculative.  It was not something that at the time it was made

5     could be established to have been false.

6        And so let me pivot then to actual malice.  Wouldn't you

7     have to have actual malice in terms of sustaining your claim,

8     and how do you do that in this situation?

9            MR. HARDER:  Well, Your Honor, Mr. Waldman doesn't

10    say that Russia and/or North Korea might give aid.  He says

11    they will give aid because of the invitation that was made.

12    It's a very specific factual statement that something is going

13    to happen because of what has just happened.  The --

14           THE COURT:  Whether or not it's about what just

15    happened, what I guess I'm trying to understand is that actual

16    malice is -- at least as far as I perceive it or understand

17    it -- is knowing a false statement or statement with reckless

18    disregard for the truth.  And to the extent that we're talking

19    about a predictive, speculative thing, this thing -- even if he

20    says will happen in the future, how can you allege that he knew

21    that that thing would not happen in the future such that the

22    statement was false at the time that he made it?  The

23    predictive nature of this makes it hard for me to see how you

24    can establish actual malice.

25           MR. HARDER:  Our actual malice claim is based upon

1    the fact that he says that North Korea will give aid to the

2    Trump campaign, and there was absolutely no basis whatsoever

3    for him to make that statement.  It was -- it was a knowingly

4    reckless statement to make because he was basing it on an -- a

5    noninvitation that he calls an invitation.  It's --

6         THE COURT:  All right.  Is there anything else in

7    the -- in the complaint with respect to either article that you

8    would like to highlight in terms of actual malice?

9         The cases that I have seen about this where they're

10   talking about sufficient allegations of actual malice at the

11   complaint stage, highlight things like other information known

12   to the individual that would indicate that if that person did

13   know this other information, when he was making the statement

14   that is at issue, he likely knew or it's plausible that he knew

15   that the statement was false.  Is there something else that you

16   say in the complaint about the knowledge of Mr. Sargent or

17   Mr. Waldman other than look how false their statements are?

18        MR. HARDER:  Well, as to Sargent, that one's actually

19   very easy because his statement is based upon the Mueller

20   report; and his statement is Mueller concluded the Trump

21   campaign tried to conspire with the efforts regarding Russia.

22   Mueller -- his report did not conclude that.  He had that

23   infor- -- Mr. Sargent had that information in his hands at the

24   time he wrote this false statement.

25        THE COURT:  Right.  But -- but that's just look how

1   false the statement is.  I'm saying, is there something outside

2   the Mueller report that you allege that Sargent knew such that

3   when he characterized the Mueller report in this way he was

4   acting with actual malice because he truly knew the Mueller

5   report was not the way he characterized it?

6        MR. HARDER:  Your Honor, we don't need anything more

7   than the Mueller report.  The Mueller report is the basis for

8   his statement, and he false -- he makes a false statement about

9   the Mueller report.  We don't --

10       THE COURT:  All right.

11       MR. HARDER:  -- need to go beyond that.  To answer

12  your question, we don't have anything more than the Mueller

13  report, but we don't need it.

14       THE COURT:  Okay.  Let me let you then pivot to

15  whatever else you wanted to respond to Mr. Baine about.

16       MR. HARDER:  Sure.  Thank you, Your Honor.

17       The fair report privilege, I mean, it absolutely does

18  not apply here.  The fair report privilege has to be a fair and

19  accurate description of the report, and this isn't.  When

20  Sargent says Mueller concluded that the campaign tried to

21  conspire with Russia, that's not fair or accurate.  It's also

22  not reasonable and it's also not supportable.  So all of the

23  arguments that Mr. Baine was making on those subjects

24  completely fall apart.

25       THE COURT:  But let me -- can I just ask you about

1    that, because this is -- I've been puzzling through.  I mean,

2    I'm not a judge in New York.  This is New York law.  So I'm

3    trying to understand what -- what is behind the fair report

4    privilege.  But it struck me in reviewing all of this that the

5    falsity of the statement is almost baked in; right?  That's why

6    you need a privilege.

7         It strikes me that it's -- it's coming across like

8    qualified immunity; that we have a statement that a reporter

9    made concerning an official report that, as it turned out, it's

10   not a true statement.  But the question is, is that person

11   going to be held liable?  And New York courts -- New York

12   legislature, you know, in establishing this privilege,

13   essentially is saying what, you know, courts have said about

14   the qualified immunity doctrine; that we want to allow for

15   reporters to do this kind of investigative reporting; that we

16   understand that mistakes are sometimes made in characterizing

17   these legislative documents.

18        But to the extent that it is substantially accurate

19   that, you know, it is -- this notion of fair reporting is

20   liberally construed because we're not going to hold reporters

21   liable for having made a mistake in terms of their

22   characterization.

23        If I'm right about that in terms of how to think about

24   the fair reporting privilege, then your argument that this is

25   just, you know, a mischaracterization, he is not accurately

1     reporting the Mueller report, is -- is beside the point.  I

2     mean, we're -- the question is whether he can be held liable

3     for that.

4              MR. HARDER:  Thank you, Your Honor.

5          The concept of a fair report privilege is if a report

6     happens to be false -- let's say there's a report that says

7     John Smith killed somebody.  The press can report that

8     according to this report, this report says John Smith killed

9     somebody.  Let's say John Smith never actually killed anyone.

10    John Smith cannot sue the *New York Times* and say you defamed me

11    because you said I killed someone and I never did, because the

12    publication is relying upon the report.

13         But, Your Honor, if the report says John Smith didn't

14    kill somebody, the *New York Times* can't say, according to the

15    report, John Smith killed somebody, because that's not a fair

16    and accurate statement of the report.  It's the opposite.  And

17    what we have here is that Mr. Mueller concluded that there's

18    not sufficient evidence for conspiracy, and yet Mr. Sargent

19    said that the campaign tried to conspire, which is conspiracy.

20              (Indiscernible simultaneous cross-talk.)

21              THE COURT:  All right.  But try to conspire -- but --

22    but tried to conspire and -- and conspiracy or conspire are two

23    different things.  No?  I mean --

24              MR. HARDER:  I don't agree.

25              THE COURT:  Tell me why not.  Why aren't those two --

1    if I, you know, you know, call someone and say let's rob, you

2    know, a gas station and there's no answer and the person

3    doesn't -- and the action never occurs, I may have tried to rob

4    the gas station, but I didn't actually do it.  So how is it

5    that you can say those aren't two different things?

6              MR. HARDER:  Well, Your Honor, if you have an intent

7    to kill someone and you put a gun in your pocket and you get in

8    the car and you start driving and then you change your mind and

9    you go back home, you've committed a crime of intent to murder.

10   It's --

11             THE COURT:  That's not the same crime as murder.

12   What you're saying is the intent to -- to conspire or the

13   attempt to conspire is the same as actually conspiring.  And --

14   and Mueller just says in the report that the investigation did

15   not conclude that there had been conspiring -- that the

16   campaign had conspired.  If anything, it doesn't speak to

17   whether the campaign tried to conspire.  And that's what

18   Sargent is talking about.

19             MR. HARDER:  Well, Your Honor, I -- I'm not a

20   criminal prosecutor or defense lawyer.  So it's -- it's

21   difficult for me to speak with authority, but I believe that --

22   that conspiracy, if somebody makes an effort to conspire, let's

23   say with Russia, and says:  Russia, if you dump a whole bunch

24   of emails and you flip this election, then we're going to do

25   wonderful things for you after the election.  And let's say

1    Russia goes way and is never heard from again.  I believe that

2    that person committed a crime of conspiracy.

3            THE COURT:  I think -- I don't -- I actually

4    disagree; right?  Conspiracy requires the agreement.  That is

5    the essence of conspiracy.  What happens is conspiracy is

6    different than actually doing the crime.  If Russia agrees,

7    then you have a completed crime of conspiracy, even if the

8    30,000 emails never show up, if they never even actually act

9    upon it.  But -- but trying to conspire, soliciting an

10   agreement, if the agreement is never made, you don't have a

11   conspiracy under the law, I'm pretty sure.

12           MR. HARDER:  You said something very important,

13   Your Honor.  You said soliciting an agreement.  The Trump

14   campaign people never solicited an agreement.  They happened to

15   be in a meeting and they walked away.  There happened to be

16   some emails, but there was never an effort by the Trump

17   campaign to get an agreement from Russia.

18           THE COURT:  But what I'm asking you is to the extent

19   that there is a possibility of interpreting all of the

20   activities in the report that are discussed -- the litany of

21   events that Mr. Baine started to rattle off, the Trump Tower

22   meeting, the President saying openly, Russia, please do this,

23   give the 30,000 emails or whatever -- if there is at least some

24   reasonable belief that that qualified as attempting to get some

25   agreement from Russia, why don't you lose on the point of

1    defamation?

2         In other words, you have Mr. Sargent interpreting those

3    facts as trying to conspire.  And those facts are in the

4    report.  But maybe someone else, maybe you look at it

5    differently and you say that doesn't equal trying to conspire,

6    but --

7         MR. HARDER:  It's a good question.  It's a good

8    question, Your Honor.

9         THE COURT:  Yes.

10        MR. HARDER:  If Mr. Sargent had said here are seven

11   things -- the -- the -- the motion has seven bullet points

12   right up front that identify things in the Mueller report.  If

13   Mr. Sargent in his article said here are the seven things that

14   the Mueller report identifies, I, Mr. Sargent, believe that

15   these things constitute trying to conspire with; however,

16   Mr. Mueller saw things a different way, that would be protected

17   speech, but that's not what we have here.

18        What we have is Mr. Sargent is speaking through the

19   mouth of Mr. Mueller and says Mueller concluded that the

20   Trump campaign tried to conspire.  That's not what Mr. Mueller

21   concluded.  He concluded there was no conspiracy.

22        THE COURT:  All right.  Well, let me ask you this.

23   Whether we're talking about trying to conspire or actual

24   conspiracy, Mr. Baine points to many cases that he says

25   insulate someone like Mr. Sargent precisely because he's

1    speaking to what Mueller said.  In other words, I -- I totally

2    understand your point.  It's something that's very interesting

3    and that I have to think about and that I started the whole

4    hearing with, which is:  Does it matter and how does it matter

5    that we have a statement that is referencing another work and

6    purporting to describe what the other work says?  You see that

7    as the damning aspect of this; that what makes it false, from

8    your perspective, it is purporting to describe what Mueller

9    said in a way that you say is not so.

10          Mr. Baine says because it's purporting to describe what

11   Mueller says, we have courts that say that is protected because

12   it's an interpretation.  Off the top, regardless of what it

13   really says, the point is he's seeking to interpret another

14   work.  He's linked the other work.  The basis is there.  So

15   he's off the hook on that ground.  What's your response to

16   that?

17          MR. HARDER:  Your Honor, the interpretation has to be

18   reasonable.  It has to be supportable, fair, and accurate, and

19   it's none of those things because Mueller didn't conclude that

20   the campaign tried to conspire.  That's why.  It's actually

21   pretty simple.

22          THE COURT:  So you're saying that if the

23   interpretation diverges from what the work it is trying to

24   interpret actually says, then there is no protection.  It's a

25   verifiable fact that is refuted by the work itself.

1          MR. HARDER:  What I'm saying, Your Honor, is if

2     somebody is going to interpret a report, it has to be an

3     interpretation that is accurate, fair, supportable, and

4     reasonable, as Mr. Baine said and as the law says.  But what we

5     have here is a report that doesn't say what Mr. Sargent says it

6     says.

7          Let's say -- here's a hypothetical.  Let's say there's a

8     criminal report that says John Smith tried to commit murder,

9     and then -- then he links to the report, and then the report

10    says John Smith never tried to commit murder.  That's not --

11    that's not supportable.  It's not reasonable.

12          THE COURT:  But you do understand that there is

13    a step removed in your hypothetical to what we have here.

14    And this goes back to what actually Mueller said, which I

15    read several times in -- out of the executive summary, in

16    talking with Mr. Baine, which speaks to conspiracy but not

17    attempted conspiracy, not trying to conspire.  So if I disagree

18    with you that those are one in the same, don't you lose on this

19    point?

20          MR. HARDER:  I don't think so, Your Honor.  I don't

21    think that it's fair or reasonable for Mr. Sargent to say that

22    the campaign tried to conspire when the campaign never tried to

23    conspire.  The campaign may have been in a meeting to hear what

24    people had to say, but he never tried to conspire.

25          THE COURT:  But, Mr. Harder, you're moving -- you're

1    moving to the actual facts.  We have to stay in one world or

2    the other.

3         In other words, we were talking about what Mueller said

4    he said.  In other words, Mueller says the investigation did

5    not establish that members of the Trump campaign conspired or

6    coordinated with the Russia government.  Mr. Sargent does not

7    say the exact opposite of that.  He does not say the

8    Mueller campaign [sic] did conclude that the Trump campaign

9    conspired or coordinated.  Mr. Sargent says the Mueller

10   campaign -- excuse me -- the Mueller report -- let me find the

11   exact language here -- concluded that Trump and/or his campaign

12   tried to conspire with.

13        MR. HARDER:  Yes, Your Honor.  I -- I -- I believe

14   very strongly that that is a statement that is not supported by

15   the Mueller report.  It is -- if you don't want to say it's the

16   opposite, it's inconsistent with the Mueller report's

17   conclusions.  So to say that Mr. Mueller made the conclusion

18   that the -- Your Honor, here's -- if the Mueller report said,

19   somewhere in there, the Trump campaign tried to conspire but

20   there wasn't sufficient evidence to charge them with the crime

21   of conspiracy, the defense would be putting that in their brief

22   and showing you, but it doesn't exist in there.  So Mr. Sargent

23   went way out on a limb by saying that the Mueller report

24   concluded that the campaign tried to conspire.

25        THE COURT:  And let me -- so one more thing on this,

1     and then we'll see if you have anything else.

2          What do you say about The Washington Post's point that

3     even characterizing it in this way, Mr. Sargent includes a live

4     link to the report?  So he's not hiding it.  He's not

5     purporting to be the only person in the world who's ever seen

6     the report and is telling everybody about it.  Here it is.

7     Everyone in the world can decide whether or not what he is

8     saying is consistent with the report or not.

9          Why doesn't that undermine either the fact versus

10    opinion point or element or the actual malice?

11          MR. HARDER:  Because, Your Honor, the statement by

12    Sargent was false.  You can't make a false factual statement

13    and then link a report and expect everyone to read the report

14    and conclude that the statement was false and that the

15    statement needs to be disbelieved.  It -- it doesn't get you

16    out of defamation.

17          Imagine if somebody wanted to say, John Smith is a

18    murderer, here's a link, and somebody --

19          THE COURT:  But -- but the actual analogy is the

20    police report says John Smith is a murderer, hyperlink to the

21    police report.  And when we go to the police report, it's not

22    in there.

23          MR. HARDER:  Can you imagine how harmful that would

24    be to people if you could say that they committed crimes,

25    here's the report, and the report says they didn't commit any

```
1    crimes at all?

2              THE COURT:  But I didn't say they committed crimes.

3    I said the police report said they committed crimes and I offer

4    you the police report.

5              MR. HARDER:  My --

6              THE COURT:  I'm still struggling with why that's

7    defamation, but go ahead.

8              MR. HARDER:  I'm not -- I'm not understanding the

9    hypothetical.  If the hypothetical is John Smith committed the

10   following crime, here's the report, and you look at the report

11   and it's consistent with that statement, that's protected free

12   speech.  If the statement is John Smith committed the following

13   crime, here's the police report, and some people go to the

14   report and some people don't and the report says there were no

15   crimes committed, that's a defamation.  That's --

16             THE COURT REPORTER:  Judge, you're muted.  Judge,

17   you're on mute.

18        Can you guys hear her?

19             MR. HARDER:  I do.

20             THE COURT:  Yes.

21             THE COURT REPORTER:  Oh.  Okay.  So, Judge, I -- I

22   did not get what you were saying.  I'm sorry.

23             THE COURT:  Can you hear me now, Nancy?

24             THE COURT REPORTER:  Yes.

25             THE COURT:  I apologize.
```

1          What I was saying is, what if the hypothetical is,

2     quote, the police report indicates that John Smith is a

3     murderer, end quote, hyperlink the police report, isn't that

4     different than a person saying John Smith is a murderer and

5     hyperlinking the police report?

6          MR. HARDER:  Well, it's -- I'm confused by the

7     hypothetical, because here it says Mueller concluded.  And so

8     it's talking about the conclusion.  So if in your hypothetical

9     you say the police report concluded that so-and-so committed

10    the following crime, here's the report, the report has to

11    support what that statement is in order for it to be protected

12    free speech.  If the report is completely different from that

13    statement and that person, John Smith, according to the report

14    did not commit the crime, that's defamation.

15          THE COURT:  Okay.

16          MR. HARDER:  Otherwise, Your Honor --

17          THE COURT:  Yes.

18          MR. HARDER:  -- defamation law wouldn't exist.  All

19    you have to do is defame somebody and say look at the report.

20    And as long as the report is -- says anything at all, has words

21    on the pages, doesn't matter what those words are, it's

22    protected, there would be no defamation law.

23          THE COURT:  Well, no.  I mean, you'd still have

24    reasonable, supportable.  You'd still have a situation in which

25    the report says exactly the opposite, which I think we have at

1    least debated about whether or not Mr. Sargent's comment is the

2    opposite of what is said in the Mueller report.

3              MR. HARDER:  Your Honor, you and I can differ about

4    whether it's the diametric opposite, but I think that,

5    hopefully, we can agree that the statement by Mr. Sargent and

6    the report, the report does not -- is not reasonable or

7    supportable.  Well, I don't know.  Maybe we -- we don't agree

8    on that.  But you don't have to have a scenario where the

9    report is the diametric opposite to have defamation.  All you

10   need is where the report does not support the statement.

11        So if the statement is Mueller concluded the Trump

12   campaign tried to conspire with Russia and you look at the

13   report and it doesn't say that; it says the words that you

14   actually read from the beginning of that section, which is

15   there was no evidence to conclude this.  That's, by

16   definition, lack of support by the report of the statement by

17   the writer.

18             THE COURT:  All right.  I think I understand your

19   argument in that regard.  Is there something else you wanted to

20   say or let me let Mr. Baine come back?

21             MR. HARDER:  Let me just check my notes.

22        Well, one thing that Mr. Baine said was that the Mueller

23   report is a lengthy document that bristles with ambiguity.  I

24   think Your Honor addressed that, but I don't think it bristles

25   with ambiguity at all.  It says that certain things allegedly

1      occurred but that that was not conspiracy.  I think that was

2      quite clear.  And so for Mr. Sargent to say that the campaign,

3      according to the report, tried to conspire, it's -- it's --

4      it's just -- it's just not a reasonable --

5              THE COURT:  Can I ask you a question?  Would your --

6      would your position be the same if it was actually Mr. Sargent

7      who was making the conclusion about conspiracy but not the

8      Mueller report?  So the Mueller report has a listing of all of

9      the individual events, the Trump Tower meeting, et cetera,

10     et cetera, et cetera, and it doesn't say anything in my

11     hypothetical about conspiracy one way or the other.  It's just

12     investigation.  Here are all of these things.

13          If Mr. Sargent says exactly what he said, the Mueller

14     report concluded, but that statement about conclusion is based

15     on Mr. Sargent's own interpretation of the listing of events in

16     the Mueller report, would he have to say all that in order to

17     satisfy you or would you still say it's still -- it's -- it's

18     defamatory if he's basing it on the listing of events in the

19     Mueller report only?

20              MR. HARDER:  Yes.  Your Honor, Mr. Sargent would need

21     to make clear to the reader that he is going beyond the report

22     at this point and making his own interpretation and saying my

23     interpretation of the report based on the fact that it says

24     this and this and this, my interpretation is the following, but

25     Mr. Mueller did not come to that conclusion.  He came to a

1    different conclusion.  That would show the reader that, yes,

2    there is a difference of opinion between Mr. Sargent and

3    Mr. Mueller.

4         And the *Partington* case from the Ninth Circuit, 1995,

5    which we've cited to, actually has a good quote on it.  It

6    says, quote, when an author outlines the facts available to

7    him, thus making it clear that the challenged statements

8    represent his own interpretation of those facts and leaving the

9    reader free to draw his own conclusions, those statements are

10   generally protected by the First Amendment, close quote.  And I

11   agree with that.  But that's not what we have here.

12        THE COURT:  And so in your view -- and this gets back

13   to the hyperlinking -- Mr. Sargent would have to list in his

14   own article the various events and say in my -- you know,

15   quote, in my interpretation, the Mueller report leads to the

16   conclusion that, but it wouldn't be enough for him to say what

17   he said here and hyperlink the report that has all of the

18   events listed in it?

19        MR. HARDER:  If Mr. Sargent was making it clear that

20   this was his opinion and he says based on these facts, my

21   conclusion, me, Mr. Sargent, is that there was an effort to

22   conspire, that's protected.  But for him to say Mr. Mueller

23   concluded there -- that the campaign tried to conspire, that's

24   not -- he's not stating his opinion.

25        THE COURT:  Can -- can -- so what confuses me a

1     little bit about your point, which is well taken -- I -- I

2     think I understand what you're saying.  Why then are you giving

3     up on "eagerly encouraged" and "happily profited"?  I mean,

4     it's all in the same sentence.  "Mueller also concluded that

5     Trump and/or his campaign eagerly encouraged, tried to conspire

6     with, and happily profited off . . . ."  All of those are

7     purported -- purportedly Mueller's conclusions.  So I'm

8     confused as to why the campaign only cares "about tried to

9     conspire with."

10          MR. HARDER:  Well, Your Honor, based upon those seven

11    facts -- they're in the Mueller report that he cites to -- I

12    think a -- a reasonable interpretation could be that certain

13    people on the campaign encouraged, and certain people of the

14    campaign were happy, and certain people of the campaign were --

15    or the campaign itself may have, quote/unquote, profited off

16    of; meaning, somehow the Trump campaign was -- was advantaged

17    to some extent by what Russia did.

18          Those, I think, are probably -- may be disputable, but

19    fair interpretations.  But it's not a fair interpretation to

20    say that the campaign members tried to conspire with Russia.  I

21    don't believe that that's a fair interpretation, and it's

22    certainly --

23          THE COURT:  Even though -- even though it's arguably

24    based on the same kinds of things that you say supports

25    Mr. Sargent saying "eagerly encouraged" and "happily profited"?

1              I mean, all three of those Mr. Sargent and

2     The Washington Post would arguably say, let me point you to

3     places in the Mueller report that would support that

4     representation.  And two of them you say, well, maybe it's fair

5     some people were happy, some people encouraged, but we don't

6     think that the Trump Tower meeting, you know, shows trying to

7     conspire.  They all seem of the same nature, and yet you're

8     giving up on the other two in a -- in a very confusing way to

9     me.

10             Either -- either your point is in all cases Mr. Sargent

11    is representing what Mueller concluded in a way that either --

12    that -- that Mueller never says, I conclude these things.

13    Mueller never said they tried to conspire with, but Mueller

14    also never said eagerly encouraged or happily profited from.

15    So why aren't all of those?  Is it because those other two are

16    more clearly opinions, and, if so, isn't this the same?

17    They're all sandwiched in the same sentence.  How are we -- why

18    are we focusing in on this part?

19             MR. HARDER:  Well, Your Honor, conspiracy is a crime.

20    And so when Mr. Sargent says that the campaign members tried to

21    engage in a crime, that's very defamatory.  To say that they --

22    that they encouraged something, it's not as defamatory as to

23    say that Mueller concluded that the campaign members tried to

24    commit a crime.

25             THE COURT:  All right.  Well, let me ask you one

1       final thing.  The last thing I have has to do with the link to

2       the -- the Wittes article and whether or not that matters.  I

3       mean, here we have some other person who reached a

4       substantially similar conclusion.  First of all, do you concede

5       that; that the Wittes article to which this is linked

6       interprets the Mueller report in the same way?

7                MR. HARDER:  I think they're very similar.

8                THE COURT:  All right.  Somehow you didn't sue

9       Wittes.  Is his statement defamatory as well or what?

10               MR. HARDER:  I think his statement is defamatory.

11               THE COURT:  Okay.  Doesn't the fact that Mr. Sargent

12      links to the Wittes article undermine actual malice insofar as

13      rather than being an extra fact that indicates that he knew

14      what he was saying was false, it's the opposite.  He's saying,

15      here, someone else agrees with the way in which I'm reading

16      this report.  Doesn't that undermine actual malice?

17               MR. HARDER:  No, Your Honor.

18               THE COURT:  Why not?

19               MR. HARDER:  Because actual malice stems from the

20      fact that Mr. Sargent had the Mueller report in his hands and

21      intentionally misinterpreted it, recklessly misinterpreted it

22      by saying that the campaign tried to conspire with Russia when

23      the Mueller report did not conclude that.  You can't cite to

24      some third party who may come to a -- a -- you know, make a

25      similar defamatory statement and say, okay, I'm going to

1   protect myself by referencing some other defamation.

2        The Mueller report right there is, you know, sort of

3   best evidence, if you will, of whether the Mueller report did

4   or did not conclude something.  You can't just rely upon

5   somebody who may completely misunderstand the Mueller report.

6        And, Your Honor, can you imagine if -- if defamation law

7   wouldn't exist at all; if somebody could find somebody else who

8   committed a defamation and then say -- and then do the exact

9   same thing and say, oh, well, I was just following their

10  defamation, when you have the facts sitting in your hands,

11  which is the report itself, or the true facts or the true

12  evidence itself.

13        THE COURT:  All right.  I think I understand it.  Is

14  there anything else that you would like to add?

15        MR. HARDER:  Well, just one last thing, Your Honor,

16  which is that -- I mean, obviously all these issues that we're

17  talking about, they go beyond just the parties to this case.

18  They -- they deal with defamation law itself and whether a

19  person is going to be able to protect their reputation by an

20  individual or a publication who says something that's flat out

21  false and they know it.

22        And I just hope that -- I mean, obviously the

23  First Amendment is a very important thing, and it needs to be

24  protected, but there are limitations.  And defamation is one of

25  those limitations.  And if we're going to say that defamation

1    doesn't exist here when this is a clear defamation case, it

2    would just -- this will be a case that gets cited to for other

3    people who then want to protect their reputations.  And

4    defamation law shrank that much more because if -- if

5    The Washington Post is allowed to win based on the arguments

6    that they're making, they're -- they're trying to shrink the

7    defamation law and expand the First Amendment so that the

8    First Amendment will eventually inch by inch overwhelm

9    defamation so that a person can't protect themselves.  So I

10   would just --

11            THE COURT:  And let me -- can I just ask you in this

12   context when you're talking about something -- the underlying

13   subject was of enormous public interest and discussion, as you

14   know.  Given the context of the Mueller report and its

15   publication, the campaign and others involved with the

16   President undertook a number of efforts to characterize the

17   foreign connection aspect of this to describe what the Mueller

18   report said, I think, even prior to either of the articles that

19   you're talking about.  There was quite a bit of discussion of

20   what the report said, et cetera.

21            So is this really -- this case -- is this really about

22   the protection of reputation or the sullying of reputation

23   through these two opinion -- you know, quote labeled opinion

24   pieces, when there was so much talk about this and the campaign

25   was already in, you know, mode of characterizing the Mueller

 1    report, notwithstanding these articles?

 2              MR. HARDER:  It's a good question, Your Honor.

 3          If the campaign is making statements about the Mueller

 4    report and giving their opinion about the Mueller report and

 5    then Mr. Sargent comes along and wants to give his opinion

 6    about the Mueller report, that's totally fine as long as it's

 7    written as his opinion of the Mueller report.  But when he says

 8    Mueller concluded that the campaign tried to conspire with

 9    Russia and that's just factually false and not supported by the

10    Mueller report itself, he crosses the line.

11          If he had kept it to his opinion -- my opinion is based

12    on this, this, and this, I think they should have been charged,

13    but Mr. Mueller felt there wasn't sufficient evidence, that's

14    opinion.  That's protected by the First Amendment.  And

15    soldiers die on the battlefield for that.

16          But when you cross the line into defamation, suddenly

17    you're getting into a different world.  It's the world of

18    Richard Jewell and people who get defamed and the press who

19    say, well, it's protected anyway.  You have to let us -- you

20    have to give us space, and you have to let us cite to other

21    things and cite to reports.  Richard Jewell was a victim of

22    news organizations who flat out defamed him.  And they tried to

23    get away with it by citing to the First Amendment and saying a

24    lot of the same things that we're hearing now.

25          But at some point there's a line to be drawn and you

1    cross over.  And in this case, it's when Mr. Sargent said this

2    about the conclusion of Mr. Mueller and it was false.  And it's

3    also when Mr. Waldman said that there was an invitation to get

4    Russia and North Korea to give aid to the Trump campaign, and

5    that never happened.  So --

6            THE COURT:  All right.  Mr. Baine --

7            MR. HARDER:  It's a fine line, but it's an important

8    line, Your Honor.

9            THE COURT:  All right, Mr. Harder.  Thank you.

10           Mr. Baine.

11           MR. BAINE:  Yes, Your Honor, briefly.

12           We're not trying to shrink libel law here at all.  Libel

13   law tries very hard to come up with rules that make common

14   sense, and -- and the basic common-sense point here is the one

15   that Your Honor noted in the course of your questioning;

16   that -- that surely we're not going to hold someone liable if

17   they make a mistake of interpretation, especially a document

18   like the Mueller report.

19           Mr. Mueller and the Attorney General disagreed about how

20   to interpret and how to characterize Mr. Mueller's findings

21   when he tried to do it in a condensed or abbreviated form,

22   which is what columnists have to do.  Mr. Sargent didn't say:

23   Oh, I think there should have been a finding of a criminal

24   conspiracy.  He said two things.  He said, first, Mr. Mueller

25   did not find a legal conspiracy, and, second, he made a

1    rhetorical statement.  He said, well, I think -- that he

2    concluded that -- that the President and/or his campaign

3    eagerly encouraged, tried to conspire, happily profited.  These

4    are rhetorical phrases.  They're not -- they didn't purport to

5    be Mr. Mueller's exact words.  They were obviously each of the

6    three of them of the same variety; namely, his interpretative

7    rhetorical statement and characterization of the multiple

8    findings that we describe.

9          THE COURT:  So, Mr. -- Mr. Baine, I hear Mr. Harder

10   really homing in on Mr. Sargent's use of "concluded."  So

11   doesn't he have a point that to the extent that the article in

12   this sentence appears to be referencing the Mueller report and

13   making a statement about what Mueller concluded, that it is

14   transcending mere, you know, rhetoric?  So if it didn't say

15   Mueller also concluded, if it just said, you know, Trump and

16   his campaign eagerly encouraged, tried to conspire, or

17   whatever, and linked to the Mueller report, then one might

18   reasonably say, oh, Mr. Sargent wasn't really reciting what the

19   Mueller report said, he was drawing from the Mueller report

20   to -- to state his own conclusion that that's what the Mueller

21   report meant when it listed all of those events.

22         But this says, he -- "Mueller concluded that," and it

23   goes on in the next sentence to say, "Mueller did not find."

24   So those two sentences both now seem they are both addressed to

25   what the report said.

1           MR. BAINE:  Yes, Your Honor.

2           And what I would say to that is that -- is that the

3      statement that -- that Mueller made these conclusions when the

4      conclusions are themselves stated in the way that they're

5      stated, eagerly encouraging, happily profiting, et cetera,

6      those are obviously Mr. Sargent's words that in his mind

7      capture the essence of all of the conclusions and findings that

8      Mueller made.

9           Remember, Mueller said at the beginning, when I say

10     there's no conspiracy, I mean there's no agreement, but "That

11     requires more than the two parties taking actions that were

12     informed by or responsive to the other's actions or interests."

13     All of the findings -- and they are findings or conclusions

14     about what happened in those various events.  All of those

15     conclusions certainly amount to the parties taking actions

16     that were informed by and responsive to the other's.

17          At the very least, they -- they amount to trying to take

18     action that are responsive and coordinated in that sense, and

19     it's very clear, I think, in context that Mr. Sargent is making

20     a legal statement about the legal conclusion and a factual --

21     and an interpretative statement of the factual findings.

22     And --

23          THE COURT:  I see.  So when you -- when you're

24     looking at this paragraph, the sentence "Mueller also

25     concluded . . ." is really Mueller also found and the findings

1   are his -- as stated here are Sargent's interpretation of the

2   various findings of the report?

3           MR. BAINE:  Yes, Your Honor, which was exactly the

4   interpretation of *The Atlantic* columnist, that it wasn't for

5   lack of trying.

6           And, again, there are two points.  One is that -- is

7   that the first sentence there is a rhetorical characterization

8   of findings, and the second is that there's a big difference in

9   the world between trying to conspire in a lay sense and

10  actually committing the crime of conspiracy.  And Mueller

11  concluded that there was no actual crime of conspiracy.  He did

12  not conclude that there wasn't an effort at -- at a crime of --

13  as a legal agreement.  And he certainly didn't conclude -- did

14  not conclude -- that there wasn't an effort to act in

15  coordination.

16          I would say his findings very clearly establish that the

17  Russian -- that the Russian representatives and -- and

18  represented the Trump campaign and Mr. Trump himself were very

19  much acting in response to each other.  Mr. Trump is

20  encouraging Russia to release the stolen emails.  When they

21  release the emails, he's saying let's get a communication

22  strategy.  There will be more coming.  They are clearly trying

23  to act in harmony.  They're clearly responding to each other's

24  actions, and what they do is informed by.

25          And those are Mr. Mueller's words, "informed by" and

1    "responsive to."  And he says, when I say there's no agreement,

2    it's because it requires a lot more than that.  And then

3    Sargent says, I think fairly read, the report concludes that

4    that really occurred.  At the very least, there was -- there

5    was an attempt.

6         So I do think that in context and given the -- the

7    interpretative license that the D.C. Circuit says has to be

8    given in these kinds of situations, that this certainly

9    protects.  And I -- I should add that this is, in part, a

10   malice point, but if one reads the *Moldea* opinion at page 316,

11   the opinion says -- this is Judge Edwards, as I recall --

12   "Although Masson, Bose and Pape all concerned the evidence

13   necessary to establish 'actual malice,' those decisions are

14   rooted in the question of a plaintiff's ability to prove

15   falsity . . ."  And it goes on to say that when you're dealing

16   with interpreting other written work, there has to be

17   interpretative license under the First Amendment.

18        And if there was ever a case in which the

19   First Amendment surely grants interpretative license, it is for

20   a political columnist, a political blogger's attempt to capture

21   and interpret a report that is the most debated, characterized,

22   argued over report that I can remember in recent history, one

23   in which the author and the Attorney General themselves can't

24   agree on interpretation of what was concluded.

25             THE COURT:  But Mr. -- Mr. Harder says, with all due

1      respect, Mr. Sargent does not plainly indicate in this piece,

2      in this section of the piece, at least, that what he is doing

3      is interpreting the Mueller report.

4              MR. BAINE:  And a political commentator does not have

5      to punctuate his sentences with in my opinion, as I see it, it

6      is my judgment that.  Political bloggers write sentences like

7      this, that contain rhetorical language like this, all the time.

8              And, you know, *Ollman v. Evans* -- and the New York Court

9      of Appeals talked about what's an opinion and what's fact.

10     What are the factors they look to?  They look to, number one,

11     what's the context.  Well, the context here is something that

12     was labeled opinion at the top of the -- of the page, and then

13     it says opinion column.  So it's an opinion piece.  And then

14     courts look at the language itself.  Is the language literally

15     capable of being proven true or false?  Well, eagerly --

16     eagerly encouraged, happily profited, tried to conspire, this

17     is loose, figurative, rhetorical language, all consistent

18     with -- with the -- with the technique of political

19     commentators.

20             And it would be a severe restriction on public debate if

21     when a columnist, a commentator on television, anybody in

22     conversation tried to say what they think Mueller really was

23     finding -- if they had to preface it by saying, now, bear in

24     mind, this is my interpretation, this is my opinion.  Obviously

25     it's his opinion.  That's what he told you at the top of the

1     column when he said opinion by.  I -- I just think that these

2     kinds of --

3          I go back to the common sense principle, Your Honor.

4     How in the world could we really conclude that a political

5     columnist could be sued over his characterization of the

6     findings of the Mueller report when Mueller and the Attorney

7     General can't agree on those findings?  That can't be what the

8     law of libel means.  That can't be what the First Amendment

9     means.

10          Now, if I might just quickly turn to the Waldman column.

11          THE COURT:  Yes, please.

12          MR. BAINE:  Mr. Harder says that the statement who

13     knows what kind of aid will be provided is a factual statement,

14     and what he says is, well, the only question is what sort of

15     aid.  That is a completely unreasonable reading of this

16     statement.  This is a rhetorical question.  Who knows what's

17     going to happen now that Donald Trump, not -- not Trump for

18     President, Inc. -- Donald Trump, in an interview we're

19     hyperlinking to, has basically invited any country to provide

20     whatever assistance it wants.

21          THE COURT:  But Mr. Harder says that's not what he

22     did.  When you go to the ABC News article, Mr. Harder says

23     Donald Trump talks specifically about Norway.

24          MR. BAINE:  Well, he did.  But the question -- the

25     question was about Russia, China, or any other country.  And

1    his answer was, oh, I think I'd listen.  And then he gave a

2    hypothetical to try to turn it all into something that -- that

3    maybe it's a rhetorical device kind of, oh, let's talk about

4    Norway for a second.  But the question was about Russia, China,

5    or other foreign countries.  And he said, sure, I'd listen.

6         But, in any event, we're -- here we are interpreting

7    what the President meant.  Well, columnists are allowed to

8    interpret what the President meant in a widely broadcast

9    interview with George Stephanopoulos.  There must have been

10   hundreds of columns about that interview.  And anybody who

11   wants to see it can click on the link or find it themselves or

12   watch it on ABC News.  Everybody knew about that interview.

13   And Mr. Trump was certainly capable of saying, Oh, there goes

14   the press again mischaracterizing what I said.

15        That's how it works, Your Honor.  Libel law doesn't

16   exist to ask judges or juries to decide whether or not that was

17   a fair interpretation or characterization of Mr. Trump's

18   statement.  By golly, Mr. Trump --

19             THE COURT:  Let me ask you, isn't -- isn't --

20   speaking of juries, isn't at least the actual malice

21   question -- doesn't it raise a question of fact for the jury?

22             MR. BAINE:  Not in light of the holdings of *Time v.*

23   *Pape* and its reaffirmation in -- in *Bose* and -- and *Masson*.

24   And I would say that this is a far stronger case.  In *Time*

25   against -- *v. Pape*, what the Court said was a rational

1    interpretation of a -- of another -- of a lengthy government

2    report cannot be the basis of finding of malice.

3        When you asked Mr. Harder, what's your evidence of

4    malice, that was the only thing he cited.  It's the report.

5    That's all they have.

6        And here we have, quite frankly, a much more reasonable

7    interpretation of that report and *Time* magazine's mistaken

8    characterization of an allegation as a finding, and we have an

9    interpretation that's supported by another columnist to which

10   Mr. Waldman linked.  So the only evidence that the plaintiff is

11   offering in support of malice is something that cannot support

12   a finding of malice, and that's negated by another author who

13   reached the same conclusion.

14       THE COURT:  So if you reject his view that -- you

15   know, in a hypothetical world, let's say the complaint --

16   the -- the report at issue was absolutely unambiguous with

17   respect to its statement, the statement that, for example, the

18   Trump campaign did not conspire --

19       MR. BAINE:  If -- if --

20       THE COURT:  -- if Mr. Sargent says the opposite in

21   his article, you would have to have other evidence to establish

22   actual malice.  Why isn't it enough that we have, you know, the

23   report itself?  That's what Mr. Harder says; the report itself

24   is evidence that when you have mischaracterized it so

25   egregiously that you're acting with at least reckless disregard

1       for the truth or falsity of what you're saying.

2               MR. BAINE:  Well, mischaracterizing is what happened

3       in *Time v. Pape*, and the Court said that's not enough.

4               To make it clear, Your Honor, if Mr. Sargent had written

5       the Mueller report finds that there was a criminal conspiracy,

6       that would not have been a reasonable interpretation of the

7       Mueller report, because the Mueller report said the opposite.

8       But Mr. Sargent didn't say that.  He said the Mueller report

9       found there was no criminal conspiracy.  So that was completely

10      accurate.

11              What he then attempted to do was characterize the

12      findings of all of the acting and coordination, acting in

13      harmony toward a common end, that he characterized as trying to

14      conspire in a lay sense.  And when all you have is an argument

15      that, oh, that's not a reasonable interpretation, that's not

16      enough, it is enough if you flat out say the opposite.  It is

17      enough if Mr. Sargent said Mueller found a criminal conspiracy.

18      That would be enough to survive a motion to dismiss.

19              Then at summary judgment maybe the -- the author would

20      say, oh, you know what?  Actually, that page in the Mueller

21      report was out of my copy and so I missed that.  And -- and so

22      maybe that wouldn't be actual malice, but it would get you past

23      the -- the complaint stage if what was said was the exact

24      opposite, but this is where I -- I respectfully disagree with

25      Mr. Harder.

1          There's no way in the world you can say that this is a

2     statement of fact that's totally opposite to what Mr. Mueller

3     found when it acknowledges explicitly that Mr. Mueller found no

4     legal conspiracy and then went on to say, what political

5     bloggers do, to characterize in his own words, how he sees the

6     other findings that he's leading to.

7          And "tried to conspire" has to be interpreted in this --

8     in the context of the phrase before it and after it.  Eagerly

9     encouraging, happily profiting are obviously rhetorical lay

10    statements, and sandwiched between them is another lay

11    reference to trying to conspire.

12              THE COURT:  All right.  I think I --

13              MR. BAINE:  It has a lot of meanings, including the

14    one I mentioned a number of times, which is far from a legal

15    agreement.

16              THE COURT:  I think I understand.  If you want to say

17    anything more, I'll let Mr. Harder say something more, and then

18    I think we need to conclude.

19              MR. BAINE:  Thank you, Your Honor.  You've been very

20    patient.  I think I've made my point.

21              THE COURT:  Mr. Harder, do you have one final

22    statement?

23              MR. HARDER:  Thank you, Your Honor.  Just briefly.

24         Rule 12(b)(6) says that the Court accepts as true the

25    factual allegations and gives the plaintiff reasonable

1    inferences and the benefit of the doubt.  And I believe that

2    we've laid out an absolutely supportable defamation claim as to

3    both of these articles.

4        Mr. Baine has said a whole lot of things that are

5    outside of the four corners of the complaint, outside of

6    the four corners of the article, talking about the

7    Attorney General and whether he has one interpretation of the

8    Mueller report and somebody else who's not mentioned here has

9    another interpretation of the Mueller report.  And that the

10   writer, Mr. Sargent, apparently is -- is using the word

11   "conspire" in a lay sense and not a criminal definition sense.

12   None of that's in evidence and the Court's required,

13   according to the case law, to -- to give us the benefit of the

14   doubt when it comes to factual allegations and to accept them

15   as true.

16       THE COURT:  Can I ask you -- I'm sorry to interrupt.

17       Can I ask you about the Georgia case.  Are you familiar

18   with this *Donald Trump for President, Inc. v. CNN Broadcasting*

19   case that just came out?

20       MR. HARDER:  Yes.  I'm counsel on that case.

21       THE COURT:  Oh, great.  So you're more familiar than

22   most of us, certainly than me.

23       It looks as though the court in that case dismissed the

24   complaint.  So is the court wrong, or is that case materially

25   different than what's happening here?

1          MR. HARDER:  Well, obviously, Your Honor, I can't --

2     I can't make a statement about that case to this Court because

3     that case is pending and could be interpreted in some fashion

4     against my client in -- in that other case.  But these are

5     different factual situations.  These are different factual

6     allegations.  We didn't have a Mueller report.  That -- that

7     entire dismissal is based upon actual malice and based -- and

8     we didn't have the Mueller report or other facts that we have

9     here.

10         This is actually factually a much stronger case because

11    of the statement that Mueller concluded something that Mueller

12    didn't conclude based upon something that was in Mr. Sargent's

13    hands at the time that he wrote that.  That's a very clear

14    actual malice situation.  And also Mr. Waldman making

15    statements about -- misinterpreting what the President said to

16    Mr. Stephanopoulos and saying based upon that there is going to

17    be aid given to the Trump campaign.  Completely different

18    factual scenario than the CNN case.

19         THE COURT:  All right.  Thank you to both of you.

20         MR. HARDER:  Oh, Your Honor, I will say one thing.

21    I'm sorry to interrupt you.

22         But that -- that *CNN* case did say that notwithstanding

23    the fact that that other CNN article was an opinion article

24    and stated above, that the statements that were made that

25    were at issue were actually statements of fact and not

1    statements of opinion.  So that's something that's analogous to

2    this case.

3              THE COURT:  Understood.  I am going to take this

4    motion under advisement.  I do understand your arguments, and I

5    appreciate your time this afternoon.  Thank you very much.

6              (The proceedings concluded at 4:29 p.m.)

1          <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 16th day of December, 2020.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25